

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 1 6 2004

LUTHER D. THOMAS, Clerk
By JWK
Deputy Clerk

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ESTATE OF GLADNEY E. HEAZEL, )
DECEASED, ROBERT J. HEAZEL, )
EXECUTOR, )
           )
    Plaintiff, )
           )    Civil Action No.
v. )    1:02-CV-2665-RLV
           )
UNITED STATES OF AMERICA by and )
through the COMMISSIONER OF )
INTERNAL REVENUE SERVICE, )
           )
    Defendant. )

---

## MOTION *IN LIMINE* BY PLAINTIFF TO
## EXCLUDE TESTIMONY OF FRANCIS X. BURNS

---

PLAINTIFF HEREBY MOVES to exclude the testimony and, if

offered, the report of Defendant's expert, Francis X. Burns, on the grounds

that they violate each of the conjunctive elements F.R. Evid. 702:

    (i)    "the testimony is [not] based on sufficient facts or data" in that
        it appears Mr. Burns never looked at the subject Stock
        Certificate, considered either one of the two sets of restrictions
        stated on the face of the Stock Certificate, learned of the $67
        million preferred stock subordination of the subject stock, or
        interviewed anyone on either side of any of the non-cash
        transactions upon which he ultimately relies;

*51*

(ii)   "the testimony is [not] the product of reliable principles and methods" in that he disregards altogether the two business appraisal methods that should be given the greatest weight, misapplies a variation on the market method, relies primarily upon hindsight events, assumes that non-cash stock swap and incentive option transactions are the equivalent of cash transactions, and assumes that no discount applies; and

(iii)  "the witness has [not] applied the principles and methods reliably to the facts of the case" for many of the same reasons.

IN SUPPORT THEREOF, Plaintiff shows unto the Court:

1.   Defendant's expert, Francis X. Burns, has tendered a report and been deposed.

2.   Based on the contents of his report and deposition, his expert opinion fails to satisfy the three conjunctive elements required by F.R.EVID. 702 and any of the four tests for reliability set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

3.   Plaintiff invites the attention of the Court to the accompanying Memorandum in Support and to the following exhibits attached thereto:

a.   Subject Stock Certificate

b.   Defendant's Response to Plaintiff's Request for Admissions

c.   Affidavit and Report by James R. Hitchner

d.   Report by Francis X. Burns.

- 2 -

4.      Plaintiff respectfully requests that the Court protect the record by barring that testimony.

5.      Defendant objects to the granting of this Motion.

WHEREFORE, it is prayed that Mr. Burns be precluded in whole and part from offering any expert opinions in this matter.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & MARTIN

By: _____
David D. Aughtry
Georgia Bar No. 028010

By: _____
Samuel R. Linsky
Georgia Bar No. 453279

ATTORNEYS FOR PLAINTIFF

191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303-1747
Telephone: (404) 659-1410
162330.1
002034-000000:3/16/2004

- 3 -

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing **MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF FRANCIS X. BURNS** has been made on counsel for Defendant by Federal Express addressed to:

Frank M. Dale Jr.
Michael N. Wilcove
Trial Attorney, Civil Trial Section
Southern Region
U.S. Department of Justice
P.O. Box 14198
Washington, D.C.  20044

This 16th day of March, 2004.

David D. Aughtry

# ORIGINAL

FILED IN CLERK'S OFFICE
U D C Atlanta

MAR 1 6 2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ESTATE OF GLADNEY E. HEAZEL, DECEASED, ROBERT J. HEAZEL, EXECUTOR, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:02-CV-2665-RLV |
| UNITED STATES OF AMERICA by and through the COMMISSIONER OF INTERNAL REVENUE SERVICE, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF FRANCIS X. BURNS

Because of the great power of expert testimony, the Supreme Court recognized in *Daubert v. Merrell Dow Pharmaceticals, Inc.*, 509 U.S. 579, 589 (1993) that Federal District Court Judges hold this right and obligation as gatekeepers:

> [U]nder the Rules [F.R. EVID. 702 and 703] the trial judge must ensure that any and all scientific [and other expert] testimony or evidence admitted is not only relevant, but reliable.

51

To that end, F.R. EVID. 702 that an expert witness opinion may be admitted only if three criteria are satisfied:

"(1)   the testimony must be based upon sufficient facts or data,

(2)   the testimony must be the product of reliable principles and methods, *and*

(3)   the witness must apply the principles and methods reliably to the facts of the case."

In the Eleventh Circuit, expert testimony is admissible only if his methodology is reliable, under the inquiry set forth in *Daubert* 509 at 593-5; *Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir. 1999); *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).

## **BACKGROUND**

Gladney E. Heazel was a real person. She was born in Atlanta, lettered in five sports in high school, played on the state girls basketball championship team, attended the University of Georgia, went into the catalogue business, and died tragically at age 46 on February 16, 1998. A local high school gymnasium is now named for Gladney. She deserves a valuation of what she owned that is reliable.

At her death, the Internal Revenue Code imposed a federal estate tax on the "fair market value" of what she owned. That tax is imposed upon the fair market value of what citizens own on the assumption that they can actually sell the

- 2 -

property for that "fair market value" and pay up to 55% of the proceeds to the IRS. That practicality compelled the Tax Court to recognize the importance of determining the actual value – not some theoretical intrinsic value – of what we own in *Estate of Katz v. Commissioner,* T.C. Memo 1968-171 (1968):

> If [the IRS'] theory were correct, an estate might well find itself in the position where the taxing authorities have placed a value on its stock leading to an estate tax it could not pay by selling all the stock on the market... We do not think Congress ever intended such a result.

Consequently, the Court must be especially vigilant in resisting theories and inapplicable premises that artificially inflate the putative value. Judge Frank of the Second Circuit defined fair market value best in his characteristically pithy style: "What you could have got for it *in money* if you had sold it." *Andrews v. Commissioner,* 135 F.2d 314, 317 (2d Cir. 1943).

This problem places Gladney's Estate *in extremis.* At her death, Gladney owned relatively little other than a 1.7 percent interest in a closely-held catalogue company. Depending upon the valuation of that stock, her estate would not have been taxable. At no point during her life was Gladney ever offered any money for her stock. In fact, a review of her Stock Certificate confirms that, as a practical matter, she was barred from selling it. As her executor, her brother Robert hired a former IRS Estate and Gift Tax Attorney to prepare the U.S. Estate Tax Return.

- 3 -

On his recommendation, the stock was listed at $6 per share without an appraisal of any sort.  Her attorney calculated her taxes and concluded that she should pay the IRS $840,000 in federal estate taxes and pay the Georgia Department of Revenue $150,000 in inheritance taxes.  Because there was no market for Gladney's stock, her Estate was forced to borrow nearly $1 million needed to pay taxes from her other brother, Mike, and his family.  Even now, six years after her death and by all accounts with the stock greatly improved, the most anyone has ever offered for Gladney's stock is $3 per share.  As a result, the Estate has been unable to pay the principal and interest on the two loans – a point that impacts another issue in this case.

## DISCUSSION

The report and anticipated testimony by Mr. Burns violate each of the three conjunctive requirements in F.R. EVID. 702, as well as each of the four standards stated in *Daubert*.

## A. THE BURNS REPORT AND TESTIMONY ARE NOT BASED ON "SUFFICIENT FACTS OR DATA" TO BE RELIABLE.

The Burns Report effectively values the wrong property interest by overlooking the most critical features of the 1.7 percent interest Gladney owned in The International Cornerstone Group, Inc. ("International Cornerstone") on the day that she died:

- 4 -

1.      Consistent with his reliance upon hindsight throughout his Report, Mr. Burns refers to the company by the wrong name.  He undermines his own reliability by defining the company as Cornerstone Brands, Inc.  Burns Rep., p. 1. He now admits that name did not exist until well after Gladney's death.  Burns. Dep., Vol. 1, p. 149, Lines 14-16.  This omission is insightful.

2.      Mr. Burns equates Gladney's stock with publicly traded "comparable" stock that is not subordinated to preferred stock.

3.      Gladney owned common stock that was subordinated to three classes of preferred stock – preferred stock with the power to force $67 million in liquidation and dividend preferences before the owner of Gladney's stock would receive a penny.  D. Resp. to Pl. Req. for Adm. ¶¶ 51, 53, 55.

4.      NOWHERE IN HIS REPORT DOES MR. BURNS MENTION THE EXISTENCE OF THAT PREFERRED STOCK OR ITS $67 MILLION IN PREFERRED STOCK PREFERENCES.  Burns. Dep. Vol. 1, p. 54, Lines 8-11.

5.      Defendant admits the significance of that omission:

> 22.     The common stock Gladney held at her death did not possess cumulative dividend rights.
>
> Response: Admits.
>
> 23.     The common stock Gladney held at her death did not possess liquidation preferences over other classes of Cornerstone shares.

Response: Admits.

24.    Other classes of Cornerstone stock did possess cumulative dividend rights and liquidation preferences.

Response: Admits.

26.    Gladney's stock was subordinate to other classes of Cornerstone shares, in regards to both cumulative dividend rights and liquidation preferences.

Response: Admits

27.    That fact was relevant to the fair market value of Gladney's stock on February 16, 1998.

Response: The United States objects to this request, as it is too ambiguous to permit admission or denial. To the extent the words "That fact" refers to the entire statement contained in Request No. 26, the United States admits.

29.    Treasury Regulation §20.2031-1(b) contemplates that an arm's length, willing buyer would have accounted for the subordinate position of Gladney's stock in terms of cumulative dividends rights and liquidation preferences - together with all other relevant facts - in determining the price he or she would pay for that stock on the date of Gladney's death.

Response: Admits.

- 6 -

6.    Unlike unrestricted publicly traded common stock, the face of Gladney's Stock Certificate also disclosed two sets of restrictions.   That Stock Certificate is the most important document in this case: it is attached as Exhibit A.

7.    It appears that Mr. Burns may have NEVER LOOKED AT THE STOCK CERTIFICATE THAT IS THE OBJECT OF THIS CASE.   The Stock Certificate states the first restriction as follows:

> "The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be sold or transferred in the absence of an effective Registration Statement under the Act or an exemption from registration thereunder."

8.    The parties largely agree as to the significance of this restriction:

> 80.   Gladney did not have the power to cause Cornerstone to file a registration statement.

> Response: Admits.

> 83.   The requirement that Cornerstone (as the issuer) file a registration statement in order for Gladney to sell her shares restricted the marketability of Gladney's shares to third party, willing buyers.

> Response: Admits.

> 85.   In the absence of a registration statement filed by Cornerstone, Gladney could only sell her Cornerstone shares under an available exemption from registration under the Securities laws.

> Response: Admits.

- 7 -

86.   The requirement that Gladney sell her restricted Cornerstone shares through an exempt offering restricted the marketability of her shares to third party, willing buyers.

Response:  Admits.

87.   Gladney's Cornerstone shares were "restricted securities" as defined in Rule 144(a)(3) of the Securities Act.

Response:  Admits.

88.   One year did not elapse between the date of Gladney's acquisition of her restricted Cornerstone shares from the issuer (Cornerstone), and her date of death.

Response:  Admits.

89.   At her date of death, Gladney did not meet the holding period requirement for restricted securities contained in Rule 144(d) of the Securities Act.

Response:  Admits.

90.   On February 16, 1998, current information regarding Cornerstone sufficient to satisfy the requirements of Rule 144(c) of the Securities Act was not publicly available.

Response:  Admits.

93.   At her date of death, Gladney could not rely on Rule 144 of the Securities Act to resell her Cornerstone Shares.

<u>Response</u>: Admits.

94.    Gladney's inability to rely on Rule 144 to resell her Cornerstone shares in an exempt offering restricted the marketability of her shares to third party, willing buyers.

<u>Response</u>: Admits.

95.    At her date of death, Gladney could not rely on § (4)(1) of the Securities Act.

<u>Response</u>: Admits.

96.    Gladney's inability to rely on § (4)(1) to resell her Cornerstone shares in an exempt offering restricted the marketability of her shares to third party, willing buyers.

<u>Response</u>: Admits.

9.    NOWHERE IN HIS REPORT DOES MR. BURNS MENTION THE EXISTENCE OF THIS SECURITIES RESTRICTION REFLECTED OF THE FACE OF GLADNEY'S STOCK CERTIFICATE.  Burns Dep. Vol. 1, p. 160, Lines 14-17.

10.    The face of Gladney's Stock Certificate also reflects this restriction:

"The securities represented by this certificate are also subject to a certain Stockholders Agreement dated as of September 13, 1995, among the Company and certain of the Company's Stockholders, as amended and modified from time to time."

11.    Again, the parties largely agree as to much of its significance.

102. The Stockholders Agreement required that any sale of Gladney's Shares be made **only for cash or installments of cash**, *and* **prohibited** Gladney's Shares **from being pledged** to secure indebtedness. (Emphasis added).

Response: Admits.

*See also,* D. Resp. to Pl. Req. Adm. ¶¶ 103, 104, 107, and 112.

12. NOWHERE IN HIS REPORT DOES MR. BURNS MENTION THE EXISTENCE OF THIS RESTRICTION ON THE FACE OF THE SUBJECT STOCK CERTIFICATE OR THE EXISTENCE OF THE UNDERLYING STOCKHOLDERS AGREEMENT.

13. Mr. Burns now admits that the Stockholders Agreement prohibited the owner of Gladney's stock from selling it for any consideration other than cash. Burns. Dep. Vol. 1, p. 159, Lines 4-6.

14. Mr. Burns relies largely on non-cash transactions involving stock swaps and the granting of (unexercised) incentive stock options incident to International Cornerstone acquiring a controlling interest in several companies. Burns Rep. 8-10. With no inquiry, he infers that those unexercised options and stock swaps represent the arm's length negotiated cash value of Gladney's 1.7 percent interest. Aside from the methodological flaws in that equation (addressed

- 10 -

in the next section  under the second element of F.R.EVID. 702), he made no effort

to obtain "sufficient facts or data" from the parties to those transactions:

399
15      Q     How many of the preferred shareholders
16   did you interview?
17      A     None.
18      Q     How many of the common shareholders did
19   you interview?
20      A     None.
21      Q     How many of the officers or employees of
22   Cornerstone did you interview?
23      A     None.
24      Q     So the assumption is not based upon any
25   discussions with any individual; is that right?

400
1       A     That's correct.
2       Q     Perhaps like Baird, neither you nor
3    anybody in your office interviewed any preferred
4    shareholders; is that right?
5             THE WITNESS:  Could you read that
6        question back, please, the first part of the
7        question.
8             MR. AUGHTRY:  I'll restate.
9    BY MR. AUGHTRY:
10      Q     Like Baird, do we have a situation where
11   someone in your office interviewed preferred
12   shareholders but you didn't interview?
13      A     No.
14      Q     So neither you nor anyone in your office
15   interviewed any preferred shareholders, any common
16   shareholders or any officers of Cornerstone; is that
17   right?
18      A     That's correct.
19      Q     Did you interview any person or
20   representative or anyone in any of the subsidiaries

- 11 -

21   which were acquired?
22      A    No.
23      Q    Did you conduct any interviews whatsoever
24   in your valuation process in this case?
25      A    I don't believe so.

15.   In short, Defendant's expert failed to pursue basic due diligence when, as Defendant admits, a willing buyer would:

> 28.   Consistent with Treasury Regulation § 20.2031-1(b), an arm's length, willing buyer of Gladney's Cornerstone stock would have engaged in some level of due diligence prior to buying the shares.

Response:  Admits.

## B.   THE BURNS REPORT AND TESTIMONY ARE "NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS."

The selection and application of appropriate valuation methods are a question of law to be determined by the Court. *Estate of Palmer v. Commissioner*, 839 F.2d 420, 423 (8th Cir. 1988) (proper method for selecting comparables is question of law); *Estate of Dunn v. Commissioner,* 301 F.3d 839, 348, n.15, citing *Palmer* with approval and quoting *Powers v. Commissioner*, 312 U.S. 259, 260 (1941) ("The question of what criteria should be used to determine value is a question of law subject to *de novo* review").  For the same reasons, the appropriate method for selecting "comparables" is also a question of law for the Court.  *Id.*

- 12 -

Mr. Burns' Report and deposition testimony confirm six major violations of accepted appraisal standards, principles, and practices.  On that score, Plaintiff invites the attention of the Court to the accompanying report by James R. Hitchner who is recognized nationally as a leading business valuation expert and whose opinion is often sought by both private citizens and the federal government.  Mr. Hitchner's Report outlines these areas of concern relating to Mr. Burns' report:

> (i)     Violations of the Uniform Standards of Professional Appraisal Practice
>
> (ii)    Reliance on Post Valuation Date Information
>
> (iii)   Inappropriate Identification of Subject Property
>
> (iv)    Omission or Suppression of Significant Material Information
>
> (v)     Market Approach
>
> (vi)    Discounts for Lack of Control and Marketability

With that analysis in mind, Plaintiff offers these observations as to Mr. Burns' methodologies:

1.     Accepted business valuation principles encourage an appraiser to consider all three of the standard valuations methods: asset, income, and market.

2.     Of those methods, Mr. Burns disregards altogether the method even the IRS admits is preferred for valuing **holding companies** such as International

- 13 -

Cornerstone. Every business valuation treatise relies heavily upon IRS Rev. Rul. 59-60, 1959-1 C.B. 237 ("Rev. Rul. 59-60"), which confirms:

> In the investment or *holding type of company,* the appraiser **must** *accord the greatest weight to the assets* underlying the security to be valued. (Emphasis added).

By February 16, 1998, International Cornerstone had comparatively little left of its tangible assets. One must wonder if the asset method was rejected simply because it did not aid Mr. Burns' biggest client.

      3.      Mr. Burns also rejects the income method for internally inconsistent reasons. At page 7 of his report, he contends he lacks sufficient information (specifically forecasts) to use the income method, but at page 12, he uses a form of income (revenue) for certain valuation assertions.[1] Mr. Willis had no difficulty in calculating value under an income method. Mr. Hitchner confirmed that the income method should have been used since sufficient information was available. Hitchner Rep. 15-16. With all due respect, the reality is that the income method confirms a conclusion that does not support Mr. Burns' client.

---

[1] It should be noted that Mr. Burns' use of a revenue multiple in his publicly traded guideline analysis effectively tainted an otherwise acceptable methodology. By preferring a revenue multiple to an EBITDA multiple, Mr. Burns failed to adequately account for differences in capital structure, profit margins and operating margins between International Cornerstone and the publicly-traded guideline companies.

4.     Mr. Burns ultimately used an altered form of the market method that relies primarily on five instances of hindsight and three instances of pre-death NON-CASH consideration.

5.     Both that altered method and the method he used to select "comparables" violate accepted appraisal principles and all four elements outlined by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (*e.g.,* peer review, known error rate, accepted within the appraisal community, and tested reliability). *See* Hitchner Report.

Plaintiff now turns to the flaws in the selection and application of the method Mr. Burns does use.

## C.     MR. BURNS MISAPPLIES THE ONE VALUATION METHOD HE DOES USE, A VARIATION ON THE MARKET METHOD.

On pages 11-12 of his report, Mr. Burns compares, without adjustment or discount, Gladney's doubly restricted, subordinated 1.7 percent interest in unregistered and untraded closely-held stock to freely traded, unrestricted public company stock that is subordinated to no preferred stock – much less subordinated to $67 million in preference rights that can force liquidation. That comparison is simply prejudicial window dressing, for he places no weight upon it.

Instead, he places 100 percent of his conclusion on his careful selection of eight transactions involving International Cornerstone stock.

1.    **FIVE OF THOSE EIGHT TRANSACTONS ARE BASED ON HINDSIGHT.**

That is correct: neither Gladney nor any willing buyer or seller could have possibly known of the majority of Mr. Burns' selected International Cornerstone events transactions on the controlling valuation date, the day Gladney died.

Plaintiff invites the attention of the Court to the accompanying Motion *in Limine* and Memorandum outlining the precedent of the Eleventh Circuit, the Supreme Court, and other Courts of Appeals adopting the trend in this Circuit toward barring the use of such "hindsight" for federal estate tax valuation purposes.

2.    **ALL OF THE REMAINING THREE INVOLVE NON-CASH CONSIDERATION SWAPPED FOR THE INTERNATIONAL CORNERSTONE SOTCK.**

Mr. Burns ultimately bases his conclusion upon three pre-death stock swaps for International Cornerstone stock – stock swaps that, unbeknownst to Mr. Burns, constituted consideration that was prohibited by the Stock Certificate restriction he overlooked.

One involves the company for which Gladney worked, Ballard Designs. Cornerstone acquired Ballard via a statutory merger consisting of a stock-for-stock exchange under the tax-free reorganization rules of 26 U.S.C. § 368(a) ("Statutory Mergers").  AS A MATTER OF LAW, BOTH PARTIES NOW ADMIT THAT

SUCH TRANSACTIONS REPRESENT THE WRONG MARKET FOR THE

SUBJECT STOCK:

- The IRS admits in Treas. Reg. § 20.2031-1(b) that:

    > **Nor is the fair market value** of an item of property **to be determined** by the sale price of the item **in a market other** than that in which such item is **most commonly sold to the public**, taking into account the location of the item wherever appropriate. (Emphasis added).

- Both parties admit that closely-held stock (like the 1.7 percent Cornerstone stock) is NOT most commonly sold in that market:

    > 37.  A tax-free reorganization is **not a market** in which closely-held common stock is **most commonly sold to the public**. (Emphasis added).

    Response: Admits.

    D. Resp. to Pl. Req. Adm. ¶ 37.

That only makes sense because neither Gladney nor anyone else could be expected to sell her stock in an acquisition transaction like those relied upon by Mr. Burns.

Nonetheless, Mr. Burns' relies upon certain (unexercised) incentive stock options Cornerstone issued incident to the Ballard acquisition and acquisition of The Territory Ahead. No one ever exercised those options nor paid any cash for them. Mr. Burns' cites Internal Revenue Code Section 422 for the proposition that

the stated exercise prices in those options somehow represent fair market value.
This is interesting for several reasons:

- These are *incentive* stock options determined by the Board of the issuing company. As Mr. Burns now admits, that is not an arm's length determination.

- Section 422 confirms that the exercise price cannot be BELOW fair market value but it can be ABOVE fair market value.

- That is the point of INCENTIVE stock options – to motivate the recipient to increase the value of the company, not to reward him for doing nothing.

- Mr. Burns does not contend that the exercise price was based on an independent competent appraisal as required by Section 422(c) and the underlying regulations. Treas. Reg. § 1.422-2(e)(2)(iii).

- Therefore, the exercise price – AS A MATTER OF LAW – does NOT constitute a "good faith effort" TO DETERMINE VALUE.

- The inescapable corollary is that Mr. Burns' Section 422 methodology does not constitute a "good faith effort" to determine value – as a matter of law.

The third and final transaction, the acquisition of Garnet Hill, also involves a stock swap for International Cornerstone stock, though it is not a tax-free reorganization. Cornerstone transferred stock and cash for a controlling interest in the Garnet Hill stock. The critical point, however, is the same:

1.   While Cornerstone also paid a substantial amount of cash to Garnet Hill, the SOLE CONSIDERATION for the International Cornerstone stock was the Garnet Hill stock.

2.   As noted, the owner of Gladney's International Cornerstone stock was contractually prohibited by the Stock Certificate restriction from selling her stock for anything other than cash.

3.   To paraphrase the IRS regulation, acquisitions of the controlling stock interest in a corporation is NOT the most common market for Gladney or anyone else selling her minority interest in a restricted, subordinated, untraded interest in closely-held stock.

4.   To equate the two incomparable situations is misleading and prejudicial.

5.   Accepted appraisal principles, practices, and standards recognize as much – fair *market* value requires consideration paid in CASH or CASH EQUIVALENTS:

> The price, expressed in terms of **cash equivalents**, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms-length in an open and unrestricted market, where neither is under

compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[2]  (Emphasis added).

6.     Nowhere in his report does Mr. Burns consider or attempt to convert the non-cash consideration into cash or cash equivalents.

7.     As acknowledged by Mr. Burns, Shannon Pratt in his book, *The Market Approach to Valuing Businesses,* mentions that such non-cash transactions can take several forms, such as past transactions in the subject company and past acquisitions by the subject company. However, as also stated by Shannon Pratt:

> Merger and acquisition prices, often, to some extent, reflect synergies and/or strategic advantages between acquirer and acquiree. To the extent that this is true, a transaction may be more reflective *of investment value* (value to the particular buyer) than *fair market value* (the value to a hypothetical, typically motivated buyer). For this reason, the circumstances of the merger and acquisition transactions must be carefully analyzed.[3]

Mr. Burns spoke to no one on either side of any of those transactions. Without inquiry, he mistakenly equates the non-cash strategic "investment value" with the easily confused completely different "fair

---

[2] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003.

[3] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition.* McGraw-Hill, 2000.

market value."   That equation is wrong under accepted appraisal practice.

8.   Mr. Burns admits that the stock transferred for the International Cornerstone stock in his "comparables" does not constitute CASH or CASH EQUIVALENTS:

```
10      Q      You would agree, wouldn't you, that a
11   untraded, unregistered, closely held stock would not

12   be a cash equivalent?
13      A      I'm not sure what you mean by a "cash
14   equivalent."
15      Q      Have you ever used the phrase "cash
16   equivalent"?
17      A      Cash equivalent in my mind would be
18   something that could be converted to cash readily.
19      Q      Like a CD?
20      A      Yes.
21      Q      Or a bond without restrictions?
22      A      Yes.
23      Q      But not a stock?
24      A      I would not view that as a cash
25   equivalent.
```

Burns Dep. 162.

9.   Mr. Burns also admits that fair market value should be based on the price a willing buyer would pay a willing seller in cash or a cash equivalent:

163

```
1      Q      And to the extent you're talking about a
```

- 21 -

2    transaction with consideration other than cash or
3    cash equivalent -- let me say, you would agree that's
4    the standard for measuring fair market value,
5    wouldn't you?  What a hypothetical buyer would pay in
6    cash or cash equivalent on a subject property on the
7    valuation date to a hypothetical seller?
8        A    I think that's fair.

## CONCLUSION

The report and anticipated testimony by Mr. Burns' fall short of each of the

three conjunctive elements required by F.R.EVID. 702 and reinforced by the

Supreme Court in *Daubert*.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & MARTIN

By: _____
    David D. Aughtry
    Georgia Bar No. 028010

By: _____
    Samuel R. Linsky
    Georgia Bar No. 453279

ATTORNEYS FOR PLAINTIFF

191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303-1747
Telephone: (404) 659-1410
162232.7

- 22 -



THE INTERNATIONAL CORNERSTONE GROUP, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

C 43

*443,333*

PAR VALUE $.001 EACH
COMMON STOCK

*SEE RESTRICTIONS SET FORTH ON REVERSE SIDE*

**This is to Certify that** ***Gladney Heazel*************************************************** **is the owner of**

***Four Hundred Forty-three Thousand Three Hundred Thirty-three***************************************************

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK OF
THE INTERNATIONAL CORNERSTONE GROUP, INC.

*transferable on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. Witness, the seal of the Corporation and the signatures of its duly authorized officers.*

**Dated** as of August 13, 1997

Nicolas A. Kensington, Secretary

Donald J. Steiner, Executive Officer
and Managing Director

EXHIBIT

A

© 1987 CORPEX BANKNOTE CO., NEW YORK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ESTATE OF GLADNEY E. HEAZEL, DECEASED, ROBERT J. HEAZEL, EXECUTOR,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA by and through the COMMISSIONER OF INTERNAL REVENUE SERVICE,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br>Civil Action No.<br>1:02-CV-2665-RLV |

---

## AFFIDAVIT OF JAMES R. HITCHNER, CPA/ABV, ASA

---

Before me, an officer duly authorized to take acknowledgments and administer oaths, this day personally appeared James R. Hitchner, who first being duly sworn deposes and states:

### 1.

My name is James R. Hitchner. I am over the age of 18 and make this affidavit for use in support of "Plaintiff's Motion *in Limine* to Exclude Testimony of Francis X. Burns and Supporting Memorandum of Law", and for all other uses authorized by law.



EXHIBIT

B

**2.**

This affidavit is based upon my personal knowledge except as otherwise stated. I am an expert appraiser retained by the Plaintiff in the above-styled cause.

**3.**

Attached hereto is a true copy of our "Expert Witness Report of James R. Hitchner, CPA/ABV, ASA Regarding the (Expert) Appraisal Report of Francis X. Burns, Dated August 19, 2003", dated March 12, 2004.

**4.**

More specifically, our report, a true copy of which is attached, includes a technical review of the following major areas of Francis X. Burns' appraisal report:

 (i)  Violations of the Uniform Standards of Professional Appraisal Practice;

 (ii)  Reliance on post-valuation date information;

 (iii)  Inappropriate identification of subject property;

 (iv)  Omission or suppression of significant material information;

 (v)  Use of the Market Approach to value the subject property; and,

 (vi)  Discounts for lack of control and marketability.

**5.**

The attached report was made at or near the time of the technical review and analysis which I performed respecting Francis X. Burns' August 19, 2003 Appraisal Report.

**6.**

It is my regular practice as an appraiser to make such reports.

**7.**

The information and data analyzed or recorded in the attached report was verified by my staff and me or is based on observations within my personal knowledge.

**8.**

The attached report was made and kept in the regular course of my business as a professional appraiser.

Further affiant sayeth not.

_James R. Hitchner_

James R. Hitchner

Sworn to and Subscribed
before me this ⟨16⟩ day of
⟨March⟩, 2004.

_Notary signature_

Notary Public
My Commission Expires: ⟨11-2007⟩
[Notary Seal]

- 3 -

**Expert Witness Report**

**Of**

**James R. Hitchner, CPA/ABV, ASA**

**Regarding the (Expert) Appraisal Report of**

**Francis X. Burns, Dated August 19, 2003**

**March 16, 2004**

# Expert Witness Report

## Of

## James R. Hitchner, CPA/ABV, ASA

## Regarding the (Expert) Appraisal Report of

## Francis X. Burns, Dated August 19, 2003

## March 16, 2004

### Including a Technical Appraisal Review of the Following Major Areas of Francis X. Burns' Appraisal Report:

**Violations of the Uniform Standards of Professional Appraisal Practice**

**Reliance on Post Valuation Date Information**

**Inappropriate Identification of Subject Property**

**Omission or Suppression of Significant Material Information**

**Market Approach**

**Discounts for Lack of Control and Marketability**

# Expert Witness Report
## Of
## James R. Hitchner, CPA/ABV, ASA
## Regarding the (Expert) Appraisal Report of
## Francis X. Burns, Dated August 19, 2003
## March 16, 2004

| | | |
|---|---|---|
| I. | Introduction | 3 |
| II. | Summary of Opinions | 6 |
| III. | Detailed Opinions | 13 |
| A. | Violations of the Uniform Standards of Professional Appraisal Practice | 13 |
| B. | Reliance on Post Valuation Date Information | 22 |
| C. | Inappropriate Identification of Subject Property | 26 |
| D. | Omission or Suppression of Significant Material Information | 28 |
| E. | Market Approach | 30 |
| F. | Discounts for Lack of Control and Marketability | 41 |
| IV. | Assumptions and Limiting Conditions | 42 |
| V. | Valuation Certification | 45 |
| VI. | Curriculum Vitae – James R. Hitchner | 47 |
| VII. | Expert Witness Testimony – James R. Hitchner | 56 |
| VIII. | Curriculum Vitae – Paul J. Vogt | 57 |



## I.   Introduction

I, James R. Hitchner, CPA/ABV, ASA, have been retained by Chamberlain, Hrdlicka, White, Williams & Martin to assist the Court in the Estate ("Estate") of Gladney Heazel ("Decedent") by performing a technical appraisal review of the (Expert) Appraisal Report prepared by Francis X. Burns ("Mr. Burns") of Intecap, Inc. and dated August 19, 2003, titled, "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998," ("Appraisal Report"). The use for this technical appraisal review and report is an estate tax refund claim in conjunction with the case of *Estate of Gladney Heazel v. United States of America*, Civil Action No. 1:02-CV-2665-RLV.

This technical appraisal review is in conformity with Standard 3: Appraisal Review, Development and Reporting, of the Uniform Standards of Professional Appraisal Practice ("USPAP"). The Appraisal Standards Board ("ASB") of the Appraisal Foundation is authorized by the United States Congress as the source of appraisal standards and appraiser qualifications. The ASB develops, publishes, interprets and amends USPAP on behalf of appraisers and users of appraisal services. These standards have been in effect for almost seventeen years.

USPAP Standard 3 defines an appraisal review as follows:

> "Appraisal review is the act or process of developing and communicating an opinion about the quality of all or part of the work of another appraiser, including an appraisal report, appraisal review report, or appraisal consulting report. The reviewer's opinion about quality must encompass the completeness, adequacy, relevance, appropriateness, and reasonableness of the work under review, developed in the context of the requirements applicable to that work."[1]

---

[1] "Uniform Standards of Professional Appraisal Practice ("USPAP") Statement", The Appraisal Foundation, 2004 edition, p. 33.



3340 Peachtree Road, N.E. ❖ Suite 1785, Tower Place
Atlanta, GA  30326 ❖ Tel: 404.814.3730 ❖ Fax: 404.814.3737
www.fvginternational.com

The purpose of this appraisal review is to evaluate Mr. Burns' compliance with USPAP requirements and to determine whether his analysis, conclusion and report are complete, adequate, relevant, appropriate and reasonable.

My engagement as an expert witness in this matter is a management consulting and appraisal engagement; I have not audited in accordance with generally accepted auditing standards any of the financial information or other documents considered in reaching my opinions in this report.

The information and documents I, or persons working under my direct supervision, considered in reaching the opinions provided in this report are of the type normally used by CPAs, appraisers and other financial expert witnesses to reach opinions on the matters for which I have been engaged.

My firm, The Financial Valuation Group of Atlanta, Inc., is being compensated at our normal hourly rates for the time incurred in this engagement, and compensation is in no way contingent upon the outcome of this litigation.

**Limitations and Other Points Concerning Opinions Included in This Report**

This report includes the opinions I presently expect to provide at trial. However, I understand that additional information which may be provided before or during the trial may affect my opinions. This additional information may include opinions of other experts and additional documents or testimony. Upon request, I would be pleased to address any additional information when and if it arises.

*James R. Hitchner*

James R. Hitchner, CPA/ABV, ASA
March 12, 2004

## II.    Summary of Opinions

The following is a summary of my opinions regarding the Appraisal Report "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc., as of February 16, 1998," prepared by Francis X. Burns of Intecap, Inc., and dated August 19, 2003.  My opinions are based upon my skills, knowledge, education, experience and training as an expert and on the data and information I or persons working under my direct supervision considered. Among the data and information I have considered are the documents noted below.

a) Mr. Burns' Appraisal Report and supporting exhibits.

b) The documents and data cited in Mr. Burns' Appraisal Report.

c) The 'Working File' documents of Mr. Burns.

d) The deposition of Mr. Burns taken October 1, 2003 and October 15, 2003, with supporting exhibits.

e) Various publications and documents from various reputable sources concerning valuation theory, approaches, methodologies and applications, including: defining the assignment, the guideline company transaction method, discount for minority interest, discount for lack of marketability, restricted stock and the derivation and application of the guideline public company method.

f) The 2003 and 2004 Editions of the Uniform Standards of Professional Appraisal *Practice standards and statements regarding appraisal review* (Standard 3), business appraisal development (Standard 9), and business appraisal reporting (Standard 10).

USPAP requires that I give my opinion as to the quality of Mr. Burns' analysis and report, which must "...encompass the completeness, adequacy, relevance, appropriateness and reasonableness of the work under review."[2]

---

[2] USPAP 2004, p. 33

Based on my review of the documents listed above and other data, it is my opinion that the valuation conclusion reached by Mr. Burns is unsupportable. His Appraisal Report and analysis are incomplete, inadequate and contain numerous incorrect, inappropriate and inconsistent valuation methodologies, assumptions and applications leading to an overstated value. As detailed throughout this report, Mr. Burns has also committed violations of USPAP. Our focus was on the following:

1) Violations of the Uniform Standards of Professional Appraisal Practice.

Mr. Burns stated in his report that the analysis and report are in conformity with USPAP. It is my opinion that there are numerous violations of USPAP throughout the analysis and report, many of which have a significant impact on value.

- All valuation approaches, methodologies and applications that result in a lower value were rejected;

    o No income approach, which should have been one of the primary valuation approaches

    o No asset approach even though Mr. Burns admits that it is a preferred approach when valuing holding companies

    o Reliance on stock swaps and stock option transactions which he agreed were not cash or cash equivalent

    o Complete reliance on International Cornerstone stock transactions which are based on values that Mr. Burns agrees were not derived by independent parties and where he admittedly had inadequate background or supporting information or data

   o  Incorrect application of the publicly traded guideline company method of the market approach

       &mdash; Sole reliance on revenue valuation multiples as opposed to the more relevant earnings valuation multiple, which significantly raised the value

       &mdash; Failure to address the major differences in capital structure (preferred stock, debt and common equity) between International Cornerstone and the guideline public companies

   o  Does not consider or apply the guideline company transaction method of the market approach

   o  Failure to identify and consider the restrictions attached to the minority common stock

   o  Failure to address the effect of the company's preferred stock on the value of the minority common stock

- The report does not name Mr. Rick Springer and Ms. Pamela Mazur, both of whom provided significant professional assistance to Mr. Burns. This is required under the reporting standards of USPAP.

- Other violations are mentioned throughout this report.

2) Reliance on post valuation date information.

A review of Mr. Burns' Appraisal Report indicated that post valuation date information was repeatedly referenced and heavily relied upon. In most instances,

the post valuation date information indicated a higher common stock value from the pre-valuation date information. As stated in *Valuing a Business, The Analysis and Appraisal of Closely Held Companies:*

> "The date, or dates, at which the business is being valued is critically important because circumstances can cause values to vary materially from one date to another, and the valuation date directly influences data available for the valuation."[3]

Additionally, *USPAP states:*

> "In the absence of evidence in the market that data subsequent to the effective date [date of valuation] were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser."[4]

Although Mr. Burns concluded that his opinion was not dependent upon the post valuation date information, his reliance upon this data and his comment that "…these subsequent [post valuation date] price indications are probative of the market conditions that existed for Cornerstone stock in February 1998,"[5] were inappropriate. In my opinion, factors and events that occurred subsequent to the valuation date that were not discernible or predictable (known or knowable) at the valuation date should be excluded. This view is consistent with USPAP. Thus, Mr. Burns' reliance on post valuation date information would be a violation of USPAP under these circumstances.

3) Inappropriate identification of subject property.

---

[3] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies. Fourth Edition.* McGraw-Hill, 2000, p.26.
[4] USPAP, 2003, p.88.
[5] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.10.

I have reviewed Mr. Burns' Appraisal Report and various valuation publications, including the USPAP standards concerning the accurate identification of the subject property. Mr. Burns inappropriately identifies the subject company as Cornerstone Brands, Inc. At the valuation date, the subject company should have been appropriately identified as The International Cornerstone Group, Inc., ("International Cornerstone"). Mr. Burns fails to adequately address the fact that International Cornerstone is a holding company whose only assets are stock of several operating companies. Mr. Burns also fails to emphasize and analyze the small percentage ownership interest (1.7%) being valued and never identifies the Estate shares being valued as common shares subject to various restrictions. These are factors that affect the appraisal methods used and the adjustments to value. They are also violations of USPAP.

4) Omission or suppression of significant material information.

My review and analysis of Mr. Burns' Appraisal Report, working papers and other relevant data indicate that significant material information and attributes of the Estate's minority restricted common stock in International Cornerstone were omitted. For example, the Estate shares valued by Mr. Burns were subject to certain written restrictions, and he fails to consider or incorporate the effect these restrictions have on the value of the shares. Additionally, Mr. Burns fails to consider or discuss that the Estate shares were subordinated to approximately $67.0 million in preferred stock and does not contemplate the effect that these preferential rights would have on the Estate shares. Another instance where significant material information was omitted from Mr. Burns' Appraisal Report was relevant testimony in conjunction with a prior engagement which was not disclosed in his credentials attached to his report titled "Previous Testimony." Omission or suppression of these material items would also be a violation of USPAP in our view.

Furthermore, under USPAP all appraisers must adhere to the Ethics Rule, which includes the following information on appraisal practice conduct:

> "An appraiser must perform assignments with impartiality, objectivity and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue. An appraiser may be an advocate only in support of his or her assignment results. Advocacy in any form in appraisal practice is a violation of the ETHICS RULE. An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."[6]

5) Market approach.

Mr. Burns uses at least three transactions of the company's stock or stock options that occurred before the valuation date to support his value indicated by the market approach. In addition, and as discussed previously, Mr. Burns uses subsequent transactions stating, "...these subsequent price indications are probative of the market conditions that existed for Cornerstone stock in February 1998."[7] Our analysis indicates that the supporting detail for the transactions analyzed is not indicative of the fair market value of the subject property. On each occasion, International Cornerstone acquired a controlling interest in the target company through purchase or merger. In most cases, consideration consisted of stock for stock swap agreements as well as incentive stock options being issued to the target company owners contemporaneously to the closing of the acquisition. None of the three transactions involve the sale of International Cornerstone common stock for cash.

Mr. Burns ignored the fact that no independent third party appraisals were performed to arrive at the fair market value of the common stock of International

---

[6] USPAP 2004, p. 7.
[7] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.10.

Cornerstone at the time of the various transactions. Furthermore, by his own admission, the Board of Directors of International Cornerstone was not independent, and he has no idea how the Board arrived at the stock prices used in those transactions. Additionally, a stock-for-stock swap is not necessarily an indication of fair market value, because the stock-for-stock swap may not be cash equivalent and this ignores the fact that the shareholder agreement specifies cash only.

Mr. Burns admits that these transactions did not involve cash equivalents, yet he made no adjustments to convert the consideration into a cash equivalent. Furthermore, Mr. Burns gave no consideration to the shareholder agreement incorporated by the restrictions on the subject Stock Certificate. This agreement prohibits sale of the subject stock for any consideration other than cash. As such, the transactions cited, the method of application, and supporting detail cannot be relied upon in establishing the fair market value for International Cornerstone common stock.

6) Discounts for lack of control and marketability.

Mr. Burns' analysis and conclusion of a 0% discount for minority interest and marketability was inappropriate and unsupportable. My analysis and review of the supporting documents indicated that the subject 1.7% restricted minority interest had absolutely no control of the management of International Cornerstone's business and thus should have been subject to a discount for lack of control. In terms of the discount for lack of marketability, my analysis of the supporting studies and the restrictive agreements affecting the 1.7% minority interest indicates that a discount for lack of marketability should have been applied. In fact, Mr. Burns, in his guideline public company method, indicated that a discount for lack of marketability of 15% to 20% was appropriate. His discount did not include a lack of control discount and was also based on

restricted stock studies, which rely on companies that are already public. Accordingly, Mr. Burns' conclusion is overstated.

## III.    Detailed Opinions

### A.    Violations of the Uniform Standards of Professional Appraisal Practice

Mr. Burns' Appraisal Report indicates that the Appraisal Report and the analysis are in compliance with the Uniform Standards of Professional Appraisal Practice:

> "This report and the analyses contained within have been prepared in conformity with the Uniform Standards of Professional Appraisal Practice."[8]

USPAP contains the national standards for all appraisal services including business valuation. They were effective April 27, 1987 and have been adopted by most of the major appraisal organizations including the American Society of Appraisers, of which Mr. Burns is a candidate member.    USPAP is the responsibility of the Appraisal Standards Board of The Appraisal Foundation, which "...develops, publishes, interprets, and amends the Uniform Standards of Professional Appraisal Practice (USPAP) on behalf of appraisers and users of appraisal services."  The standards manual also states "...USPAP will be used by state and federal regulatory agencies and others..."[9]

The edition available at the time of the appraisal was USPAP 2003, effective January 1, 2003.  As such, Mr. Burns' Appraisal Report, dated August 19, 2003 is a retrospective appraisal as defined by USPAP and must comply with the standards from this edition.  The following sections illustrate violations of USPAP by Mr. Burns.

---

[8] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p. 21
[9] USPAP 2004, p. 1

1.    **USPAP Standard 9:  Business Appraisal, Development**

This standard deals with those areas that an appraiser must address when preparing an appraisal.

**Standards Rule 9-1**

"In developing a business or intangible asset appraisal, an appraiser must:

   (a) be aware of, understand, and correctly employ those recognized methods and procedures that are necessary to produce a credible appraisal:

   (b) not commit a substantial error of omission or commission that significantly affects an appraisal; and

   (c) not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affect the credibility of those results."[10]

There are numerous errors throughout Mr. Burns' analysis, many of which have a significant impact on the value.

There are three traditional approaches that can be used to value an interest in a closely held entity: the underlying asset or cost approach, the market approach, and the income approach. When considering the three approaches to value, Mr. Burns ignored the asset approach even though he classified the company as a holding company when he states:

   "[International Cornerstone] Operated as a holding company..."[11]

Many authoritative sources indicate that the asset approach should be considered as one of the primary methods when valuing a holding company and many

---

[10] "Uniform Standards of Professional Appraisal Practice ("USPAP") Statement," The Appraisal Foundation, 2003 edition, p. 73.
[11] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, page 2.

regulations support the use of this method. Specifically, in the book, *Financial Valuation, Applications and Models,* the editor states:

> "Revenue Ruling 59-60 supports the use of an asset approach for valuing investment or holding companies."[12]

It is our opinion that it is appropriate to consider an asset approach when valuing International Cornerstone, especially when International Cornerstone is a holding company, consisting of assets that are subsidiaries acquired in recent transactions utilized by Mr. Burns.

Also, when considering the three approaches to value, Mr. Burns suggest that the income approach is not an appropriate method. Mr. Burns states:

> "Financial projections prepared by Cornerstone's management near the date of valuation were unavailable in this case. This lack of meaningful forecasts would make predicting future earnings a highly speculative exercise...I have decided that an income based approach is not the best valuation method to apply in this case."[13]

Although Mr. Burns mentions that the lack of meaningful forecast would make an income approach speculative, the existence of historical financial data coupled with the use of pro-forma estimates would have made an income approach viable as one of the primary valuation approaches. Mr. Burns' use of pro-forma data in the guideline publicly traded company method indicates that he had a reasonable measure of comfort in making certain assumptions for that method. Specifically, in his deposition, Mr. Burns comments about the financial data of International Cornerstone being incomplete:

> "And we didn't indicate that the financials were not reliable. We indicated that they were incomplete as to the total impact of the acquisitions on the

---

[12] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p. 457.

[13] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p. 7.

numbers. From an accounting standpoint, it is okay to account for the sales and net income in the way they've done it. But from a valuation standpoint, we believed it was better to look at the proformas."[14]

When Mr. Burns was asked about the proformas, he responded:

> "It was an adjustment that we made to develop a proforma and it's at Tab 14 of our report...It was an adjustment to reflect the fact that some of the sales for the acquisitions of Garnet Hill, Territory Ahead and Whispering Pines—it was going back in time and picking up the sales and the net income for those companies back to the beginning of the fiscal year ending January 31, 1998."[15]

I agree that proforma information was more relevant for the valuation. However, this proforma information should have been used in the income approach as well as the market approach.

Instead of applying the income approach, Mr. Burns relies solely on what he refers to as the market approach to value, using transactions involving International Cornerstone. He also applies guideline public company multiples to validate his concluded value. Mr. Burns identifies the significance of a market approach in his Appraisal Report and ultimately quotes Dr. Shannon Pratt, indicating that market comparisons can be the most compelling evidence of value. Mr. Burns failed to appropriately apply all facets of the market approach to value, even with this strong evidence mentioned above regarding the market approach.

Mr. Burns applies guideline public company multiples to test the reasonableness of his concluded value. Because he believed that guideline public company data

---

[14] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume II October 15, 2003, p. 317, Lines 3-10.
[15] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume II October 15, 2003, p. 317, Lines 13-21.

existed for International Cornerstone, this approach would warrant further analysis and possible application as a primary method.

Although I agree with Mr. Burns that guideline public companies must be considered, I believe Mr. Burns' concluded multiples are incorrect. Mr. Burns acknowledges that International Cornerstone is in a roll-up phase of its business when he states, "Cornerstone had only two full years of operating results prior to the valuation date. During that period, the Company rapidly expanded its operations through new acquisitions and organic growth."[16] He also identifies the capital source of those acquisitions when he states, "Cornerstone funded its growth primarily with equity from private investors."[17] As a result, International Cornerstone has a capital structure that includes preferred stock, which is much different from those of the guideline companies. International Cornerstone also has much lower profit margins than those of the guideline companies. By applying an equity multiple of price to revenue, Mr. Burns fails to capture the inconsistencies between International Cornerstone and the guideline companies. Dr. Shannon Pratt, in his book, *Valuing a Business-The Analysis and Appraisal of Closely Held Companies*, states:

> "Valuations by multiples of revenue are particularly susceptible to distortion because of differences in capital structure between subject and guideline companies. Therefore, this valuation-pricing multiple should be calculated on a market value of invested capital basis..."[18]

The book *Financial Valuation Applications and Models* also discusses the advantages and appropriateness of using EBIT or EBITDA multiples. Specifically, the book states:

---

[16] Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.3.
[17] Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.4.
[18] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies. Fourth Edition.* McGraw-Hill, 2000, p. 247.

"The advantages of using EBIT or EBITDA are that they more closely reflect the operations of the business, and they exclude the nonoperating, financing (capital structure), and tax planning (and depreciation policies for EBITDA) aspects that are part of net income. If the capital structures, tax situations, and non-operating characteristics of the guideline companies and subject company were similar, then it would probably make little difference whether EBIT, EBITDA, or net income were used in the valuation multiple. But because these things can vary widely among companies, it is certainly important to consider these measures along with, or in many situations, as a replacement for net income."[19]

Not only do the above recognized sources indicate that an EBIT or EBITDA multiple is more appropriate and applicable than a revenue multiple, these same sources also provide guidance in matching the correct "price" to the correct parameter. For instance, the book *Financial Valuation Applications and Models,* states:

"Conventionally, 'price' is matched to the appropriate parameter based on which providers of capital in the numerator will be paid with the monies given in the denominator. For example, in price/EBIT, price is MVIC [market value invested capital], since the earnings before interest payments and taxes will be paid to both the debt and equity holders. In price/net income, price is the market value of equity only, since net income is after interest payments to debt holders and represents amounts potentially available to shareholders. Any denominators that exclude interest (e.g., EBIT or EBITDA) should usually be matched with its corresponding numerator (e.g., MVIC)."[20]

---

[19] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p. 217.
[20] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p. 219.

In light of the above-referenced information, Mr. Burns' guideline public company method used to test the reasonableness of his concluded value is questionable. This information supports the use and reliance upon EBIT or EBITDA multiples over revenue multiples.  However, Mr. Burns gives more weight to the revenue multiple, which yielded, before discounts (which need to be applied to reach an appropriate value), a higher value of $10.85 per share, compared to a value of $6.70 per share applying the more appropriate EBITDA multiple, which is also before discounts which also need to be applied, thus lowering the value. He also incorrectly applies equity multiples instead of applying invested capital multiples.  Had Mr. Burns applied invested capital EBITDA multiples and accordingly considered the preferred stock (with $67 million preferred liquidation rights) and debt and adjusted his 15%-20% marketability discount to account for the restrictions, he would have arrived at a significantly lower value per share.

In addition to Mr. Burns' questionable guideline public company method, Mr. Burns fails to employ a guideline company transaction method involving acquisitions or mergers of similar guideline companies.  A review of Mr. Burns' Appraisal Report and working papers does not indicate or provide any evidence of a search for guideline transactions.  Such evidence would include sources such as *Mergerstat, BizComps, DoneDeals or PrattStats*.  As such, it is my opinion that Mr. Burns' failure to consider the proper application and use of recognized valuation methods is a violation of USPAP.

**2.     USPAP Standard 10:  Business Appraisal, Reporting**

This standard deals with those areas that an appraiser must communicate when reporting each analysis, opinion, and conclusion in a manner that is not misleading.

**Standards Rule 10-3**

In this section, USPAP states:

"Each written business or intangible asset appraisal report must contain a signed certification that is similar in content to the following form:

I Certify that, to the best of my knowledge and belief:

> …no one provided significant business appraisal assistance to the person signing this certification. (If there are exceptions, the name of each and the significant business appraisal assistance must be stated.)"[21]

Mr. Burns, in his Appraisal Report, does not indicate or make mention of anyone providing significant professional assistance. He even states, "I prepared this report…"[22] As such the implication is that the sole appraiser signing the report has performed all significant analyses and procedures in valuing International Cornerstone. However, Mr. Burns in his deposition on numerous occasions discusses the significant professional assistance from several of his associates within his firm.

A:     "Well, the individuals working with me on the project would have been involved…"

Q:     "What are their names?"

A:     "Rick Springer is an associate at our firm who helped with this project, and Pamela Mazur."[23]

When discussing the draft of his report, Mr. Burns stated:

> "I believe I asked Pam or Rick to describe the company, to draft some language which describes the company."[24]

---

[21] USPAP, 2003, p. 81.
[22] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.21.
[23] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1,2003, p. 20, Lines11-16.
[24] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 85, Lines 19-21.

Additionally, Mr. Burns admits in his deposition that he is unable to identify what sections of the report he may have drafted and those sections in which he would have received assistance,

A:    "...it's really impossible for me to identify specifically which words that I put in initially or which words I put in after the first cut..."

Q:    "So you can't identify any specific word or sentence that you injected as opposed to Ms. Mazur or Mr. Springer injected"

A:    "It's too difficult to go back after the fact and do that."[25]

In another instance, when asked about the preparation of the schedules included in his report, Mr. Burns stated:

"... I asked Rick and Pam to gather this information and put it into a spreadsheet."[26]

Specifically, Mr. Burns was asked about what level of professional assistance was provided:

Q:    "You asked them to do subject matter...financial performance of this company...?"

A:    "Yes."

Q:    "...historical revenues?"

A:    "Yes."

Q:    "Historical earnings?"

A:    "Yes."

Q:    "Balance sheet?"

A:    "Yes."

---

[25] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume II October 15, 2003, p. 276, Lines 22-24, p. 277, Lines 1-5.

[26] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 91, Lines 8-9.

Q:      "Intangible assets?"

A:      "That's correct."[27]

The above identified instances plainly indicate that Mr. Burns received significant business appraisal assistance, both in the analysis phase of the engagement and in the report writing phase of the engagement. As such, it is my opinion that Mr. Burns' departure is a violation of USPAP.

Other USPAP violations are addressed in the remaining sections of this report.

**B.      Reliance on Post Valuation Date Information**

As stated earlier in this report, the date at which a business enterprise is being valued is vitally important due to the fact that any one fact or circumstance can cause material changes in value. In fact, the risks assumed when relying on post valuation date information can be significant and can yield a distorted value.

As presented by the following valuation standards and publications, a business valuation is relevant only for a specific point in time. The valuation captures all of the relevant elements at that particular point in time. Factors and events that occurred subsequent to the valuation date that were not discernible or predictable at the valuation date are normally excluded.

According to USPAP *Statement on Appraisal Standards No. 3 (SMT-3)*:

"Two dates are essential to an appraisal report. Standards Rule 2-2(a)(vi), (b)(vi), and (c)(vi), and 8-2(a)(vi), (b)(vi), and (c)(vi) require that each appraisal report specify the effective date of the appraisal and the date of the report. The date of the report indicates the perspective from which the appraiser is examining the market. The effective date of the appraisal establishes the context for the value opinion. Three categories of effective

---

[27] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume II October 15, 2003, p 264, Lines 19-25 & p. 265, Lines1-7.

dates – retrospective, current, or prospective – may be used according to the purpose and function of the appraisal assignment."[28]

"Retrospective appraisals (effective date of the appraisal prior to the date of the report) may be required for property tax matters, estate or inheritance tax matters, condemnation proceedings, suits to recover damages, and similar situations."[29]

"A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the market after the effective date of the appraisal. Data subsequent to the effective date may be considered in estimating a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date. The appraiser should determine a logical cut-off since, at some point distant from the effective date, the subsequent data will not reflect the relevant market. This is a difficult determination to make. Studying the market conditions as of the date of the appraisal assists the appraiser in judging where he or she should make this cut-off.  In the absence of evidence in the market that data subsequent to the effective date was consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser."[30]

As stated in *Financial Valuation: Businesses and Business Interests*;

"an appraisal is an opinion or estimate of the value of a specifically defined asset at a given point in time. Value is a dynamic concept that changes because of a multitude of external and internal factors. A business valuation is relevant for a specific point in time. The valuation captures all of the relevant elements at that particular point in time. The practitioner is recreating the market environment in which a willing buyer and willing

---

[28] USPAP, 2003, p.88.
[29] Ibid.
[30] Ibid.

> seller will operate, both knowledgeable of the relevant facts at that time. Factors and events that occurred subsequent to the valuation date that were not discernible or predictable at the valuation date are normally excluded."[31]

The above valuation publications give credence to the importance of the valuation date. As such, the use of subsequent events to the valuation date is usually speculative. Defined in numerous authoritative sources, the value of a business is the future probable economic benefit. Specifically, Dr. Shannon Pratt in his book, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies,* states:

> "From a financial point of view, the value of a business or business interest is the sum of the expected future benefits to its owner…"

Appraisal principle is dependent upon projecting future possibilities not just speculative potential. As discussed later in this report, Mr. Burns relies on speculative information when he emphasizes the attempted initial public offering ("IPO") of International Cornerstone and suppresses the fact that this IPO failed. The failure of this IPO substantiates that reliance upon subsequent data is usually speculative.

An inherent problem of relying on subsequent data is the fact that possibilities exist for a business enterprise to experience success, failure, bankruptcy or any number of positive and negative events and circumstances. In my opinion, factors and events that occurred subsequent to the valuation date that were not discernible or predictable at the valuation date should be excluded from the valuation analysis.

---

[31] "Financial Valuation: Businesses and Business Interests," James H. Zukin and John G. Mavredakis, Warren Gorham Lamont, 1990, p. 2-6.

Following is a listing of data and information contained in Mr. Burns Appraisal Report that took place or was completed after the valuation:

a)      The May 1998 Board of Directors Meeting where the Directors "voted to raise" the price per share to $9.00.[32]

b)      The July 6, 1998, John Walters purchase of 55,555 shares of common stock for a purchase price of $9.00 per share.

c)      The August 25, 1998 acquisition of Smith & Noble where International Cornerstone issued stock options with an exercise price of $17.00 per share.

d)      Cornerstone Brands, Inc. Form S-1 Registration Statement, dated August 26, 1998.

e)      The Anticipated IPO expected in October 1998 with shares expected to be offered in the $16-$19 range.

f)      The October 8, 1998 acquisition of Whispering Pines where the shares of Cornerstone (International Cornerstone) were valued at $17.00 by the parties.

It should be specifically noted that the letter describing the Board of Directors Meeting which took place in May 1998 and included as an attachment in Mr. Burns' Appraisal Report clearly indicates that the Directors voted to "raise the price" per share to $9.00. If one were to rely on this information, it would be implied that the price per share prior to the May 1998 meeting would be less than $9.00 per share.

---

[32] International Cornerstone Group letter to The Bowden Law Firm from Donald J. Steiner, dated June 8, 1998.

As mentioned earlier, Mr. Burns discusses the attempted IPO and indicates the expected price per share to be in the range of $16.00 - $19.00. Mr. Burns applies the average price of $17.50 per share as a measure of International Cornerstone's stock price during October 1998. Although Mr. Burns indicates that the filing was withdrawn due to volatile market conditions, his presentation still implies International Cornerstone would have maintained a price per share of approximately $17.50. He not only uses post valuation data as a test of reasonableness for his concluded value, he represents that a reasonable buyer would have anticipated that International Cornerstone would complete a successful IPO in the near future, despite the fact that the one attempt at an IPO was unsuccessful. He does not present any data that would indicate a subsequent attempt or that an IPO was contemplated at the valuation date.

The previous list indicates that Mr. Burns relied upon post valuation data to support his concluded value. In nearly all instances, the post valuation date information indicated a higher value. Mr. Burns concluded that the post valuation date information was "probative of the market conditions" in the valuation of International Cornerstone. Based on the above information, it is inappropriate for Mr. Burns to conclude that the post valuation date transactions and information were representative of market perception as of February 16, 1998 and is in our opinion a violation of USPAP standards that overstates value.

## C.    Inappropriate Identification of Subject Property

As outlined in numerous sources, the business enterprise, asset or equity being valued must be correctly identified. As observed from various documents, including but not limited to Stock Certificates and financial data, the Decedent held 443,333 Shares of common stock of The International Cornerstone Group, Inc. ("International Cornerstone"). Subsequent to Decedent's date of death, International Cornerstone became Cornerstone Brands, Inc. ("Cornerstone"). Mr. Burns in his deposition states:

"...[the subject property] probably should more accurately refer to the name of the company at the time of death."[33]

Additionally, International Cornerstone, at the time of Decedent's date of death, was a holding company for six direct marketing companies offering home, leisure and casual apparel products, primarily through catalogues.   As previously indicated Revenue Ruling 59-60 indicates that the valuation of closely held companies requires the appraiser to consider all relevant factors, specifically:

> "...in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued."

Mr. Burns ignored the asset approach even though he classified the company as a holding company "[International Cornerstone] Operated as a holding company..."[34]

Mr. Burns omits many of the attributes of the subject property as outlined by USPAP Standards Rule 9-2(d)(ii), which states:

> "Special attention should be paid to the attributes of the interest being appraised, including the rights and benefits of ownership. The elements of control in a given situation may be affected by law, distribution of ownership interests, contractual relationships, and many other factors. As a consequence, the degree of control or lack of it depends on a broad variety of facts and circumstances that must be evaluated in the specific situation." [35]

Also, the Appraisal Report does not indicate the fact that the Estate shares represent a 1.7% minority interest until page 17 of the Appraisal Report.

---

[33] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 149, Lines 14-16.
[34] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, page 2.

As previously mentioned, Mr. Burns inappropriately identifies the subject property when he fails to specifically identify the Decedent's 443,333 shares as minority common shares that are restricted. USPAP Standard Rule 9-2(d)(i) addresses this issue and states:

> "In developing a business or intangible asset appraisal, an appraiser must identify...the business enterprises, assets or equity to be valued; identify any buy-sell agreements, investment letter stock restrictions, restrictive corporate charter or partnership agreement clauses, and any similar features or factors that may have an influence on value..."[36]

It is my opinion that Mr. Burns' failure to properly identify the subject property is a violation of USPAP and overstates the concluded value.

## D.     Omission or Suppression of Significant Material Information

Mr. Burns not only fails to accurately and appropriately identify the Estate's minority restricted shares of common stock, he also omits from his report material information concerning the attributes of the common shares held by the Estate. The stock certificate representing ownership of the common shares held by the Estate contained a legend referencing several restrictive agreements in relation to the transferability of the common shares. The legend on the stock certificate reads as follows:

> "The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be sold or transferred in the absence of an effective Registration Statement under the Act or an exemption from registration thereunder. The securities represented by this certificate are also subject to certain repurchase options and certain other agreements set forth in an Executive Stock Repurchase Agreement between the issuer (the "Company") and an executive of the Company dated as of September 13, 1995, as amended and modified from

---

[35] USPAP, 2003, p. 74
[36] USPAP, 2003, pp. 73-74.

time to time, a copy of which may be obtained by the holder hereof at the Company's principal place of business without charge to the holder hereof upon written request.  The securities represented by this certificate are also subject to a certain Stockholder's Agreement dated as of September 13, 1995, among the Company and certain of the Company's stockholders, as amended and modified from time to time. A copy of such Stockholder Agreement may be obtained by the holder hereof at the Company's principal place of business without charge to the holder hereof upon written request."[37]

These referenced restrictions include a provision for the right of first refusal, not allowing any transfer of shares for any consideration other than cash and not allowing any transfer or sale of shares for a period of time.

In his deposition, when asked if restrictions on stock are very important from a stock valuation perspective, Mr. Burns responds:

"It has a bearing on value, yes" and continues, "...I think if a stock is restricted it's something that should be considered in determining its value, other things equal."[38]

Consequently, when Mr. Burns was asked if he considered any of the restrictions placed upon the Estate shares in reaching a fair market value conclusion, he responds:

"I don't believe so."[39]

Another significant omission of material information is Mr. Burns' failure to identify his testimony in the *Estate of John L. Baird v. Commissioner of Internal*

---

[37] The International Cornerstone Group, Inc., Stock Certificate issued to Gladney Heazel as owner of Four Hundred Forty-three Thousand Three Hundred Thirty-three shares of common stock, as of August 13,1997.
[38] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 150, Line 22; p. 151, Lines 2-5.
[39] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 160, Lines14-17.

*Revenue.* Mr. Burns states in his deposition the reasoning for not identifying his testimony:

> "I didn't testify as an expert witness, which is what my interpretation of the rule, Federal Rules calls for, and I am willing to admit that I could be wrong in it."[40]

However, Mr. Burns' credentials attached to the Appraisal Report include a listing of his testimony which is entitled "Previous Testimony."[41] This list appears to be a record of all his previous testimony and has not been divided among expert testimony and any other testimony.

As was stated earlier, under USPAP, all appraisers must adhere to the Ethics Rule which includes the following information on appraisal practice concerning conduct:

> "An appraiser must perform assignments with impartiality, objectivity and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue. An appraiser may be an advocate only in support of his or her assignment results. Advocacy in any form in appraisal practice is a violation of the ETHICS RULE. An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."[42]

### E.    Market Approach

When discussing the three generally accepted valuation approaches for valuing a business in the Appraisal Report, Mr. Burns stated:

> "Cornerstone engaged in several arm's-length acquisitions surrounding the valuation date in which its common stock was offered in lieu of cash. The value of Cornerstone's stock used in these acquisitions serves as the best

---

[40] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 130, Lines 16-19.
[41] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, tab 18

proxy for the price that a willing buyer and willing seller would have negotiated on the valuation date."[43]

We agree with Mr. Burns that the market approach can be an effective way to value a business based on the fact that it relies on arm's-length transactions in similar guideline companies. As acknowledged by Mr. Burns, Shannon Pratt in his book, *The Market Approach to Valuing Businesses*, mentions that such arm's-length transactions can take several forms, such as past transactions in the subject company and past acquisitions by the subject company. However, as also stated by Shannon Pratt:

> "Merger and acquisition prices, often, to some extent, reflect synergies and/or strategic advantages between acquirer and acquiree. To the extent that this is true, a transaction may be more reflective *of investment value* (value to that particular buyer) than *fair market value* (the value to a hypothetical, typically motivated buyer). For this reason, the circumstances of the merger and acquisition transactions must be carefully analyzed."[44]

After reviewing International Cornerstone's business plan and strategy, we understand that International Cornerstone focused on "strategically" acquiring target companies. Mr. Burns, in his Appraisal Report agrees:

> "...Cornerstone focused on strategically acquiring direct-mail catalog businesses that offered high quality brand images and brand names...Cornerstone preferred to keep the management of the acquired company in place while taking on responsibility for back-end operations...Management believed that this strategy allowed the company

---

[42] USPAP 2004, p. 7.
[43] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p.7
[44] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition.* McGraw-Hill, 2000, p. 278.

to maintain its quality and consumer focus while gaining the efficiencies of a large-scale order fulfillment operation."[45]

It is my opinion that Mr. Burns failed to carefully analyze the transactions applied in the market approach. Accordingly, Mr. Burns' concluded value is unsupportable as outlined in more detail below.

## 1.   Reliance on Stock for Stock Transactions as Fair Market Value

The *International Glossary of Business Valuation Terms* defines fair market value as:

> "The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms-length in an open and unrestricted market, where neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[46]

Accordingly, this definition clearly indicates that when arriving at a conclusion of fair market value, the price articulated should be expressed in terms of cash and/or cash equivalents. Further to add to this point, Dr. Shannon Pratt states:

> "For guideline valuation purposes, and certainly if the standard of value is fair market value, it is necessary that the deal price used to develop a value measure be a cash or cash equivalent price. In many acquisitions, the consideration paid is all or partly something other than cash, such as common or preferred stock, (sometimes convertible), notes (also sometimes convertible), and so on. The cash value of such consideration often is less than its face value (rarely more). If using a guideline transaction in which the consideration paid was not all cash, the analyst

---

[45] "Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998" issued by Francis X. Burns of Intecap, Inc. and dated August 19, 2003, p. 2

[46] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p.4.

should make the best possible effort to convert the consideration paid to a cash equivalent value."[47]

Mr. Burns should be familiar with these well known established sources and acknowledges in his deposition, "I would not view that [stock] as a cash equivalent."[48] In light of this analysis and with respect to Mr. Burns' own testimony that stock should not be viewed as a cash equivalent, it is our opinion that Mr. Burns failed to "make the best possible effort" and convert shares of International Cornerstone to a cash equivalent value.

As mentioned, Mr. Burns determined that the market approach was the most reliable methodology in concluding the fair market value of International Cornerstone. More specifically, Mr. Burns determined that because International Cornerstone engaged in several, what he calls arm's-length acquisitions, this data would serve as the best proxy for value. However, the value of the common stock and option exercise prices used in these acquisitions was determined by the board of directors of International Cornerstone, and no independent third party appraisals were performed. The following chart indicates the implied stock prices of International Cornerstone at various dates and Mr. Burns' implied annualized rate of return on the stock price. The chart indicates incidents of wild volatility and incidents of 0.0% return for extended periods of time.

---

[47] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition.* McGraw-Hill, 2000, p. 265.
[48] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 162, Line 24-25.

## MR. BURNS IMPLIED APPRECIATION OF INTERNATIONAL
## CORNERSTONE TRANSACTIONS

| | 13-Sep-95 | 31-Mar-97 | 28-Jul-97 | 13-Aug-97 | 16-Feb-98 | 1-May-98 | 6-Jul-98 | 25-Aug-98 | 8-Oct-98 |
|---|---|---|---|---|---|---|---|---|---|
| | Madison Dearborn, LP | The Territory Ahead, Inc. | Garnet Hill, Inc. | Ballard Designs, Inc | Valuation Date | Board Memo | John Walters | Smith & Noble, LLC | Whispering Pines, LLC |
| Implied Stock Price | $4.55 | $6.00 | $8.00 | $9.00 | $9.00 | $9.00 | $9.00 | $17.00 | $17.00 |
| Days Between Events | n/a | 565 | 119 | 16 | 187 | 74 | 66 | 50 | 44 |
| Implied Rate of Return (Between Events) | n/a | 31.9% | 33.3% | 12.5% | 0.0% | 0.0% | 0.0% | 88.9% | 0.0% |
| **Annualized Rate of Return** | **n/a** | **20.6%** | **102.3%** | **285.4%** | **0.0%** | **0.0%** | **0.0%** | **649.3%** | **0.0%** |

The above chart indicates that when Garnet Hill, Inc. shareholders received stock in International Cornerstone on July 28, 1997, their rate of return in only 16 days ($9 used for Ballard Designs Inc. vs. $8 for Garnet Hill Inc.) would have been 12.5% or 285.4% on an annualized basis. The chart also indicates that these same shareholders would have achieved no return for nearly one full year. This chart demonstrates that these implied stock prices and their subsequent implied rates of return are arbitrary, unsupportable, and bear no relationship to fair market value.

Not only does the relevance of these stock prices raise concerns, their impartiality and the reliability of the underlying data are also questionable. In his deposition, Mr. Burns openly acknowledges the fact that the Board of Directors set the price for the stock option agreements, which is the foundation for his stock price per share. Specifically, when asked if he agreed that the Board of Directors of International Cornerstone would be independent of International Cornerstone, he states:

> "They [the board of directors] are part of Cornerstone, so they cannot be independent of Cornerstone."[49]

---

[49] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 198, Lines 24-25.

Additionally, Mr. Burns is completely unaware of the methods, techniques, data or any information employed to arrive at these amounts. In his deposition, Mr. Burns was asked what due diligence he performed and specifically, if he verified or confirmed how the option prices were set by the Board of Directors. Mr. Burns responds, "We would have loved to have had that information."[50] Accordingly, Mr. Burns relies upon amounts that he acknowledges were not independent and were not concluded by independent third parties. In addition, although Mr. Burns admits that he has no documentation, supporting evidence or any facts whatsoever as to how the option price was set by the Board of Directors, he employs these related party values anyway and relies on these unexercised related party option prices in concluding his value. As such, Mr. Burns' use of these prices in reaching his value conclusion is inappropriate, unsupportable and a violation of USPAP.

2.      **Transactions Consisting of Synergies and Control and Applied as Minority Interest**

There have been numerous texts and articles written, as well as numerous methodical studies and analyses, which have established the theory that a purchase price paid for a controlling interest can support a premium in excess of what a minority interest would achieve. A control premium is paid to reflect the power of control to direct the management, operations and financial aspects of a company.

Similarly, a synergistic value (or investment value) will likely support a premium paid in excess of a control premium. As stated in *Financial Valuation, Applications and Models:*

> "One of the most difficult aspects of a valuation for a transaction is estimating the potential value of synergies which should result in a

---

[50] Deposition of Francis X. Burns, Estate of Gladney E. Heazel v. United States of America, Volume I October 1, 2003, p. 175, Lines 19-20.

'increase in cash flows in addition to what two companies can generate independently.'"[51]

International Cornerstone's strategy was to acquire premier catalog companies and implement efficiencies and economies of scale, as well as expand the capabilities of each acquired company. As such, International Cornerstone likely paid a premium in acquiring each company and a proper and thorough analysis of each transaction is necessary to arrive at the fair market value of each company.

Because each transaction contemplated by Mr. Burns involved acquiring a controlling interest of the target company and incorporated an investment value, the individual minority shareholders, as a whole, received a greater value for their stock in the acquired company. Had this transaction not occurred and an individual minority shareholder of one of the acquired companies sought to sell his/her minority interest, the same value would not have been received for the minority interest. The fair market value of a minority non-marketable interest in one of the acquired companies, had it not been purchased by International Cornerstone, would have realized a substantially lower amount. However, each minority shareholder of the companies acquired by International Cornerstone received an investment value for his/her interest, not fair market value. As such, the transactions considered and applied by Mr. Burns to arrive at this concluded value, without performing a careful analysis of those transactions, are unsupportable.

**3.      Application of Multiples of Publicly Traded Guideline Companies**

We agree with Mr. Burns that the market approach is an effective way to value a business and the application of guideline publicly traded multiples is relevant because of daily transactions of public stock between willing buyers and willing sellers in the public marketplace. However, when selection and application of

---

[51] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p. 853.

those guideline publicly traded multiples is not thoroughly analyzed, the resulting value will likely be incorrect and unsupportable.

The American Society of Appraisers ("ASA") *Business Valuation Standards BVS-V Market Approach to Business Valuation* requires an appraiser to consider a reasonable basis for comparison, which includes:

"1. A sufficient similarity of qualitative and quantitative investment characteristics

2. The amount and verifiability of data known about the similar investment

3. Whether or not the price of the similar investment was obtained in an arm's-length transaction, or a forced or distress sale."[52]

Although Mr. Burns identified three guideline publicly traded companies that in his opinion were "most comparable," his Appraisal Report does not include any analyses to indicate in what manner these guideline companies were comparable. When choosing guideline companies, the book *Financial Valuation, Applications and Models* states:

"The process for choosing guideline companies can be summarized as:

- Using a variety of sources, compile a list of companies in the same or similar industry as the subject company.

- Review the detailed business descriptions of these companies and eliminate those that are dissimilar to the business of the subject company.

- Eliminated companies whose financial characteristics are not similar to the subject. Two of the most important characteristics are absolute size and growth potential.

- Collect detailed financial information (both historical and prospective, if available) about each of the potential guideline companies, placing the data in a format that is consistent across all

---

[52] "Business Valuation Standards©," Copyright 2001, American Society of Appraisers.

companies, and include the same information for the subject company.

- Make any necessary adjustments to the guideline companies and the subject company."[53]

Mr. Burns' Appraisal Report does not indicate any reference to an analysis that would identify similarities in size, growth, strength, operations, financial performance or capital structure.   ASA *Statements on Business Valuation Standard SBVS-1 The Guideline Company Valuation Method* requires the following when an appraiser considers valuation ratios derived from guideline companies:

"A.   Price information of the guideline companies *must* be related to the appropriate underlying financial data of each guideline company in order to compute appropriate valuation ratios.

B.   The valuation ratios for the guideline companies and the comparative analysis of qualitative and quantitative factors should be used together to determine appropriate valuation ratios to be applied to the subject company.

C.   Several valuation ratios may be selected for application to the subject company, and several value indications may be obtained. The appraiser should consider the relative importance accorded to each of the value indications used in arriving at the opinion or conclusion of value.

D.   To the extent that adjustments for dissimilarities with respect to minority and control, or marketability, have been made earlier, appropriate adjustments for these factors must be made, if applicable."[54]

As such, Mr. Burns' application of average guideline company multiples without any consideration or indication of potential adjustments, including adjustments for the difference in capital structure, is incorrect. Mr. Burns' reliance on a simple

---

[53] Hitchner, James R. *Financial Valuation, Applications and Models.* John Wiley & Sons, Inc., New Jersey, 2003, p 213-214.
[54] "Business Valuation Standards©," Copyright 2001, American Society of Appraisers.

average of guideline company multiples without a comparative analysis is a common mistake made by appraisers as indicated in the book *Valuing A Business – The Analysis and Appraisal of Closely Held Companies*.

> "Unless the guideline and subject companies are extremely homogenous in their financial characteristics, the mean or median of the guideline company pricing multiples may not be the most appropriate pricing multiples for the subject company. Yet analysts often use the mean or median guideline company pricing multiple with no explanation to justify the implied notion that the subject company's characteristics indicate that it should be valued right at the average of the guideline companies."[55]

After obtaining the working papers of Mr. Burns, it was evident that only a limited analysis of the guideline publicly traded companies was conducted. More specifically, an analysis as to the profitability of the guideline companies compared to International Cornerstone was performed. Mr. Burns' analysis clearly indicates that the guideline companies were much more profitable than International Cornerstone. The following is a summary of Mr. Burns' analysis of the guideline companies and International Cornerstone for 1997, which were omitted from the report but extracted from his work papers.

|  | Coldwater Creek, Inc. | Lands' End, Inc. | Williams Sonoma, Inc. | International Cornerstone |
|---|---|---|---|---|
| Operating Margin | 5.0% | 7.8% | 7.9% | 2.2% |
| Profit Margin | 5.8% | 5.1% | 4.4% | 3.0% |
| Return on Equity | 31.7% | 27.6% | 24.4% | 8.3% |
| Return on Assets | 17.2% | 15.8% | 9.4% | 5.7% |

[55] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition*. McGraw-Hill, 2000, p.255-256.

As presented above, International Cornerstone clearly underperforms those of its peer group. As such, an application of an average multiple without any adjustments is inappropriate. Previously in this report, I discussed the inaccuracies in selecting a price/sales multiple instead of relying on the price/EBITDA multiple.

As observed in his Appraisal Report, Mr. Burns considered and applied guideline multiples without providing any detailed analyses or explanations of any adjustments. Without sufficient information regarding an analysis as to any potential adjustments to account for differences in the operations, capital structure or financial fundamentals of the guideline companies and International Cornerstone, the concluded multiples are discretionary and unsupportable.

Mr. Burns only relied on the guideline public company method as a test of reasonableness. If Mr. Burns agrees that the public companies are similar, then this method, when correctly and properly applied, should have been considered as one of the primary methods. Many authoritative sources in valuation have indicated the relevance and importance of applying a guideline public company method. USPAP Standard Rule 9-4(a) substantiates and confirms that an appraiser should consider and apply all appropriate methods:

> "In developing a business or intangible asset appraisal, an appraiser must collect and analyze all information pertinent to the appraisal problem, given the scope of work identified in accordance with Standards Rule 9-2(e). An appraiser must develop value opinion(s) and conclusion(s) by use of one or more approaches that apply to the specific appraisal assignment..." USPAP also comments, "This Standards Rule requires the appraiser to use all relevant approaches for which sufficient reliable data are available."[56]

---

[56] USPAP, 2003, p.75.

### F.    Discounts for Lack of Control and Marketability

In his Appraisal Report, Mr. Burns acknowledged that the 1.7% interest in International Cornerstone was a minority interest in a closely held business. However, he concludes that the value per share determined from recent International Cornerstone stock transactions and guideline companies is a minority interest.    Therefore, he concludes no further adjustment for lack of control is warranted.    Mr. Burns also concludes that transactions involving International Cornerstone stock would have considered all aspects for applicable discounts and premiums. Therefore, he concludes any lack of marketability would have been addressed in the negotiated price and again concluded no further adjustment for lack of control was necessary.

In conjunction with the above argument regarding the purchase price paid for the acquired companies, Dr. Shannon Pratt, in his book *Valuing A Business – the Analysis and Appraisal of Closely Held Companies,* states,

> "…while not all capital transactions pundits agree, most analysts concur that it is perfectly rational for acquirers to pay transaction prices that include (1) a noncontrolling ownership value plus (2) an ownership control premium plus (3) an additional acquisition price premium (above the control premium) related to the expected economic benefits of the merged companies."[57]

Mr. Burns' method uses an estimate of value based on controlling, marketable transactions.    This means that each individual shareholder received a control value, which is also an investment value for their shares of the acquired company. Accordingly, it is inappropriate to use those transactions as a measure of fair market value, without additional information and an analysis of each transaction.

---

[57] Pratt, Reilly, Schweihs. *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition.* McGraw-Hill, 4th Edition, 2000, p. 353.

## IV.    Assumptions and Limiting Conditions

The primary assumptions and limiting conditions pertaining to the technical appraisal review stated in this report are summarized below.  Other assumptions are cited elsewhere in this report.

The technical appraisal review conclusion(s) may not be used in conjunction with any other appraisal or study.  The technical appraisal review conclusion(s) stated in this report are based on the program of utilization described in the report and may not be separated into parts.  The technical appraisal review was prepared solely for the purpose, function and party so identified in the report.  The technical appraisal review report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of The Financial Valuation Group of Atlanta, Inc.  It may be furnished to the Court in this matter.

No change of any item in any of the report shall be made by anyone other than The Financial Valuation Group of Atlanta, Inc., and we shall have no responsibility for any such unauthorized change.

Neither all nor any part of the contents of the report shall be disseminated or referred to the public through advertising, public relations, news or sales media, or any other public means of communication, or referenced in any publication, including any private or public offerings, including but not limited to those filed with the Securities and Exchange Commission or other governmental agency, without the prior written consent and approval of The Financial Valuation Group of Atlanta, Inc.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

All facts and data set forth in our report are true and accurate to the best of the Valuator's knowledge and belief.

All conclusion(s) are presented as the Valuator's conclusion(s) and are based on the facts and data set forth in this report.

During the course of our analysis, we have considered information provided by counsel and other third parties. We believe these sources to be reliable, but no further responsibility is assumed for their accuracy.

This report is intended solely for use by the Estate of Gladney E. Heazel in connection with the case, *Estate of Gladney E. Heazel v. United Sates of America* and should not be used for any other purpose or distributed to third parties, in whole or in part, without the express written consent of The Financial Valuation Group of Atlanta, Inc. It may be furnished to the Court in this matter.

We have not examined the financial data or the underlying assumptions in accordance with the standards prescribed by the American Institute of Certified Public Accountants and do not express an opinion or any other form of assurance on the data and related assumptions.

We have no responsibility or obligation to update this report for events or circumstances occurring subsequent to the date of this report.

Our report is based on historical and/or prospective financial information provided to us by counsel and other third parties. This information has not been audited, reviewed or compiled by us, nor has it been subjected to any type of audit, review or compilation procedures by us, nor have we audited, reviewed or compiled the books and records of the subject company. Had we audited, reviewed or compiled the underlying data, matters may have come to our attention that would have resulted in our using data that differ from those provided; accordingly, we take no responsibility for the underlying data presented or relied upon in this report.

We will retain our supporting workpapers for your matter(s), and will be available to assist in active defense of our professional positions taken, at our then current rates, plus direct expenses at actual, and according to our then current Standard Professional Agreement.

## V.    Valuation Certification

**I certify that, to the best of my knowledge and belief:**

- The statements of fact and data contained in this review report and used in the review process are true and correct.

- The analyses, opinions, and conclusions in this review report are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest or bias in the business or property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- My engagement is not contingent upon developing or reporting any predetermined results.

- My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this review analysis and report.

- My analyses, opinions, conclusions and this review report were developed, in conformity with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Foundation and the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers.

- This technical appraisal review report and analysis was prepared under the direction of James R. Hitchner, CPA/ABV, ASA with significant professional assistance from Paul J. Vogt. Mr. Hitchner is a Certified Public Accountant licensed in the State of Georgia and is accredited in business valuation (ABV) by the American Institute of Certified Public

Accountants.  He is also an accredited senior appraiser (ASA) with the American Society of Appraisers.

- The American Society of Appraisers has a mandatory recertification program for its Senior Members. Mr. Hitchner is in compliance with that program.


James R. Hitchner, CPA/ABV, ASA
The Financial Valuation Group of Atlanta, Inc.

## VI.    Curriculum Vitae – James R. Hitchner

## JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

James R. Hitchner is a managing director with The Financial Valuation Group (FVG), a national firm specializing in valuation and litigation services.

Mr. Hitchner has twenty-five years of professional experience, including twenty-three years of valuation experience and two years of experience in real estate development. Prior to joining FVG, Mr. Hitchner co-founded Phillips Hitchner Group, Inc. (PHG) where he served seven years as a principle shareholder. Prior to forming PHG, he was the partner in charge of Valuation Services for the Southern Region of Coopers & Lybrand (now PricewaterhouseCoopers), a then "Big Six" accounting and consulting firm, where he spent more than nine years. He was also employed as a senior analyst with the national appraisal firm American Appraisal Associates, in both the financial and industrial valuation groups.

*Educational and Professional Designations*

**Accredited in Business Valuation** (ABV Designation), American Institute of Certified Public Accountants
**Accredited Senior Appraiser** (ASA Designation), American Society of Appraisers, Machinery & Technical Specialties
**Certified Public Accountant** (CPA Designation), American Institute of Certified Public Accountants
**MBA**, Rider University
**B.S.,** Engineering, University of Pittsburgh

*Professional Affiliations*

- American Institute of Certified Public Accountants (AICPA)
- AICPA National Business Valuations Subcommittee (former member)
- Contributing Editor of AICPA CPA Expert newsletter for business valuation and litigation services
- Chairman of 1996 AICPA National Business Valuation Conference
- Steering Committee for 1995 AICPA National Business Valuation Conference
- Chairman, AICPA ABV Examination Preparatory/Review Course (1997)
- Review Committee, AICPA Fundamentals of Business Valuation – FBV I & FBV II

- Inductee in AICPA Business Valuation Hall of Fame (2000)
- AICPA Business Valuation Volunteer of the Year Award (1999 & 2002)
- AICPA BV Standards Task Force (2002-2003)
- Former Chair, GSCPA Business Valuation Subcommittee
- Pennsylvania Institute of CPAs
- Former member of The Appraisal Foundation Industry Advisory Council
- Association for Investment Management and Research (AIMR)
- Atlanta Society of Financial Analysts
- American Society of Appraisers
- Georgia Society of CPAs (GSCPA)
- AICPA ABV Examination Committee (1997)

*Financial Consulting Group, LC*

Mr. Hitchner is a founding member of the Financial Consulting Group, LC (FCG), headquartered in Tampa, Florida. FCG is a national association of professional services firms dedicated to excellence in valuation, financial and litigation consulting. This strategic alliance of independent firms allows each firm to provide its clients with current and broad based financial databases and technology, industry, geographic and consulting expertise at the highest levels.

*Expert Testimony*

Mr. Hitchner has been recognized as a qualified expert witness in federal and state courts and has provided testimony on valuations in Florida, Georgia, Indiana, New Jersey, North Carolina, Ohio, Tennessee and Virginia, as well as the U.S. Tax Court.

*Books*

Mr. Hitchner is editor and co-author of Financial Valuation Applications and Models Copyright © 2003 by John Wiley & Sons, Inc.

Mr. Hitchner is co-author of Financial Valuation Workbook Copyright © 2003 by John Wiley & Sons, Inc.

Mr. Hitchner is co-author of Valuation for Financial Reporting, Intangible Assets, Goodwill, And Impairment Analysis, SFAS 141 and 141, Copyright © 2002 by John Wiley & Sons, Inc.

*Courses*

"Calculating Cost of Capital and Defending Your Conclusions" and "The Truth About Discounts and Premiums: It's Not What You Think It Is"

Author for one-day course offered by the Rhode Island Society of CPAs

"Advanced Business Valuation"

Author for three-day course offered by the National Association of Certified Valuation Analysts

"Discounts and Premiums"

Author for one-day course offered by the Financial Consulting Group, L.C.

"Valuation for Financial Reporting"

Co-author for 3 part video self study series offered by the AICPA and CPA2Biz

"3rd Annual FCG University program"

Co-creator and Co-instructor for two-day session offered by the Financial Consulting Group, L.C. on valuation and litigation services

"Fundamentals of Business Valuation (FBV I)"

Co-author for national AICPA three-day business valuation course

"Fundamentals of Business Valuation (FBV II)"

Co-author for national AICPA three-day business valuation course

"FCG University - Intensive Learning Series"

Co-creator for two-day session offered by the Financial Consulting Group, L.C. on valuing an actual company as part of a case study and a review of the Ibbotson SBBI-Valuation Edition

"Valuations & Transfers: Acquisition Settings & Federal Estate & Gift Tax Settings"

Co-author for course 6 (NBV6) of national AICPA business valuation - Certificate of Educational Achievement (CEA) program

"Advanced Analysis of Discounts and Premiums"

Author for course 1 (BVA-ADP) of national AICPA business valuation advanced - CEA program

# JAMES R. HITCHNER, CPA/ABV, ASA
# CURRICULUM VITAE

"Special Issues in Business Valuations"
    Contributing editor for course 5 (NBV 5) of national AICPA business valuation - CEA program
"A Practical Approach to Valuation Report Writing"
    Co-author of sample report for course 8 (NBV8) of national AICPA business valuation - CEA program
"Preparing for the AICPA ABV Examination Review Course"
    Co-author for national AICPA Accredited in Business Valuation (ABV) review course
"Valuation Services I, II, III"
    Author for national courses for national accounting firm

*Instructor*

"Calculating Cost of Capital and Defending Your Conclusions" and "The Truth About Discounts and Premiums: It's Not What You Think It Is"
    Instructor for one-day course offered by the Rhode Island Society of CPAs, Providence, RI (2003)
"Discounts and Premiums"
    Instructor for one-day course for the Financial Consulting Group, L.C., Atlanta (2003)
"Business Valuation Issues in Tax Planning"
    Instructor for one-day course for Polaris North American Network, Orlando (2003)
"Recent Tax Court Valuation Opinions: Ideas to Help Closely Held Business Owners"
    Instructor for one-day course for Polaris North American Network, Atlanta (2003)
"Advanced Business Valuation"
    Co-instructor for three-day course for the National Association of Certified Valuation Analysts, Washington, D.C. (2003)
    Co-instructor for three-day course for the National Association of Certified Valuation Analysts, New Orleans (2003)
"FCG Way Workshop"
    Co-instructor for one-day course for the Financial Consulting Group, L.C., 2003 Annual Conference Memphis, TN
"Financial Statements in the Courtroom" – Flaschner Judicial Institute – Jointly Sponsored with the American Institute of Certified Public Accountants
    Instructor for Business Valuation course for Judges, Boston, MA (2001)
"Business Issues for Judges" - The National Judicial College
    Co-instructor for Business Valuation course for Judges, Orlando (2000)
"Business Valuation and Analysis"
    Guest instructor, Financial Analysis and Loan Structuring, (2001) Georgia State University, Atlanta, GA
"Fundamentals of Business Valuation (FBV I)"
    Co-instructor for AICPA/State CPA Society three-day business valuation course, Atlanta (2000)
"Fundamentals of Business Valuation (FBV II)"
    Co-instructor for AICPA/State CPA Society three-day business valuation course, Atlanta (2000)
"Preparing for the AICPA ABV Examination Review Course"
    Instructor for AICPA two-day review course, Atlanta (2002)
    Instructor for AICPA two-day review course, Atlanta (2001)
    Instructor for AICPA two-day review course, Atlanta (2000)
    Instructor for AICPA two-day review course, Atlanta (1999)
    Instructor for AICPA two-day review course, Atlanta (1998)
    Instructor for AICPA two-day review course, Atlanta (1997)
    Instructor for AICPA two-day review course, Philadelphia (1997)

# JAMES R. HITCHNER, CPA/ABV, ASA
# CURRICULUM VITAE

"Valuations & Transfers: Acquisition Settings & Federal Estate & Gift Tax Settings"
    Instructor for AICPA/State CPA Society business valuation course, Columbus (1996)
    Instructor for AICPA/State CPA Society business valuation course, Raleigh (1996)
    Instructor for AICPA/State CPA Society business valuation course, Boston (1995)
    Instructor for AICPA/State CPA Society business valuation course, Denver (1995)
    Instructor for AICPA/State CPA Society business valuation course, Philadelphia (1995)
"Special Issues in Business Valuation"
    Instructor for AICPA/State CPA Society business valuation course, Atlanta, GA (1998)
    Instructor for AICPA/State CPA Society business valuation course, Jackson, MS (1997)
    Instructor for AICPA/State CPA Society business valuation course, Indianapolis (1996)
    Instructor for AICPA/State CPA Society business valuation course, Nashville (1996)
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1995)
    Instructor for AICPA/State CPA Society business valuation course, Chicago (1995)
    Instructor for AICPA/State CPA Society business valuation course, Little Rock (1995)
"The Income Approach and the Asset-Based Approach to Valuation"
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1999)
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1997)
    Instructor for AICPA/State CPA Society business valuation course, Orlando (1997)
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1996)
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1996)
    Instructor for AICPA/State CPA Society business valuation course, Columbia, SC (1996)
"Advanced Analysis of Discounts and Premiums"
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1998)
    Instructor for AICPA/State CPA Society business valuation course, Atlanta (1997)
"Valuation of Real Estate"
    Instructor for National Course
"Valuation Services I, II, and III"
    Instructor for National Course

*Reviewer*
    "Cost of Capital Estimation and Applications" Copyright © 2002, 1998 by John Wiley & Sons, Inc.
        Shannon P. Pratt, CFA, FASA, CBA
    "Conducting a Valuation of a Closely Held Business" Copyright © 2001 by AICPA, INC. New York, NY
        Gary R. Trugman, CPA/ABV, MCBA, ASA, MVS
    "Understanding Business Valuation" Copyright © 1998 by AICPA, Inc., New York, NY 10036
        Gary R. Trugman, CPA, ABV, CBA, ASA, CFE, MVS
    "Valuing Accounting Practices"
        Robert F. Reilly & Robert P. Schweihs Copyright © 1997 by John Wiley & Sons, Inc.
    National AICPA Business Valuation Certificate of Educational Achievement (CEA)
        Eight (8) Course Program
    "Special Issues in Business Valuation"
        Course 5 (NBV5) of national AICPA business valuation –CEA program
    Preparing for the AICPA ABV Examination Review Course
    "Fundamentals of Business Valuation – FBV I & FBV II"
        Two national three-day AICPA courses

*Publications and Articles*
    "Tax Court deals blow to traditional discount studies"
        Article published in Fall 2003, Valuation Plus Newsletter
    "Courts Decide on FLP Discounts and Capital Gains"
        Article published in Winter, 2002 Valuation Plus Newsletter
    "Court Details Requirements for Buy-Sell Agreements"
        Article published in Fall 2001, Valuation Plus Newsletter

## JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

"Similar Valuations in Wall Case should have Prevented Trial"
  Article published in Summer 2001, Valuation Plus Newsletter
"Tax Court favors IRS expert's discounts in valuation case"
  Article published in Spring 2001, Valuation Plus Newsletter
"Tax Court frowns on WACC application in recent decisions"
  Article published in Winter 2001, Valuation Plus Newsletter
"Tax Court Gets Into It!"
  Article published in AICPA Spring 1999, CPA Expert newsletter for business valuation and litigation
  services
"What Are Professional Practices Worth"
  Interview with The Practical Accountant (1998)
"50% + 50% ≠ 100%"
  Article published in AICPA Winter 1998, CPA Expert
"When the Future Becomes the Past"
  Article published in AICPA Spring/Summer 1998, CPA Expert
"IRS Disregards Family Limited Partnership"
  Article published in AICPA Summer 1997, CPA Expert
"Large Discounts Allowed in Real Estate Partnership"
  Article published in AICPA Spring 1997, CPA Expert
"Big Things Come In Small Packages"
  Article published in AICPA Fall 1996, CPA Expert
"An Important Reminder: IRS Accepts Value Reduction For Built-in Corporate Capital Gains Tax Liability"
  Article published in AICPA Fall 1996, CPA Expert
"Matter of Slant/Fin Corp. v. The Chicago Corp."
  Article published in AICPA Spring 1996, CPA Expert
"Valuers Can Do More for Clients than Determine Value; Assisting Privately Held Clients Maximize and
Measure Shareholder Value"
  Article published in AICPA Winter Issue, CPA Expert
"Tax Court Reviews Nine Factors for Selecting Marketability Discounts"
  Article published in AICPA Winter Issue, CPA Expert
"Court Continues to Select Values Based on Appraisal Merit"
  Article published in AICPA Premier Issue, CPA Expert
"The Use of Discounts in Estate and Gift Tax Valuations"
  Article published in Trusts and Estates, Aug. 1992, and Digest of Tax Articles
"Family Limited Partnerships - Potential Tax Savings"
  Article published in Business Alabama Monthly, February 1995
"What's It Worth? The Second Most Important Question!"
  Article published in Fall 1996 Your Healthy Practice newsletter for healthcare professionals
"What You See Is Not Only What You Get! Hidden Value in Physician Practices"
  Article published in Winter 1996 Your Healthy Practice newsletter for healthcare professionals
"Court Looks at Fair Value vs. Fair Market Value"
  Article published in Summer 1996 On Point newsletter for attorneys
"What's in a Name? Little, Say Western Union Skeptics"
  Interview with Investor's Daily
"Valuation of Closely Held Businesses"
  Article published by the AICPA in The Tax Advisor, July 1992
"Marketability and Control Govern Value of Family Businesses"
  Article published in Taxation for Lawyers, July/August 1993 and Taxation for Accountants
"Valuing Indirectly Held Real Estate Has Special Concerns"
  Article published in Estate Planning, July/August 1993
"The Tax Benefits of Performing a Depreciation Study"
  Article published in the Real Estate Finance Journal, Spring 1992

## JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

"Team Player - Valuation Specialists Should Be Consulted Prior to Construction to Perform an Asset Analysis"
Article published in Focus Magazine, November 14, 1990 - Construction Edition

*Presentations*
"SFAS 141/142 Valuations: Clarifying the Controversies"
Speaker at American Society of Appraisers, Advanced Business Valuation Conference, Chicago, IL (2003)
"Defending Your Discounts and Premiums: It's Not What It Used To Be"
Speaker at Fourth Annual Virginia Society of CPAs Business Valuation and Litigation Services Conference, Richmond, VA (2003)
"Defending Against an IRS Challenge to Marketability Studies"
Speaker for Financial Consulting Group, L.C. 2003 Annual Conference, Memphis, TN
"Defending & Attacking Cap Rates in the Courtroom"
Speaker at the National Litigation Support Services Association Spring 2003 Conference, Boston, MA
"Cost of Capital Issues"
Speaker at the 2003 Illinois CPA Foundation Business Valuation Conference, Chicago, IL
"Excelling During Direct Examination"
Commentator for Business Valuation Resources Audio Conference (2003)
"SFAS 141/142"
Speaker at the Florida Institute of CPAs Litigation & Valuation Services Conference, Ft. Lauderdale, FL (2003)
"Intangible Assets, Goodwill and Impairment"
Commentator for Business Valuation Resources Audio Conference (2002)
"Valuation Adjustments"
Speaker at 2002 AAML/AICPA National Conference on Divorce, Las Vegas, NV
"Using Transaction Databases to Value Small Businesses"
Speaker at 2002 Minnesota Society of CPAs Business Valuation Conference, Minneapolis, MN
"Valuation of Intangible Assets"
Participant at Financial Accounting Standards Board (FASB) Roundtable Discussion (2002), Norwalk, CT
"Valuation of Intangible Assets"
Co-presenter to FASB (2002), Norwalk, CT
"Valuation for Financial Reporting: Intangible Assets, Goodwill & Impairment Analysis, SFAS 141 &142"
Speaker at 2002 CPA Associates Business Valuation Conference, Chicago, IL
"Valuation Adjustments"
Speaker at 2002 AAML/AICPA National Conference on Divorce, Las Vegas, NV
"Business Valuation Survivor" and "Small Business Case Study"
Co-panelist and co-speaker at 2001 AICPA Business Valuation Conference, Las Vegas, NV
"Discounts, Discounts and More Damn Discounts"
Speaker at 2002 Illinois CPA Foundation Business Valuation Conference, Chicago, IL

# JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

"Preparing and Critiquing Valuation Reports"
Speaker at 2002 Florida Institute of CPAs Litigation and Valuation Services Conference, Ft. Lauderdale, FL
"How to Create Value for Shareholders: Current Issues in Business Valuation"
Speaker at 2002 Georgia State University Society of Entrepreneurs Luncheon, Atlanta, GA
"Valuation for Financial Reporting"
Co-presenter at 3 part series by the AICPA and CPA2Biz Webcasts, 2001-2002, Jersey City, NJ
"Discounts, Discounts and More Damn Discounts"
2001 NACVA Business Valuation Meeting, Atlanta, GA
"Blockage & Market Absorption Discounts"
Speaker at 2001 NACVA 8th Annual Business Valuation Conference, Chicago, IL
"Valuation Jeopardy" and "Discounts and Premiums"
Moderator and Speaker at 2000 AICPA Business Valuation Conference, Miami, FL
"Discounts & Premiums" and "Discount Rates"
Speaker at 2000 AICPA National Advanced Litigation Services Conference, Los Angeles, CA
"Utilization of Net Income vs. Cash Flow, Determination of Projected Long Term Growth, and Determination of a Discount Rate"
Panelist at 2000 Lawyers Public Information Foundation, Family Law Seminar, La Romana, Dominican Republic
"State of the Valuation Industry"
Speaker at 2000 Utah Association of CPAs Third Annual Business Valuation Symposium, Salt Lake City, UT
"Family Limited Partnerships"
Speaker at 2000 Maryland Association of CPAs Strategic Mega Conference, Baltimore, MD
"Valuation of Small Businesses, A Practical Approach"
Speaker at 2000 Clifton Gunderson LLC Valuation & Forensic Services Group Annual CPE Meeting, Chicago, IL
"Advanced DCF Model"
Presentation at 2000 CPA Associates International Business Valuations Seminar, New Orleans, LA
"DCF Module In-depth Session on Theory and Application"
Presentation at 2000 Financial Consulting Group, L.C. (FCG) Member Firm Conference, Denver, CO
"Valuation – Trends, Regression Analysis and Terminal Value"
Session Leader at 2000 AICPA National Advanced Divorce Conference, Las Vegas, NV
"The CPA as an Expert Witness"
Speaker at Chattanooga Chapter of the Tennessee Society of Certified Public Accountants (TSCPA) March 2000 Monthly Meeting, Chattanooga, TN
"Valuation of Small Businesses: A Practical Approach"
Presentation at 2000 Business Valuation Conference, Chicago, IL
"How to Use Databases to Value a Closely Held Company"
Presentation at 1999 Florida Institute of CPAs Litigation & Valuation Services Conference, Ft. Lauderdale, FL
"Shareholder Dispute Issues"
Presentation at 1999 Florida Institute of CPAs Litigation & Valuation Services Conference, Ft. Lauderdale, FL
"Controversial Business Valuation Issues"
Speaker at 1999 New Jersey Society of CPAs (NJCPA) Symposium, New Brunswick, NJ

# JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

"Business Valuations: Current Issues and Problems"
  Speaker at 1999 North Carolina Association of CPAs (NCACPA) Accounting and Taxation Symposium, Raleigh, NC
"Valuation of High-Tech Start-Up Companies; Intellectual Properties, and In-Process R&D"
  Co-speaker at 1999 California Society of CPAs Conference, Los Angeles & San Jose, CA
"Allocation of Purchase Price & Valuation and Lifing of Intangible Assets"
  Presentation to the Financial Accounting Standards Board (FASB) 1999, Norwalk, CT
"Virtual Valuation Experience"
  Creator, presenter and moderator at 1998 AICPA National Business Valuation Conference, West Palm Beach, FL
"New Valuation Methods and Theory"
  Presentation at 1998 Lawyers Public Information Foundation Family Law Seminar,
  Sintra, Portugal
"The Financial Expert: Reports, USPAP, and the New Rules on Case Management and Discovery"
  Presentation at 1998 Lawyers Public Information Foundation Family Law Seminar,
  Sintra, Portugal
"Landmark Cases"
  Presentation at 1997 AICPA National Business Valuation Conference, San Diego, CA
"Crossfire: Capitalization Rates, Discounts and Premiums. Reasons for Differences"
  Moderator at 1996 AICPA National Business Valuation Conference, Phoenix, AZ
"Lawyers are from Mars & CPAs are from Pluto: Differences Between Lawyers and CPAs"
  Moderator at 1996 AICPA National Business Valuation Conference, Phoenix, AZ
"Discounts and Premiums"
  Presenter and moderator at 1996 AICPA National Business Valuation Conference, Phoenix, AZ
"Court Case Review"
  Presentation at 1995 AICPA National Business Valuation Conference, New Orleans, LA
"Using the IRS Valuation Manual"
  Presentation at ASA 1997 16th Annual Advanced Business Valuation Conference, San Francisco, CA
"Business Valuation: Court Case Update"
  National Association of Certified Valuation Analysts (NACVA) 1998 Regional Conference, Atlanta, GA
"Pitfalls to Avoid in Preparing Business Valuations"
  Presenter and Chairman, Georgia Society of CPAs, 1998 Business Valuation Seminar, Atlanta, GA
"Current Issues in Business Valuation"
  Presenter, Alabama Institute of CPAs 1997 Seminar, Mobile, AL
"Using the IRS Valuation Manual"
  Presentation at Chicago Business Valuation Roundtable, 1998, Chicago, IL
"Controversial Issues"
  Panelist for New Jersey Society of CPAs Business Valuation Conference
"The Dynamics of Business Valuation"
  Panelist for nationally televised business valuation conference, Dallas, TX; also primary author for business valuation case study used in program
"Valuing a Construction Company"
  Presentation at the Construction Services Program - Pencor Niche Building Superconference, Chicago, IL
"The Use of Family Limited Partnerships and Limited Liability Corporations in Family Planning"
  Presentation at the Estate Planning Council of Rochester, Rochester, NY
"Discounts and Premiums at the Cutting Edge"
  Moderator for Illinois CPA Society National Business Valuation Symposium, Chicago, IL
"Court Case Update and Review"
  Presentation at CPA Associates International Business Valuations Seminar, Cincinnati, OH

## JAMES R. HITCHNER, CPA/ABV, ASA
## CURRICULUM VITAE

"Valuation of Closely Held Companies for Estate and Gift Tax Purposes"
    Presentation at Mobile Estate Planning Institute, Mobile, AL
"Capitalization Rates, Premiums and Discounts in Business and Professional Practice Valuations"
    Presentation at AICPA National Conference on Divorce, Las Vegas, NV
"Valuation of Closely Held Companies for Tax Purposes"
    Presentation at the Alabama Federal Tax Clinic, Tuscaloosa, AL
"Valuation Issues in Health Care"
    Presentation to Health Care Group
"Valuation of Physician Practices"
    Co-Moderator for Valuation Services Group Discussion
"Valuation of Intellectual Property"
    Presentation at Atlanta High Tech Conference
"Valuation of Closely Held Companies"
    Presentation at North Carolina Seminar
"Current Issues in Valuation for CPAs"
    Presentation to the Atlanta Chapter of the American Society of Appraisers
"Valuation of Businesses for Tax Purposes"
    Presentation to Tau Alpha Chi Honorary Tax Association, Georgia State University
"Valuation in the Healthcare Industry"
    Presentation at Atlanta Eldercare Conference
"Valuing Your Company and Cashing Out"
    Presentation sponsored by the Wharton Small Business Development Center and the Philadelphia Business
    Journal
"How to Value a Patent"
    Presentation to the Pennsylvania Innovation Network
"Valuation Services for Estate Planning"
    Presentation to Minneapolis Seminar
"The Use of Discounts in Estate and Gift Tax Valuations"
    Presentation at Advanced Technical Tax Seminar in Washington, D.C.
"Transfer of Ownership Strategies - Valuation Approaches and Issues"
    Presentation to existing and potential buyers and sellers
"Valuation of Closely Held Business"
    Presentation to National Personal Financial Planning Group
"Valuation and Amortization of Intangible Assets"
    Moderator and Presenter at National Teleconference
"Valuation of Intangible Assets"
    Presentation at Atlanta Tax Workshop
"The Use of Discounts in Estate and Gift Tax Valuations"
    Presentation to Chicago Trusts and Estates Breakfast Club
"How to Buy and/or Sell Businesses"
    Presentation to the Manufacturers Association of the Delaware Valley
"Valuing an Interest in a Law Practice"
    Presentation to the Pennsylvania Bar Association
"How to Value a Business"
    Presentation to the North New Jersey Chapter of the American Society of Appraisers
"Appraisal and Valuation Approaches - Valuation and Depreciation of Fixed Assets"
    Presentation to the National Association of College and University Business Officers
"Valuing a Business"
    Presentation at Emerging Business Services Conference
    Presentation at National Tax Symposium

## VII.    Expert Witness Testimony – James R. Hitchner

### JAMES R. HITCHNER, CPA/ABV, ASA
### EXPERT TESTIMONY IN PAST FOUR YEARS

In the past four years, Mr. Hitchner has testified as an expert witness in the following cases:

Debra K. Keach and Patricia A. Sage vs. U.S. Trust Company, N.A., et al.
U.S. District Court, Central District of Illinois, Peoria Division
Civil Action File No. 01-1168
Testified at trial: December 4, 2003
Testified at deposition: November 22, 2002

Eller vs. Eller
Civil Action No. 00-01453
Testified at trial: April 23, 2003

Estate of George C. Blount, Deceased, et al., vs. Commissioner of Internal Revenue Service
Docket No. 540-02
U.S. Tax Court
Atlanta, GA
Testified at trial: October 30, 2002

Ashley vs. Ashley
In Domestic Court, FL
Testified at Deposition: May 14, 2002

Estate of Annette N. McDonald, Deceased, et al., vs. Commissioner of Internal Revenue Service
Docket Nos. 5633-00, 9697-00, 1671-00, 8829-01
U.S. Tax Court
Atlanta, GA
Testified at Trial: April 30, 2002

Wachovia Bank, N.A. vs. Magellan Health Services, Inc.
U.S. District Court, District of South Carolina, Columbia Division
Civil Action No. 3:00-2664-19
Testified at Deposition: August 22 & 23, 2001

Latin Quarter Orlando, Ltd., et al. vs. Bello, et al. vs. Jeffrey Manchester
Case No. CI-99-6491
Orlando, FL
Testified at Deposition: July 25, 2001

Frick vs. Frick
In Domestic Court, Ohio
Testified at Trial: June 28, 2001

Mansol Industries, Inc. vs. Fredric Rosen
Civil Action No. 97-V-773
Superior Court for the County of Liberty, State of Georgia
Testified at trial: June 13, 2001

**VIII.   Curriculum Vitae – Paul J. Vogt**

### PAUL J. VOGT
### CURRICULUM VITAE

Paul J. Vogt is a manager with The Financial Valuation Group (FVG), a national firm specializing in valuation and litigation services.

Mr. Vogt has approximately eight years of professional experience. Prior to joining FVG, Mr. Vogt was an associate with Kroll Lindquist Avery, an international forensic accounting and litigation firm, where he managed engagements involving *fortune 500* companies and governing bodies of foreign counties. Mr. Vogt began his valuation career at BDO Seidman, LLP. Mr. Vogt has worked on a variety of engagements for corporate planning, litigation, financial reporting and tax purposes in several different industries. He has also been involved in engagements for the Internal Revenue Service and Department of Justice.  Mr. Vogt received BBA in Finance from Kennesaw State University and is a Candidate for the American Society of Appraisers Business Valuation designation.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ESTATE OF GLADNEY E. HEAZEL, DECEASED, ROBERT J. HEAZEL, EXECUTOR, ) ) ) ) | |
| Plaintiff, ) | |
| v. ) ) | Civil Action No. 1:02-CV-2665-RLV |
| UNITED STATES OF AMERICA by and through the COMMISSIONER OF INTERNAL REVENUE SERVICE, ) ) ) ) | |
| Defendant. ) | |

## RESPONSE OF THE UNITED STATES OF AMERICA TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Defendant United States of America ("Defendant") responds to the Plaintiff's

First Request for Admissions as follows:

### Specific Requests for Admission:

1.      Gladney E. Heazel was born in Atlanta, Georgia on April 20, 1951.  She

died tragically on February 16, 1998, falling victim to a sudden death.

**Response:**  Admits.



EXHIBIT

C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ESTATE OF GLADNEY E. HEAZEL, DECEASED, ROBERT J. HEAZEL, EXECUTOR, | ) ) ) ) | |
|     Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:02-CV-2665-RLV |
| UNITED STATES OF AMERICA by and through the COMMISSIONER OF INTERNAL REVENUE SERVICE, | ) ) ) ) ) | |
|     Defendant. | ) | |

## RESPONSE OF THE UNITED STATES OF AMERICA TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Defendant United States of America ("Defendant") responds to the Plaintiff's

First Request for Admissions as follows:

### Specific Requests for Admission:

1.    Gladney E. Heazel was born in Atlanta, Georgia on April 20, 1951.  She

died tragically on February 16, 1998, falling victim to a sudden death.

**Response:**  Admits.

2.      She was survived by her two brothers, Bob and Mike, and two nephews, Ryan and Jackson.

**Response:** Admits.

3.      The Plaintiff in this case is the Estate of Gladney E. Heazel ("Estate"), and the Estate is represented by its executor, Robert J. Heazel, Exec. ("Plaintiff"). The legal address of the Estate is 40 Highlands Drive, Atlanta, Georgia 30305.

**Response:** Admits.

4.      This is a civil action arising under the Internal Revenue laws against the Commissioner of the Internal Revenue Service acting on behalf of the United States of America for recovery of estate tax of $756,155 plus interest as provided by 26 U.S.C. §§ 6611 *et seq.*, which Plaintiff alleges was erroneously and illegally assessed and collected, or such other amount as in law and in fact is recoverable.

**Response:** Admits, but denies that the estate tax was erroneously and illegally assessed and collected, or that any amount is recoverable.

5.      Gladney E. Heazel ("Decedent") was a resident of Fulton County, Georgia when she died on February 16, 1998.

**Response:** Admits.

6.      Pursuant to Item Two of the Last Will and Testament of Decedent dated July 20, 1992 ("the Will"), her brother, Robert J. Heazel, was appointed as Executor of the Will ("the Executor").

**Response**: Admits.

7.      The Will was admitted to probate in solemn form and the Executor was issued letters testamentary by order of the Fulton County Probate Court dated March 16, 1998.

**Response**: Admits.

8.      A United States Estate Tax Return, Form 706 ("the Return"), was timely filed on behalf of the Estate on May 5, 1999 reflecting a taxable estate in the amount of $2,818,251.98. A copy of the Plaintiff's United States Estate Tax Return, Form 706 is attached hereto as Exhibit C.

**Response**: Denies that a copy of Form 706 was attached to Plaintiff's First Request for Admission, but otherwise admits.

9.      On December 30, 1998, the Executor made an estimated payment of federal estate tax in the amount of $840,000 on behalf of the Estate.

**Response**: Admits.

10. Additionally, on that same date, the Executor made on behalf of the Estate an estimated payment of estate tax due to the State of Georgia in the amount of $150,000.

**Response:** Admits.

11. After the allowance of a Unified Credit of $202,050.00 and a State Death Tax Credit of $166,066.17 pursuant to the Internal Revenue Code Sections 2010 and 2011, a total federal estate tax in the amount of $826,417.38 was shown due.

**Response:** Admits.

12. The Estate did not have the funds necessary to pay the $826,417.38 that was shown due, and as a result was forced to borrow them to pay the Internal Revenue Service.

**Response:** Admits.

13. The Internal Revenue Code generally imposes an estate tax on the net assets a citizen owns at his or her death. The federal estate tax is imposed upon the fair market value of the assets as of the decedent's date of death (unless an alternative date is elected).

**Response:** Admits.

- 4 -

14.    The bulk of the Estate assets consisted of 443,333 shares of common stock in The International Cornerstone Group, Inc. ("Cornerstone").

**Response:**  Admits.

15.    This 443,333 share stake represented a less than 1.72 percent minority interest in Cornerstone's outstanding common stock at the Decedent's date of death.

**Response:**  Denies.

16.    Cornerstone was a closely-held corporation and, thus, no ready market exited for its shares.

**Response:**  Admits that Cornerstone was a closely-held corporation, but denies that no ready market existed for its shares..

17.    A competent business valuation appraiser can be of assistance in the determination of fair market value for assets such as closely held stock that is not traded on a stock exchange.

**Response:**  Admits.

- 5 -

18.    The Estate did not engage a competent business valuation appraiser prior to filing its United States Estate Tax Return, Form 706.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.

19.    The Estate reported Gladney's Cornerstone stock at a total of $2,659,998 ($6.00 per share) on Schedule B of the Estate's United States Estate Tax Return, Form 706.

**Response:**  Admits.

20.    The absence of a ready market for the shares diminished the fair *market* value of Gladney's less than 1.72 percent common interest in Cornerstone.

**Response:**  Denies.

21.    The absence of control diminished the fair *market* value of Gladney's less than 1.72 percent common interest in Cornerstone.

**Response:**  Denies.

22.    The common stock Gladney held at her death did not possess cumulative dividend rights.

**Response:**  Admits.

- 6 -

23.   The common stock Gladney held at her death did not possess liquidation preferences over other classes of Cornerstone shares.

**Response:**  Admits.

24.   Other classes of Cornerstone stock did possess cumulative dividend rights and liquidation preferences.

**Response:**  Admits.

25.   Treasury regulation section 20.2031-1(b) defines fair market value as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

**Response:**  Admits.

26.   Gladney's stock was subordinate to other classes of Cornerstone shares, in regards to both cumulative dividend rights and liquidation preferences.

**Response:**  Admits.

27.   That fact was relevant to the fair market value of Gladney's stock on February 16, 1998.

**Response:** The United States objects to this request, as it is too ambiguous to permit admission or denial. To the extent the words "That fact" refers to the entire statement contained in Request No. 26, the United States admits.

28. Consistent with Treasury Regulation § 20.2031-1(b), an arm's length, willing buyer of Gladney's Cornerstone stock would have engaged in some level of due diligence prior to buying the shares.

**Response:** Admits.

29. Treasury Regulation §20.2031-1(b) contemplates that an arm's length, willing buyer would have accounted for the subordinate position of Gladney's stock in terms of cumulative dividends rights and liquidation preferences - together with all other relevant facts - in determining the price he or she would pay for that stock on the date of Gladney's death.

**Response:** Admits.

30. During 1997, Cornerstone participated in a tax-free reorganization with Ballard Designs Inc. ("Ballard")

**Response:** Admits.

31. In the tax-free reorganization, Gladney received all of her Cornerstone shares in exchange for all of her shares in Ballard.

**Response:**  Admits.

32.    Cornerstone did not obtain a valuation report prepared by a competent, independent business valuation appraiser valuing the common stock of Cornerstone during the 12 month period preceding the Cornerstone/Ballard tax-free reorganization.

**Response:**  After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.  The United States avers, however, that it is unaware of any valuation report described in Request No. 32.

33.    Ballard did not obtain a valuation report prepared by a competent business valuation appraiser valuing the common stock of Cornerstone during the 12 month period preceding the Cornerstone/Ballard tax-free reorganization.

**Response:**  After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.  The United States avers, however, that it is unaware of any valuation report described in Request No. 33.

34.    For purposes of the Cornerstone/Ballard tax-free reorganization, the common stock of Cornerstone was set at a range $6.00-$8.00 per share.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.

35.    The $6.00-$8.00 per share valuation range for the common stock of Cornerstone was determined by the parties who negotiated the Cornerstone/Ballard tax-free reorganization.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.

36.    According to Treasury Regulation § 20.2031-1(b), fair market value should not be determined with reference to the sale price of an item in a market other than that in which such item is most commonly sold to the public.

**Response:**   The United States objects to this request, in that it relates neither to "statements or opinions of fact or of the application of law to fact," but rather, contains only an assertion of law.     Fed. R. Civ. P. 36 (a). Accordingly, no response is required.

- 10 -

37.    A tax-free reorganization is not a market in which closely-held common stock is most commonly sold to the public.

**Response:**  Admits.

38.    Internal Revenue Code § 368(c) defines "control" as the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

**Response:**  The United States objects to this request, in that it relates neither to "statements or opinions of fact or of the application of law to fact," but rather, contains only an assertion of law.    Fed. R. Civ. P. 36 (a). Accordingly, no response is required.

39.    Immediately after the Cornerstone/Ballard tax-free reorganization, Cornerstone had "control" of Ballard.

**Response:**  Admits.

40.    The Cornerstone/Ballard tax-free reorganization was a "control" transaction.

**Response:**  Admits.

- 11 -

41.    The Estate valued Gladney's Cornerstone stock at $6.00 per share on Schedule B of the Estate's United States Estate Tax Return, Form 706.

**Response:** Admits.

42.    Appendix A of the Estate's United States Estate Tax Return, Form 706, contained a short summary explaining how the Estate arrived at the $6.00 per share value for Gladney's Cornerstone stock.

**Response:** Admits.

43.    The summary contained in Appendix A of the Estate's United States Estate Tax Return, Form 706, states that the price range for the common stock of Cornerstone, as determined by the parties negotiating the Cornerstone/Ballard tax-free reorganization, was the best evidence of value as of the date of Gladney's death.

**Response:** Denies. Admits that a summary of the type described in Request No. 43 was attached to the Estate's United States Estate Tax Return, Form 706, but the statement was not labeled as Appendix A.

44.     The summary contained in Appendix A of the Estate's United States Estate Tax Return, Form 706, confirms that the Estate valued Gladney's Cornerstone stock by reference to the Cornerstone/Ballard tax-free reorganization.

**Response:**  Denies.  Admits that a summary of the type described in Request No. 43 was attached to the Estate's United States Estate Tax Return, Form 706, but the statement was not labeled as Appendix A.

45.     Valuation of closely-held stock for merger and acquisition purposes is different than valuation of closely-held stock for purposes of a sale to an independent, third-party, willing buyer. — Shannon Pratt

**Response:**  Denies.

46.     On February 16, 1998, Gladney owned 443,333 shares of Cornerstone's common stock.

**Response:**  Admits.

47.     On February 16, 1998, there were issued and outstanding 14,538,730 shares of common stock in Cornerstone.

**Response:**  Denies

- 13 -

48.     On February 16, 1998, there were issued and outstanding 56,385 shares of Series A Preferred Stock in Cornerstone which had a liquidation preference of $56,385,000.

**Response:**  Admits.

49.     On February 16, 1998, the Cornerstone Series A Preferred Stock carried with it accrued dividends rights in excess of $3,512,245.

**Response:**  Admits.

50.     On February 16, 1998, the shares of Cornerstone Series A Preferred Stock were convertible into 7,692,308 shares of Cornerstone common stock.

**Response:**  Denies, but admits that shares of Cornerstone Series A Preferred Stock were convertible into Cornerstone common stock.

51.     On February 16, 1998, the holders of the 56,385 shares of Series A Preferred Stock had the right to require Cornerstone to redeem such shares after June 30, 2002 for an amount equal to their liquidation preference plus accrued dividends, which amount was at least $59,897,245.

**Response:**  Admits.

52.     On February 16, 1998, the holders of the Series A Preferred Stock had antidilution protection rights that entitled them to receive additional shares of Series A

- 14 -

Preferred Stock if Cornerstone issued or was deemed to issue any shares of its Common Stock at a price below $4.55.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to enable the United States to admit or deny this request.

53.   On February 16, 1998, there were issued and outstanding 7,242 shares of Series B Preferred Stock which had a liquidation preference of $7,242,000.

**Response:**  Admits.

54.   On February 16, 1998, such shares of Series B Preferred Stock were convertible into 1,591,646 shares of Cornerstone common stock.

**Response:**  Denies.

55.   On February 16, 1998, there were issued and outstanding 750 shares of Series C Preferred Stock which had a liquidation preference of $750,000.

**Response:**  Admits, but denies that Series C Preferred Stock had a liquidation preference.

56.   On February 16, 1998, such shares of Series C Preferred Stock were convertible into 164,833 shares of Cornerstone common stock.

**Response:**  Denies.

- 15 -

57.    On February 16, 1998, each outstanding share of Preferred Stock had a liquidation preference of $1,000 per share.

**Response:**   Denies, but admits that Series B and C Preferred Stock had liquidation preferences.    — contrast with #55

58.    Due to the liquidation preferences enjoyed by Cornerstone Preferred Shareholders, Gladney's Shares would not have been entitled to receive a penny from the company if the company were to have liquidated until after liquidating distributions of $56,385,000, $7,242,000, and $750,000 were paid to the holders of the Series A, B, and C Preferred Stock, respectively.   — hypercrit..

**Response:**   Denies.

59.    Due to the accrued dividend rights enjoyed by Cornerstone Series A Preferred Shareholders, Gladney's Shares would not have been entitled to receive a penny from the company if the company were to have liquidated until after $3,512,245 of accrued dividends were paid to the holder(s) of the Series A Preferred Stock.

**Response:**   Admits.

60.    All of the Cornerstone Preferred Shareholders were venture capitalists who acquired their preferred shares during 1995-1997 at a price of $4.55 per share.

**Response:**   Denies.

- 16 -

61.    These venture capitalists had the right to convert their Preferred shares to common shares at any time.

**Response:** Denies.

62.    Since the Cornerstone Preferred shares were convertible to common stock at any time, the Preferred shares possessed all of the upside potential of Gladney's stock.

**Response:** Admits.

63.    The Cornerstone Series A Preferred shareholders had the right to require Cornerstone to buy their shares for their stated liquidation value plus any accrued and unpaid dividends at anytime after June 30, 2002 ("put rights").

**Response:** Admits.

64.    Due to the put rights, liquidation preference rights, and cumulative dividend rights that the preferred shareholders of Cornerstone possessed, Gladney did not enjoy the same downside protection, or exit strategy, as the venture capitalists.

**Response:** Denies.

65.    Between 1995-1997, Cornerstone engaged in a series of acquisitive transactions, including the Cornerstone/Ballard tax-free reorganization.

**Response:** Admits.

- 17 -

66.     Cornerstone used up the majority of its cash reserves in order to help finance the various acquisitive transactions that occurred between 1995-1997.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to enable the United States to admit or deny this request.

67.     The asset column of Cornerstone's balance sheet on December 31, 1997 evidenced a weaker cash position for the company than prior to the various acquisitive transactions that occurred between 1995-1997.

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to enable the United States to admit or deny this request.

68.     On February 16, 1998, there were outstanding employee stock options to purchase 1,652,342 shares of Cornerstone common stock.

**Response:**  Denies.

69.     On February 16, 1998 there were other outstanding options and warrants to purchase 315,000 shares of Cornerstone common stock.

**Response:**  Denies.

70.     On February 16, 1998, if all shares of Preferred stock were converted to common stock, and all stock options and warrants were exercised, there would be outstanding 25,954,859 shares of Cornerstone Common Stock.

**Response:**  Denies.

71.     On February 16, 1998, if all shares of Preferred stock were converted to common stock, and all stock options and warrants were exercised, Gladney's shares would represent 1.708% of all issued and outstanding shares on a fully-diluted basis.

**Response:**  Denies.

72.     On February 16, 1998, no market existed for Gladney's shares.

**Response:**  Denies.

73.     The certificate representing Gladney's Shares includes a restrictive legend on the reverse side that states in pertinent part:

> "The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be sold or transferred in the absence of an effective Registration Statement under the Act or an exemption from registration thereunder."

**Response:**  Admits.

74.     The Securities Act and applicable securities laws restricted Gladney's ability to transfer her Cornerstone shares to situations where either an

- 19 -



effective registration statement covering the resale of the shares was filed with the SEC, or where an exemption from registration was available.

**Response:**  The United States objects to this request, in that it relates neither to "statements or opinions of fact or of the application of law to fact," but rather, contains only an assertion of law.     Fed. R. Civ. P. 36 (a). Accordingly, no response is required.

75.     The Securities Act permits a registration statement to be filed only by the issuer, as that term is defined in § 2(a)(4) of the Securities Act, of securities.

**Response:**  The United States objects to this request, in that it relates neither to "statements or opinions of fact or of the application of law to fact," but rather, contains only an assertion of law.   Fed. R. Civ. P. 36 (a). Accordingly, no response is required.

76.     In Gladney's case, Cornerstone was the issuer of her Cornerstone shares.

**Response:**  Admits.

77.     Gladney was never an officer of Cornerstone.

**Response:**  Admits.

78.   Gladney was never a director of Cornerstone.

**Response**: Admits.

79.   Gladney was never an affiliate of Cornerstone, as defined in Rule 144 § (1)(a) of the Securities Act.

**Response**:   Denies, but admits that Gladney was never an affiliate of Cornerstone as defined by Rule 144 (a)(1) of the Securities Act.

80.   Gladney did not have the power to cause Cornerstone to file a registration statement.   — Huy~\.

**Response**: Admits.

81.   Filing a registration statement in order to allow a shareholder to resell shares is expensive.

**Response**: The United States objects to this request, in that it is too ambiguous to permit a response.

82.   Filing a registration statement in order to allow a shareholder to resell shares subjects issuers to the quarterly and other reporting requirements of the Securities Act of 1934.

**Response**: The United States objects to this request, in that it relates neither to "statements or opinions of fact or of the application of law to fact," but rather, contains

only an assertion of law. Fed. R. Civ. P. 36 (a).  Accordingly, no response is required.

83.    The requirement that Cornerstone (as the issuer) file a registration statement in order for Gladney to sell her shares restricted the marketability of Gladney's shares to third party, willing buyers.

**Response:**   Admits.

84.    To this day, Cornerstone has never filed a registration statement that was declared effective by the Securities and Exchange Commission.

**Response:**   Admits.

85.    In the absence of a registration statement filed by Cornerstone, Gladney could only sell her Cornerstone shares under an available exemption from registration under the Securities laws.

**Response:**   Admits.

86.    The requirement that Gladney sell her restricted Cornerstone shares through an exempt offering restricted the marketability of her shares to third party, willing buyers.

**Response:**   Admits.

87.    Gladney's Cornerstone shares were "restricted securities" as defined in Rule 144 § (a)(3) of the Securities Act.

**Response:**    Admits.

88.    One year did not elapse between the date of Gladney's acquisition of her restricted Cornerstone shares from the issuer (Cornerstone), and her date of death.

**Response:**    Admits.

89.    At her date of death, Gladney did not meet the holding period requirement for restricted securities contained in Rule 144 § (d) of the Securities Act.

**Response:**    Admits.

90.    On February 16, 1998, current information regarding Cornerstone sufficient to satisfy the requirements of Rule 144 § (c) of the Securities Act was not publicly available.

**Response**:    Admits.

91.    Gladney was bound by the requirements of a Stockholders Agreement among the stockholders of Cornerstone first made on September 13, 1995 and amended several times (the "Stockholders' Agreement").

**Response:**    Admits.

92.    The confidentiality provisions in the Stockholders' Agreement prohibited

- 23 -

Gladney from making such information publicly available.

**Response:**  The United States objects to this request, in that the reference to "such information" renders this request too ambiguous to permit a response.

93.    At her date of death, Gladney could not rely on Rule 144 of the Securities Act to resell her Cornerstone Shares.  — huge

**Response:**  Admits.

94.    Gladney's inability to rely on Rule 144 to resell her Cornerstone shares in an exempt offering restricted the marketability of her shares to third party, willing buyers.

**Response:**  Admits.  — huge

95.    At her date of death, Gladney could not rely on § (4)(1) of the Securities Act.

**Response:**  Admits.

96.    Gladney's inability to rely on § (4)(1) to resell her Cornerstone shares in an exempt offering restricted the marketability of her shares to third party, willing buyers.  — huge

**Response:**  Admits.

97.    At her date of death, there was no exemption from registration available

-24- All they have is 4(1'12) and 144(K)

for Gladney to resell her Cornerstone shares under.

**Response:**  Denies.

98.    At her date of death, Gladney was prohibited by federal law from selling any of her Cornerstone shares.

**Response:**  Denies.

99.    The Stockholders' Agreement subjected Gladney's Shares to a 30-day right of first refusal initially in favor of the Company, and then in favor of Cornerstone's other Stockholders.

**Response:**  Admits.

100.  The right of first refusal prevented Gladney from selling her shares to third-party, willing buyers at a time of her choosing.

**Response:**  Denies.

101.  The right of first refusal restricted the marketability of Gladney's shares to third party, willing buyers.

**Response:**  Denies.

102.   The Stockholders Agreement required that any sale of Gladney's Shares be made only for cash or installments of cash, and prohibited Gladney's Shares from being pledged to secure indebtedness.

**Response:**  Admits.

103.   The Stockholders Agreement gave the holders of the Preferred Stock and certain members of management the right to designate members of the board of directors.

**Response:**  Admits.

104.   Gladney, as a minority common shareholder, had no ability to designate a member of the board of directors.

**Response:**  Admits.

105.   The Stockholders Agreement required Gladney to vote for the directors designated by the other shareholders.

**Response:**  Denies.

106.   Gladney's inability to designate a member of the board of directors restricted the marketability of her Cornerstone shares to third-party, willing buyers.

**Response:**  Denies.

107.   Gladney's Shares were subject to a provision in the Stockholders

Agreement (a so-called "drag-along" right) that required her to sell such shares in the event that holders of 75% of the outstanding common stock, on an as-converted basis, determine to sell their shares after June 30, 2002.

**Response:** Admits.

108. Certain holders of outstanding Cornerstone common stock had registration rights that were superior to Gladney's registration rights.

**Response:** Admits.

109. Registration rights enhance the fair market value of common shares.

**Response:** Denies.

110. Holders of 12,392,307 shares of Common Stock, or common stock equivalents, had the right under the Registration Agreement to require the Company to prepare and file from time to time, up to four registration statements on Form S-1.

**Response:** Admits.

111.   Holders of 15,087,830 shares of Common Stock, or common stock equivalents, had the right to request an unlimited number of registration statements on Form S-2 or Certain shareholders had a priority right to include shares in registration statements before shares of other shareholders were included until the gross proceeds received by them equaled $25,000,000.

**Response:**  Denies.

112.   The Stockholders Agreement prohibited Gladney from selling her common Shares 7 days before and 120 after a registered offering of shares made in satisfaction of a demand registration right under the Registration Rights Agreement.

**Response:**  Admits.

113.   Not only would Gladney not be able to participate in a demand registration, but she could not sell her common Shares for a 128-day period, whether pursuant to a registration statement or pursuant to an exemption from registration, while other Cornerstone Shareholders would be able to sell their shares.

**Response:**  Denies.

114.   The Certificate of Incorporation of Cornerstone authorized the board of directors to issue up to 5 million shares of Preferred stock with such rights and privileges as determined by the board of directors without approval of the shareholders

(so-called "blank check preferred stock").

**Response:**   After reasonable inquiry, the United States responds that the information known or readily obtainable by the United States is insufficient to permit the United States to admit or deny this request.

115.   Additionally, the Company has several structural characteristics that protect incumbent management at the detriment of the common shareholders, including a classified board of directors, advance notice bylaws, and a 75% Supermajority requirement to amend the articles of incorporation or bylaws.

**Response:**  Denies.

**Summary of January 31, 1998 Capitalization**

| January 31, 1998 Balance Sheet | Preferred Shares | Common Stock Equivalents | Liquidation Value | Accrued Dividends |
|---|---|---|---|---|
| Common Stock | N/A | 14,538,730 | N/A | N/A |
| Series A Convertible Pfd | 56,385 | 7,692,308 | $56,385,000 | $3,512,245 |
| Series B Convertible Pfd | 7,242 | 1,591,646 | $7,242,000 | |
| Series C Convertible Pfd | 750 | 164,833 | $750,000 | |
| Stock Options | N/A | 1,652,342 | N/A | |
| Warrants | | 315,000 | | |
| Total Common Stock Equiv. | | 25,954,859 | | |
| 443,333 | | 1.708% | | |

**Response:** Denies.

WILLIAM S. DUFFEY, JR.
United States Attorney

JULIA B. ANDERSON
Georgia Bar No. 017560

FRANK M. DALE JR.
MICHAEL N. WILCOVE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 14198
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-5901

- 30 -

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing **RESPONSE OF THE UNITED STATES OF AMERICA TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS** has been made by U.S. Mail this 22nd day of August, 2003 to the following:

> David D. Aughtry
> Samuel R. Linsky
> CHAMBERLAIN, HRDLICKA, WHITE,
> WILLIAMS & MARTIN
> 191 Peachtree Street, N.E.
> Ninth Floor
> Atlanta, Georgia  30303-1747

> FRANK M. DALE JR.
> Trial Attorney, Tax Division
> U.S. Department of Justice
> P.O. Box 14198
> Ben Franklin Station
> Washington, D.C.  20044
> Telephone:  (202) 514-5901

- 31 -

# United States Department of Justice

**Tax Division**
Civil Trial Section, Southern Region
*P.O. Box 14198 - Ben Franklin Station*
*Washington, D.C. 20044*
*Fax: (202) 514-4963 or 514-9868*

## FAX TRANSMITTAL COVER SHEET

**TO:**               David D. Aughtry, Esquire
                      Samuel R. Linsky, Esquire
                      Chamberlain, Hrdlicka, White, Williams and Martin
                      191 Peachtree Street, N.E., Ninth Floor
                      Atlanta, Georgia  30303-1747

**PHONE NUMBER:**      **(404) 659-1410**

**FAX NUMBER:**        **(404) 659-1852**

**SUBJECT:**           ESTATE OF GLADNEY E. HEAZEL

**DATE SENT:**         **September 16, 2003**

**PAGES: (Including this cover     5
sheet)**

**FAX FROM:**          FRANK M. DALE JR.
                      Trial Attorney
                      (202)514-5901

COMMENTS:

WARNING: The information  contained in this facsimile is confidential and may be subject to disclosure limitations under Rule 6(e) of the Federal Rules of Criminal Procedure and Section 6103 of the Internal Revenue Code.  The information is intended only for the use of the individual or entity to whom it is addressed.  If you are not the intended recipient, or the employee or agent responsible for delivering it to the recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this facsimile in error, please immediately notify the sender identified above by telephone.



**U.S. Department of    tice**

**Tax Division**

*Civil Trial Section, Southern Region*

| | | |
|---|---|---|
| Trial Attorney: Frank M. Dale Jr. | Mailing Address: | Street address: |
| Attorney's Direct Line: (202) 514-5901 | P. O. Box 14198 | 555 4th Street, N.W., Suite 6230 |
| Facsimile Nos. (202) 514-4963 or 514-9868 | Washington, D.C. 20044 | Washington, D.C. 20001 |
| E-mail: Frank.M.Dale@usdoj.gov | | |

FMDale
5-19-20409
CMN 2003100139                                  September 16, 2003

**VIA FACSIMILE AND U.S. MAIL**

David D. Aughtry, Esquire
Samuel R. Linsky, Esquire
Chamberlain, Hrdlicka, White, Williams and Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia  30303-1747

        Re:    Estate of Gladney E. Heazel, deceased Robert J. Heazel,
               Executor v. United States of America by and through
               the Commissioner of Internal Revenue Service
               <u>Case No. 1:02-CV-2665</u>           (USDC N.D. Ga.)

Dear Counsel:

      I am writing as a follow-up to your August 15, 2003 letter and the August 22, 2003
Response of the United States of America to Plaintiff's First Request for Admissions.  Your
letter provides corrections to the Plaintiff's earlier requests for admission numbered 50, 70, 71,
and the chart following request number 115.  Because of the limited nature of the corrections
(*i.e.*, number of shares and corresponding percentages) we are providing you with our responses
as an attachment to this letter, rather than requiring you to issue new requests.

      Please call me at (202) 514-5901 if you have any questions.

                                Sincerely yours,

                                Frank M. Dale Jr.
                Trial Attorney, Civil Trial Section
                          Southern Region

cc:    William S. Duffey, Jr., Esquire
       United States Attorney
       Northern District of Georgia
       Richard Russell Building
       75 Spring Street, S.W., Suite 600
       Atlanta, Georgia 30303-3309

50. On February 16, 1998, the shares of Cornerstone Series A Preferred Stock were convertible into 12,392,307 shares of Cornerstone common stock.

**Response:** Denies, but admits that on February 16, 1998, the shares of Cornerstone Series A Preferred Stock were convertible into 12,392,308 shares of Cornerstone common stock.

70. On February 16, 1998, if all shares of Preferred stock were converted to common stock, and all stock options and warrants were exercised, there would be outstanding 30,645,860 shares of Cornerstone Common Stock.

**Response:** Denies.

71. On February 16, 1998, if all shares of Preferred stock were converted to common stock, and all stock options and warrants were exercised, Gladney's shares would represent 1.446% of all issued and outstanding shares on a fully-diluted basis.

**Response:** Denies.

## Summary of January 31, 1998 Capitalization

| January 31, 1998 Balance Sheet | Preferred Shares | Common Stock Equivalents | Liquidation Value | Accrued Dividends |
|---|---|---|---|---|
| Common Stock | N/A | 14,538,730 | N/A | N/A |
| Series A Convertible Pfd | 56,385 | 12,392,308 | $56,385,000 | $3,512,245 |
| Series B Convertible Pfd | 7,242 | 1,591,646 | $7,242,000 | |
| Series C Convertible Pfd | 750 | 164,833 | $750,000 | |
| Stock Options | N/A | 1,652,342 | N/A | |
| Warrants | | 315,000 | | |
| Total Common Stock Equiv. | | 30,654,860 | | |
| 443,333 | | 1.446% | | |

**Response:** Denies.

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF FRANCIS X. BURNS** has been made on counsel for Defendant by Federal Express addressed to:

Frank M. Dale Jr.
Michael N. Wilcove
Trial Attorney, Civil Trial Section
Southern Region
U.S. Department of Justice
P.O. Box 14198
Washington, D.C.  20044

This _____ day of March, 2004.

David D. Aughtry

# UNITED STATES DISTRICT COURT

## Estate of Gladney Heazel

### v.

## United States of America

### <u>Civil Action No. 1:02-CV-2665-RLV</u>

## Valuation of 443,333 Shares of Common Stock in Cornerstone Brands, Inc. as of February 16, 1998



INTECAP

ECONOMICS ◆ VALUATION ◆ STRATEGY



**EXHIBIT**

D

# Table of Contents

1. Executive Summary ................................................................................. 1
   A. Scope of Assignment ...................................................................... 1
   B. Standard of Value .......................................................................... 1
   C. Valuation Conclusion ..................................................................... 1
2. Overview of Cornerstone Brands, Inc. ................................................ 2
   A. Description of Company ................................................................. 2
   B. Business Strategy ........................................................................... 2
   C. Acquired Companies ...................................................................... 2
   D. Financial Performance ................................................................... 3
3. Economic Conditions at Date of Valuation ......................................... 5
   A. General U.S. Economy ................................................................... 5
   B. Retail Catalog Industry .................................................................. 6
4. Valuation Methodologies ..................................................................... 6
   A. Market Approach ............................................................................ 6
   B. Income Approach ........................................................................... 6
   C. Cost (Net Asset Value) Approach .................................................. 7
   D. Selected Valuation Methodology ................................................... 7
5. Market Based Valuation Methodology ................................................ 8
   A. Comparable Transactions in Cornerstone Stock ........................... 8
   B. Guideline Company Analysis ....................................................... 11
6. Applicability of Valuation Discounts ................................................. 12
   A. Lack of Control ............................................................................ 13
   B. Lack of Marketability ................................................................. 14
7. Valuation Conclusion ......................................................................... 18
8. Information Considered ...................................................................... 19
9. Qualifications ..................................................................................... 19
   A. InteCap, Inc. ................................................................................ 19
   B. Francis X. Burns ......................................................................... 20
10. Statement of Limiting Conditions ..................................................... 20
11. Certification ....................................................................................... 21

INTECAP

1.   **EXECUTIVE SUMMARY**

### A. Scope of Assignment

The context for this Appraisal Report is an estate tax refund claim and valuation dispute between the Estate of Gladney Heazel ("Plaintiff") and the United States of America ("Defendant").

InteCap, Inc. ("InteCap") has been asked by Defendant to determine the fair market value of 443,333 shares of common stock ("Estate Shares") in Cornerstone Brands, Inc. ("Cornerstone" or "the Company"). The valuation date is February 16, 1998— the date of Gladney Heazel's death. For purposes of this report, we have valued the Estate Shares on a fully diluted basis, which assumes that all preferred shares would be converted to common stock.

This report has been prepared in conjunction with the case of *Estate of Gladney E. Heazel v. United States of America*, Civil Action No. 1:02-CV-2665-RLV. It is not intended to be used for any other purpose. Should it be necessary, I anticipate providing expert testimony relating to my analyses and conclusions at trial.

### B. Standard of Value

The standard for appraising assets for estate tax purposes is fair market value. Internal Revenue Services Ruling 59-60 defines "fair market value" as:

> ...the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

Consistent with this definition of value, we have assumed that the willing buyer and willing seller are hypothetical parties dealing at arm's length, rather than any particular buyer or particular seller. In addition, although appraisers often focus on the price that a willing buyer would pay for an interest, equal consideration has been given to whether there would be a willing seller at the same price.

### C. Valuation Conclusion

In evaluating the fair market value of the Estate Shares, I have relied primarily on transactions involving Cornerstone stock that took place within twelve months of the valuation date. These arm's-length dealings between knowledgeable, unrelated parties provide solid evidence as to the market value of Cornerstone shares. As a means of testing the reasonableness of these value indicators, I have also analyzed price multiples in the equity market for several publicly traded companies that are similar to Cornerstone. This "guideline company" approach confirms the reasonableness of the share prices negotiated by Cornerstone and its investors. I have concluded that the fair market value of Cornerstone's equity was $9.00 per

INTECAP

share at the date of valuation.  The total value of 443,333 shares of common stock was thus $3,989,997.

## 2.   OVERVIEW OF CORNERSTONE BRANDS, INC.

### A.   Description of Company

Headquartered in Portland, Maine, Cornerstone Brands, Inc. was founded in June 1995 to build a family of direct marketing companies.[1]  Operated as a holding company, Cornerstone focused on strategically acquiring direct-mail catalog businesses that offered high quality brand images and brand names.  Instead of fully integrating each acquisition, Cornerstone preferred to keep the management of the acquired company in place while taking on responsibility for back-end operations.  Such centralized back-end operations included:  order fulfillment, certain customer service operations, customer database management and certain administrative functions.  Management believed that this strategy allowed the company to maintain its quality and consumer focus while gaining the efficiencies of a large-scale order fulfillment operation.

By 1998, the Company offered a diverse product line that included high-quality home and apparel products sold primarily via direct-mail catalog and the Internet.  A substantial portion of Cornerstone's product sales were sold under subsidiary catalog brand names.  In line with the Company's high-quality product offerings, Cornerstone marketed its products to the affluent and well-educated 35 to 54 year-old age group.  With the aging of the "baby boomer" generation, Cornerstone's target market was growing at a faster pace than the population as a whole.

### B.   Business Strategy

Cornerstone's initial business strategy consisted of three main components.  The Company sought to (1) acquire "premier specialty catalog companies;" (2) integrate the operations of the companies to achieve operating efficiencies; and (3) expand the distribution of each catalog's products through international sales, new channels of distribution, and through limited specialty store retailing.[2]  Cornerstone looked to integrate and expand the operations of its existing companies while acquiring additional titles.

### C.   Acquired Companies

As of the date of valuation, Cornerstone consisted of six catalog companies acquired through various transactions:

---

[1] Cornerstone Brands, Inc. Form S-1 Registration Statement, dated August 26, 1998.
[2] July 1995 Cornerstone Private Placement Memorandum



### Summary of Cornerstone Acquisitions

| Company | Date of Acquisition | Product Lines |
|---|---|---|
| Frontgate | September 1995 | High quality indoor and outdoor home accessories |
| TravelSmith | July 1996 | Specially-designed clothing and products for travel |
| The Territory Ahead | March 1997 | Brand-name men's and women's apparel |
| Garnet Hill | July 1997 | High quality, natural fiber clothing, bedding, and home products |
| Ballard Designs | August 1997 | Unique home furnishings and decorative accessories |
| Whispering Pines | September 1997 | High quality, exclusive designs for the home |

**Source:**
Cornerstone Brands, Inc. Form S-1 Registration Statement, dated August 26, 1998.

Further description of the acquired catalog companies is provided in Tab 1.

**D.   Financial Performance**

    **a.   Historical Revenues**

Cornerstone had only two full years of operating results prior to the valuation date. During that period, the Company rapidly expanded its operations through new acquisitions and organic growth. As shown in the following chart, Cornerstone's reported net sales grew significantly during the fiscal years leading up to the valuation date.


INTECAP



**Cornerstone Sales**

### b.   Historical Earnings

In line with its revenue growth, Cornerstone's earnings before interest, taxes, depreciation and amortization ("EBITDA") experienced a dramatic rise since its formation in 1995. The following graph highlights Cornerstone's profit growth after the removal of non-recurring charges.



**Cornerstone EBITDA**

### c.   Balance Sheet

In fiscal year 1997, Cornerstone had total assets of $127,205,919. The Company's net worth, or book value, was $86,523,218. Cornerstone funded its growth primarily with equity from private investors. As of FY 1997, Cornerstone also had outstanding borrowings of $15,450,000 from a revolving bank line of credit.

INTECAP

### d.   Intangible Assets

As of the valuation date, Cornerstone owned several registered trademarks, including: Frontgate, Splash, The Search for the Perfect Gift, Garnet Hill, The Territory Ahead, and TravelSmith.  Trademark applications had been filed for other names, such as Ballard Designs, Isabella Bird, The Ultimate Grill and Whispering Pines.  The Company believed that its trademark rights had significant value.[3]

In addition to trademarks, the Company has acquired other intangible assets in the form of consumer database information and an assembled work force. As of July 1998, Cornerstone employed approximately 860 persons on a full-time basis and approximately 520 persons on a part-time basis.

## 3.   ECONOMIC CONDITIONS AT DATE OF VALUATION

### A.   General U.S. Economy

According to the Federal Reserve, economic growth at the end of 1997 was moderate.[4]  Retail sales in particular were at or slightly above expectations, as were motor vehicle sales.  Retail sales began the holiday season slowly but quickened in the days before Christmas.  Sales of electronics, computers, appliances, and jewelry were especially strong.  Unseasonably warm weather caused the sale of winter items to miss expectations.  Increased construction productivity from the extended warm weather, combined with decreased mortgage rates, led to an increase in the demand for mortgages.

Manufacturing results were particularly strong.  Factors such as "strong demand, production, shipments, and new orders for aircraft parts, telecommunication and computer-related products, capital goods, and automobiles" were cited by the Federal Reserve as key to keeping the manufacturing sector healthy.  The industry was affected, however, by the lack of skilled workers.  Despite the labor shortage, inflationary pressure was not present.

The U.S. equity market continued its positive trend in 1997.  For the third consecutive year, U.S. stocks returned over 20% on average.  In February 1998, the Dow Jones Industrial and NASDAQ averages were at their all-time highs. Initial public offering activity was also strong, although the number of deals declined slightly from the record number of transactions closed in 1996.[5]

---

[3] Cornerstone Brands, Inc. Form S-1 Registration Statement, dated August 26, 1998, page 46.
[4] Federal Reserve January 1998 Beige Book
[5] Bloomberg Financial Services; Ibbotson Associates *Stocks Bonds Bills and Inflation*, 1998 Yearbook.



## B.   Retail Catalog Industry

The consumer direct marketing sector is highly fragmented and includes a number of businesses such as catalogs, retail stores, retail and catalog combinations, magazine publishers, book and music clubs, and the Internet.[6] The strength of direct marketing is due largely to an increasing number of dual-income households, which have more disposable income but fewer hours to spend shopping.

Growth in this sector in general, and in catalog sales in particular, outpaced total U.S. sales. In 1996, consumer direct-marketing sales reached $634 billion, a number that was expected to increase by 7.4 percent per year for the next five years. Similarly, consumer catalog sales increased by 7.9 percent per year from 1991 to 1996, with continued growth of 6.4 percent per year expected for the next five years. In contrast, consumer sales in general were estimated to grow by only 5.4 percent per year.

The increase in dual-income households spurred the corresponding increase in catalog sales. Abacus Alliance, a database of more than 600 consumer catalogs, estimated that the average catalog consumer was a 45 to 54 year old married female, professional homeowner, with some college education and a household income of greater than $50,000. The increase in discretionary income from the dual-income household was largely responsible for the increase in catalog sales.

## 4.   VALUATION METHODOLOGIES

### A.   Market Approach

The objective of the market approach is to determine value based on comparable transactions between willing buyers and sellers in the marketplace. If information regarding similar transactions is not available, value may be estimated using market multiples from publicly-traded share prices of representative companies in the same line of business.

It is acknowledged by the appraisal profession that public guideline companies will not be identical to the business being valued. Nevertheless, if reasonably comparable companies can be identified, the results of the market analysis are often useful in ascertaining the value of a privately-held business.

### B.   Income Approach

The inherent value of a company to a prospective investor may be represented by an expected stream of income or capital appreciation. Market price is determined by quantifying the present value of these future earnings or cash flows at an

---

[6] Dillon, Read & Co. analyst report on DM Management, dated June 10, 1997.



6

interest rate that reflects the risk of the income stream, as well as the time value of money. Valuations under this approach can be conducted by either applying a discount rate to specific estimates of future cash flow or by capitalizing a current ("normalized") level of earnings and factoring in an estimate of growth.

### C.   Cost (Net Asset Value) Approach

The cost approach, also referred to as the "net asset value" approach, evaluates a company based on the current cost to replace all of its assets, net of any liabilities. This analysis results in an adjusted net worth of the entity reflecting current values, as opposed to those reported in a historical cost accounting model.

The cost approach has a significant drawback for the valuation of operating entities. The main limitation of this approach is its lack of consideration for all elements of future income and/or profit streams, market conditions, useful life, and the risk associated with receiving future economic benefits. This approach is commonly applied when valuing non-operating entities, such as investment holding companies, or businesses that are in a distressed financial condition.

### D.   Selected Valuation Methodology

Financial projections prepared by Cornerstone's management near the date of valuation were unavailable in this case. This lack of meaningful forecasts would make predicting future earnings a highly speculative exercise. As of the valuation date, the Company's historical earnings may not be the best reflection of value, as the company was in an early development stage, was trying to integrate several acquisitions, and likely had not yet been able to realize operating cost savings from economies of scale. As a result of the uncertainty in predicting future growth and cash flows for Cornerstone, I have decided that an income based approach is not the best valuation method to apply in this case.

When meaningful market data exists, there is no need for an appraiser to substitute his or her judgment for that of actual investors. In this case, Cornerstone engaged in several arm's-length acquisitions surrounding the valuation date in which its common stock was offered in lieu of cash. The value of Cornerstone's stock used in these acquisitions serves as the best proxy for the price that a willing buyer and willing seller would have negotiated on the valuation date. As such, I have determined that the market approach is the most reliable methodology for ascertaining the value of Cornerstone stock.



INTECAP

## 5.  MARKET BASED VALUATION METHODOLOGY

The market approach is an effective way to value businesses, as it relies on comparison to prices at which company interests or other similar business interests changed hands in arm's-length transactions. It is favored in Revenue Ruling 59-60 and is widely used by buyers, sellers, the investment community, and business appraisers. As stated by Dr. Shannon Pratt, a well-known author of several appraisal texts:

> **Good market comparisons can be the most compelling evidence of the value of a business or a business interest…The market approach to valuation is relevant because it uses observable factual evidence of actual sales of other properties to derive indications of value.[7]**

According to Pratt, this factual sales evidence can take several forms, including:

- publicly-traded company daily market transactions;

- sales of entire public or private companies;

- past transactions in the subject company; and

- past acquisitions by the subject company.

The technique(s) ultimately selected by an appraiser will depend on the availability of, and confidence in, the underlying data. In this case, I have evaluated the market price for Cornerstone stock indicated by market transactions near the date of valuation. In addition, I have analyzed price multiples for publicly-traded guideline companies as a "reasonableness test" of the equity value negotiated in these transactions.

### A.  Comparable Transactions in Cornerstone Stock

Between March 1997 and October 1998, Cornerstone entered into several transactions that involved the use of Cornerstone stock. In two deals made prior to the valuation date—the acquisition/merger of Garnet Hill and Ballard Designs—Cornerstone's shares were used as a "currency" in consideration of the negotiated total purchase price. In other acquisitions, Cornerstone granted stock options to the owners of the acquired companies. As defined in the Cornerstone stock option plan and Section 422 of the Internal Revenue Code ("I.R.C. 422"), the option exercise prices were not to be less than fair market value at the time of issuance (Tab 2). Therefore, it follows that these option prices also reflected the negotiated fair market value of Cornerstone's stock at the time.

---

[7] Pratt, Shannon P. *The Market Approach to Valuing Businesses*. John Wiley & Sons, Inc. New York, 2001.



### The Territory Ahead

On March 31, 1997 Cornerstone purchased 80% of The Territory Ahead for $12,350,000 in cash. Stock options to be governed under I.R.C. 422 were issued to the owners of The Territory Ahead. These stock options were granted at an exercise price of $6.00 per share, and represent a valid measure of Cornerstone stock's fair market value as of March 1997 (Tab 3).

### Garnet Hill

On July 28, 1997, Cornerstone acquired 100% of the outstanding shares of Garnet Hill, Inc. for an aggregate purchase price of $37,700,000. Total consideration consisted of $30,000,000 in cash, a note of $1,700,000 issued to the selling shareholders, and 750,000 Cornerstone shares valued at $8.00 per share (Tab 4).

### Ballard Designs

On August 13, 1997, Ballard Designs, Inc. merged with Cornerstone under a stock swap agreement. Cornerstone exchanged 2,216,667 shares of Cornerstone stock for 100% of Ballard Designs' outstanding stock. Information regarding the value per Cornerstone share used in the transaction was not available to InteCap. However, in conjunction with the sale, Cornerstone granted stock options to Ballard Designs' owners under Rule 422 at an exercise price of $9.00 per share (Tab 5). The $9.00 stock option exercise price is the best indicator for Cornerstone's share price as of August 1997.

### John Walters

On July 6, 1998, the Company issued 55,555 shares of common stock to John Walters (a member of Cornerstone's Board of Directors) for a purchase price of $500,000, or $9.00 per share (Tab 6). As a potentially knowledgeable insider, Mr. Walters' investment suggests that the Company's shares were worth at least $9.00 in July 1998.

### Smith & Noble

On August 25, 1998, Cornerstone acquired 100% of Smith & Noble outstanding stock in exchange for 4,166,111 shares of Cornerstone stock. Information regarding the value per Cornerstone share used in the transaction was not provided to InteCap. However, the Company issued stock options with an exercise price of $17.00 per share to the owners of Smith & Noble (Tab 7).

### Whispering Pines

On October 8, 1998, Cornerstone acquired a 29% interest in Whispering Pines LLC for an aggregate purchase price of $1,000,000 (the Company had earlier acquired a 51% interest in September 1997). The purchase price was comprised of $700,000 in cash and 17,647 shares of Cornerstone common stock. The



Cornerstone shares were valued at $17.00 by the parties, resulting in a total stock consideration of $300,000 (Tab 8).

### Anticipated Initial Public Offering ("IPO")

It is evident that Cornerstone's shareholders were anticipating an IPO within months of the valuation date. Numerous internal Company memos and documents (Tab 9) and external media articles (Tab 10) point to the Company's strong industry position and pending IPO. In fact, Cornerstone filed a Form S-1 Registration Statement six months after the valuation date. Montgomery Securities, Cornerstone's investment banker, expected the Company's shares to be offered in the $16 - $19 range (Tab 11).[8]

### Cornerstone Management

In a June 1998 memo, Donald Steiner, a Cornerstone executive, noted that Cornerstone's common shares had been historically valued in the $6.00 to $9.00 range (Tab 12). In May of 1998, the Cornerstone Board of Directors voted that Cornerstone's common shares were to be valued at $9.00 per share.

### Conclusion

It is my opinion that an analysis of past acquisitions involving Cornerstone's stock suggests a value of $9.00 per share as of February 16, 1998. While this conclusion is not dependent upon transactions that took place after the date of valuation, I nevertheless believe that these subsequent price indications are probative of the market conditions that existed for Cornerstone stock in February 1998. The following chart illustrates Cornerstone's negotiated stock prices surrounding the date of valuation.

### Timeline of Cornerstone's Stock Value



---

[8] InteCap has assumed the IPO would be offered at the midpoint of the range, $17.50 per share as shown in the chart.

10



**Summary of Implied Cornerstone Value**
**Based upon Peer Group Competitors**
**(Coldwater Creek, Lands' End, Williams Sonoma)**

|  | Price / Sales | Price / EBITDA |
|---|---|---|
| Average Multiple | 1.34 | 13.79 |
| Cornerstone Pro-forma Financials (1) | $209,216,353 | $12,553,405 |
| Cornerstone Value | $280,349,913 | $173,111,455 |
| Diluted Common Shares | 25,844,133 | 25,844,133 |
| Implied Cornerstone Price per Share | $10.85 | $6.70 |

Notes:

(1) Assumes the Geract Hill, The Territory Ahead, and Whispering Pines acquisitions were completed at the beginning of fiscal year 1997. Adjustment made to represent a full twelve months of Company financials.

As shown in the table above, the implied value of Cornerstone's common stock, based upon the average sales and EBITDA valuation multiples of the peer group, was $10.85 or $6.70 per share (Tab 14). The discrepancy in indicated values may be explained in part by the fact that Cornerstone's earnings were dampened by its acquisition activities and integration efforts. Consequently, the value suggested by the price/sales multiple is the more meaningful indication when appraising Cornerstone stock. Indeed, Plaintiff's own appraiser has acknowledged that Cornerstone's short earnings history calls for a sales-based estimate:

> **A multiple of sales is typically used to value companies that do not have an established history of earnings.**[11]

## 6.   APPLICABILITY OF VALUATION DISCOUNTS

When valuing a minority interest in a privately-held company, appraisers must often consider the application of valuation discounts to account for lack of control and lack of marketability relative to the proxy indications of market value. Whether such discounts are appropriate depends upon the premised standard of value, as well as the appraisal methodology employed. We have addressed these issues in our analysis of the Estate Shares.

---

[11] Willis Investment Counsel appraisal report dated March 21, 2001, page 9.



## A.  Lack of Control

Lack of control discounts are meant to account for situations in which a minority ownership stake may be worth less than a pro rata share of the company's total value.  Typically, appraisers apply this discount to reflect the fact that a minority owner may be unable to dictate the business decisions of the company or force the sale, liquidation or merger of the underlying assets.  For purposes of this appraisal, I have treated the Estate Shares as non-controlling.

### a.  Value Based on Transactions Involving Cornerstone Stock

Each of the Cornerstone acquisitions involved the purchase of a controlling interest in the target company.  As such, Cornerstone likely paid a control premium in each transaction.  However, such control prices for the target's shares are irrelevant to the value of Cornerstone stock itself.

The Cornerstone shares that were used as currency to purchase catalog companies were non-controlling interests.  This is evident by the fact that none of the acquired companies received a controlling position in Cornerstone.  For example, Ballard Designs was acquired (merged) by Cornerstone in exchange for an 8.6% interest in the Company.  Because the Cornerstone shares represented a minority interest, the negotiated value for this stock reflects a minority interest price.

### b.  Value Based on Guideline Publicly-Traded Companies

It is accepted in the appraisal community that the value determined from a guideline publicly-traded company analysis is a minority interest value.  The guideline company price multiples are based on market transactions involving minority interest shares.  It would follow that the resulting value for the subject company is also a minority interest value.  This is corroborated in the fourth edition of Shannon Pratt's *Valuing a Business*:[12]

> **By definition, since the guideline publicly traded company method derives a value based on publicly traded shares, this method typically indicates a marketable, non-controlling ownership level of value.**

### c.  Conclusion

As previously stated, the market approach is the most appropriate methodology for valuing Cornerstone's equity.  I have determined that the value per share determined from analyses of recent Cornerstone stock transactions and guideline companies is a minority interest value.  Therefore, no further adjustment for lack of control is necessary or warranted.

---

[12] Pratt, Shannon P. *Valuing a Business*. The McGraw-Hill Companies. New York, 2000.



## B.   Lack of Marketability

Compared to the public securities market, in which investors can buy and sell stock interests over the phone in seconds and pay minimal commission charges, the market for privately-held interests is less developed. The universe of potential buyers for such interests is typically smaller than for publicly traded securities. There is often less available financial data from which potential buyers can confidently assess the market price for these assets. The relative uncertainty surrounding the true value of privately-held interests and their liquidity suggests that willing buyers would require a discount to value when purchasing a privately-held interest.

### a.   Restricted Stock Studies

Appraisers often attempt to measure marketability discounts by reference to various studies that estimate the marketability discount observed on "restricted stock" relative to the freely traded shares in the same company. These studies can offer insights into the economic decision-making of investors when purchasing securities with limited marketability.

#### i.   History of Restricted Stock Resale Limitations

Restricted stocks are unregistered shares, warrants or other securities of a public or private company. These securities are typically sold through a private offering and are subject to minimum holding periods. Rule 144 of the Securities Act of 1933 placed legal regulations on such stock, restricting an owner's ability to liquidate shares prior to a two-year holding period. Subsequently, two federal regulations have relaxed these marketability limitations. In 1990, Rule 144A was approved, which allowed restricted stocks to be bought and sold between institutional buyers. Thus, a limited market for restricted stocks was effectively created. In 1997, an amendment to Rule 144A reduced the holding period from two years to one year.

#### ii.   Empirical Data

The following table illustrates the results of marketability discount studies prior and subsequent to the adoption of the above noted governmental regulations on restricted stock.



| Summary of Marketability Discount Studies Based on Restricted Stock Sales | | |
|---|---|---|
| **Study** | **Years Covered** | **Mean Discount** |
| **Under Rule 144** | | |
| SEC | 1966-1969 | 25.8% |
| Gelman | 1968-1970 | 33.0% |
| Trout | 1968-1972 | 33.5% |
| Moroney | 1969-1972 | 35.6% |
| Maher | 1969-1973 | 35.4% |
| Standard Research Consultants | 1978-1982 | 45.0% (1) |
| Willamette Management Associates | 1981-1984 | 31.2% (1) |
| Silber | 1981-1988 | 33.8% |
| Mean | | 34.2% |
| **After Rule 144A** | | |
| Management Planning, Inc. | 1990-1995 | 26.7% |
| FMV Opinions, Inc. | 1991-1995 | 21.0% |
| Johnson | 1991-1995 | 20.0% |
| Columbia Financial Advisors, Inc. | 1996-1997 | 21.0% |
| Mean | | 22.2% |
| **After Amendment to Rule 144A** | | |
| Columbia Financial Advisors, Inc. | 1997-1998 | 13.0% |
| | | 13.0% |

Note:
(1)   Median Discounts

### iii.  Components of Restricted Stock Discounts

Based on the evolution of restricted stock discounts, there appear to be at least two factors that influence investors:  1) the limited access to a liquid market and 2) the required holding period before the restricted stock can be freely traded.  These factors suggest an explanation as to why average marketability discounts have decreased since the implementation of Rule 144A and the Amendment to Rule 144A.  Rule 144A allowed for institutional trading of restricted stocks.  The difference between average marketability discounts prior and subsequent to Rule 144A would appear to reflect the discount investors required for having virtually no secondary market.  In contrast, the difference between average discounts found prior to and after 1997 seems a logical result of the reduction in holding period from two years to one year.





**Evolution of Restricted Stock Discounts**

#### iv.   Applicability of Restricted Stock Studies to Cornerstone Stock

The Estate Shares are most similar to the restricted stocks studied
subsequent to the Amendment of Rule 144A in 1997. They were
unregistered and originally had a one-year restriction period. However,
as of the valuation date, the restriction period for the Estate Shares had
partially elapsed, leaving only 6 months remaining. In contrast, the
stocks in the 1997 and subsequent studies had a 1-year required holding
period when their discount to value was analyzed. As evidenced by the
reduction in average discounts after the change in required holding period
from 2-years to 1-year, the shorter holding period for Estate Shares would
likely lead to a lower negotiated discount.

#### b.   Cost of Going Public

One means for owners of a privately held company to attain liquidity for their
interests is through a public offering of common stock. The flotation costs
(i.e., legal, auditing, and underwriting fees) associated with an IPO are
sometimes used to approximate the discount for lack of marketability. This
option is typically the least expensive means of obtaining liquidity and
generally costs 6% to 7% of the equity value issued.

As of the valuation date, Cornerstone was contemplating an initial public
offering to be conducted in mid to late 1998. Indeed, Cornerstone filed an S-1
Registration Statement with the SEC in August 1998 for the issuance of
$103,500,000 in Company stock. The filing was ultimately withdrawn in
1999 due to volatility in the market.

16



Based on the performance of the public markets as of the valuation date, a willing buyer would have reasonably anticipated that Cornerstone could conduct an IPO in the near future. The prospect for an IPO would reduce concerns regarding the marketability of Estate Shares. However, the risk still existed that the IPO would not be consummated. A willing buyer would likely factor this risk into his consideration of an appropriate purchase price. Therefore, the 6% to 7% discount suggested by flotation costs may serve as a starting point for any price adjustment for lack of marketability.

### c.   Potential Blockage Discount

A discount for blockage may be considered when a valued interest is too large to be sold into the market without depressing the trading price. In this case, the Estate Shares represent 1.7% of the total diluted shares outstanding. To determine the appropriateness of a blockage discount, we analyzed the three guideline companies' total trading volume during the week prior to the valuation date as a percent of shares outstanding. The companies' total shares traded during the week averaged 1.8% of outstanding shares (Tab 15).

A willing buyer would likely require some price adjustment to account for the potential need to sell Estate Shares into the market over a period of several days or weeks. This concern, however, would be mitigated by the anticipation of a Cornerstone IPO. In a public offering of stock, Cornerstone shareholders could sell at least a portion of their shares at a single time without depressing the stock price. Considering these factors, I believe that a modest adjustment for blockage should be factored into a lack of marketability discount.

### d.   Conclusion

More recent studies of unregistered stock of public companies suggest that investors discount unregistered shares approximately 9-13% to account for the limited trading market and one-year required holding period. The consideration of an IPO's flotation costs would suggest a discount of 6% to 10%, including an incremental adjustment to account for the risk that the IPO does not close as scheduled.

Taking into account the specific characteristics of the Company, the costs associated with an IPO, the relative size of the Estate Shares, and discounts suggested by empirical research studies, I believe that a reasonable negotiation between buyer and seller would result in a price concession for lack of marketability in the range of 15% to 20%.

It is important to note that while this lack of marketability analysis would apply to the guideline company analysis, it is not an applicable factor when relying on Cornerstone stock transactions. The prices that were ultimately agreed upon by both parties to these transactions would have included all



considerations for any applicable discounts or premiums. It is self-evident that any lack of marketability issues would have been addressed in the negotiation process for the value of Cornerstone's shares. As my appraisal conclusion of $9.00 per Cornerstone share is based on previous transactions in Cornerstone stock, any discount for lack of marketability would be already included in the price. Therefore, no further adjustment is required.

7.   **VALUATION CONCLUSION**

It is my judgment—and one supported by courts and the appraisal community—that reliable data regarding previous transactions in the subject company's stock provide the best estimate of fair market value. This notion has been voiced by the U.S. Tax Court:

> **There is a compelling reason why we ordinarily view an actual and contemporaneous sale between unrelated parties having adverse interests as the best evidence of the fair market value of property—ordinarily, it is credible evidence.[13]**

> **While listed market prices are the benchmarks in the case of publicly traded stock, in determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value.[14]**

Considering acquisition and investment transactions surrounding the valuation date, I have determined that Cornerstone's fair market value per share was $9.00 as of February 16, 1998. The closest transactions before and after the valuation date involved Cornerstone stock valued at $9.00 per share. Parties on both sides of these acquisitions mutually engaged in their own due diligence to determine an acceptable price (Tab 16).

To test the reasonableness of actual transaction prices, InteCap analyzed equity multiples for guideline publicly-traded companies. The analysis yielded two estimates for Cornerstone's price per share—$10.85 and $6.70. As previously discussed, the former value is more instructive as it is not impacted by the Company's lack of earnings history.

While the transactions in Cornerstone stock suggest a rather steep rise in value from the March 1997 value of $6.00 to the February 1998 value of $9.00, this 50% increase is not out of line with the performance of the broader equity markets (Tab 17). The estimated share value as of February 1998 also appears conservative in light of the fact that Cornerstone stock was valued at $17.00 within eight months of the valuation date. As previously noted, Cornerstone's investment banker in August 1998 expected an IPO price of $16-$19 per share. Two months later, the Company acquired an interest in Whispering Pines with Cornerstone stock valued at $17.00 per share.

---

[13] *South Tulsa v. Commissioner*, United States Tax Court. 118 T.C. No. 5.
[14] *Branson v. Commissioner*, United States Tax Court. T.C. Memo 1999-231.


INTECAP

## 8. INFORMATION CONSIDERED

In preparing our analysis, we have considered information gathered from four primary sources – materials produced by the Plaintiff, documents produced by Cornerstone, documents and filings from the United States Department of Justice, and publicly available financial data. This information included:

- Audited financial statements of Cornerstone Brands, Inc.
- Form S-1 and Amended S-1 Registration Statement for Cornerstone Brands, Inc.
- Garnet Hill, Inc. acquisition documents
- Smith & Noble, LLC acquisition documents
- Ballard Designs, Inc. acquisition documents
- The Territory Ahead acquisition documents
- Madison Dearborn Capital Partners, L.P. preferred stock sale documents
- The Cornerstone Investments Group, Inc. Stockholders Agreement and Amendments
- The International Cornerstone Group, Inc. Registration Agreement and Amendments Thereto
- Amended and Restated By-Laws of Cornerstone Brands, Inc.
- Certificate of Incorporation of The Cornerstone Investments Group, Inc. and Amendments
- Stock Certificate of The International Cornerstone Group issued to Gladney Heazel
- Reorganization documents of The Cornerstone Holdings Group, Inc.
- Willis Investment Counsel valuation reports
- Willis Investment Counsel notes and correspondence
- International Cornerstone Group internal notes
- Bowden Law Firm notes and correspondence
- United States Estate Tax Return Form 706 for Gladney Heazel
- Bloomberg Financial Services
- Publicly-available sources, including *Catalog Age* magazine, *Hoover's On-line*, equity analyst reports, and SEC filings
- Various legal filings in this case

## 9. QUALIFICATIONS

### A. InteCap, Inc.

InteCap is a national consulting firm providing financial advisory services to businesses, law firms, academic institutions and government agencies. The firm advises clients on matters involving business and intangible asset valuation, commercial disputes, and technology licensing. InteCap draws upon the multi-disciplinary skills of its professional team in accounting, finance, economics, marketing, statistics, and engineering. The firm's personnel include CPAs, MBAs, and PhD graduates, and others with diverse business experience. InteCap professionals have served numerous clients in the manufacturing, distribution, and service industries.



InteCap has extensive experience in the appraisal of businesses as well as specific intangible assets. These valuations provide clients with a reliable basis to evaluate and complete transactions involving acquisitions, licenses, intercompany transfers, tax reporting, and financial restructuring.

The firm is also experienced in the valuation of intellectual property in connection with tax disputes between corporations and the Internal Revenue Service. Assignments have included valuations in the context of purchase price allocation and intercompany transfer pricing disputes. InteCap has provided opinions of value on behalf of both corporate taxpayers and the Internal Revenue Service.

InteCap also provides financial advisory services to clients involved in a variety of commercial disputes including intellectual property infringement, breach of contract, business interruption, antitrust, fraud, lender liability, and other matters. Much of this work is in the context of Federal and U.S. Tax Court, forums requiring the utmost adherence to principles of proof and independence.

### B.   Francis X. Burns

I am a Managing Director of InteCap. I graduated from Stanford University in 1982, and earned a Master of Management Degree in Finance and Economics from Northwestern University in 1986. I am a Member of the Institute of Business Appraisers and a Candidate Member of the American Society of Appraisers. InteCap is being compensated on an hourly basis for the time incurred by its professional consultants in this matter. My billing rate for this assignment is $355 per hour, while the hourly rates of others assigned to the project range from $125 to $175.

A copy of my resume and testimony list is included in Tab 18.

## 10.   STATEMENT OF LIMITING CONDITIONS

The purpose of this report is to determine the fair market value of 443,333 common shares in Cornerstone Brands, Inc. owned by the Estate of Gladney Heazel. Accordingly, the appraisal conclusions herein are limited to the particular facts and circumstances of the present matter.

In connection with our work, InteCap has been provided documents generated by both the taxpayer and the United States Department of Justice. We have also obtained publicly available information, such as historical securities prices and empirical study data, from sources generally deemed to be reliable. InteCap can make no representation as to the accuracy or completeness of such information and has accepted it without further verification.



This evaluation is based on an analysis of the information available to us at the time of our preparation of this report. New or revised data could imply results different from the findings included herein.

## 11. CERTIFICATION

I certify, to the best of my knowledge and belief, the following:

- Subject to the limiting conditions noted above, the statements of fact contained in this report are true and correct.

- Neither InteCap nor any of its employees has any present or contemplated future interest in this matter or bias with respect to the parties involved. Our employment and our compensation are in no way contingent upon the conclusions presented in this report.

- I prepared this report, and it reflects my personal, impartial, and unbiased professional analyses, opinions and conclusions.

- This report and the analyses contained within have been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

Respectfully submitted,



Francis X. Burns
Managing Director
InteCap, Inc.

8/19/03
Date



21



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

## Catalog Companies Acquired by Cornerstone

The following company descriptions have been taken directly from Cornerstone's S-1 Registration Statement filed on August 26, 1998.

### *Frontgate*—Acquired 9/95

Frontgate offers a wide selection of functional products focused on enhancing the quality of life at home. The *Frontgate* catalog is the company's primary catalog. In addition, the company mails the following three specialty titles on a seasonal basis: *The Ultimate Grill* (which offers a full range of stainless steel grills and other outdoor cooking equipment and accessories), *Splash* (which is targeted at owners of in-ground swimming pools or waterfront homes) and *The Search for the Perfect Gift* (which offers tasteful, high-quality gifts). Frontgate focuses on unique products for both the indoor and outdoor home environment. Major product categories include outdoor furnishings and accessories, barbecue grills and outdoor cooking equipment, pool products, bed and bath accessories, indoor cooking and entertainment products, electronics, and storage and organization products. Many of Frontgate's products (such as its "hotel quality" showerheads) are difficult to find through traditional retail channels. Other products such as stainless steel outdoor grills, are designed by the company and available exclusively in Frontgate's catalogs. The company strives to offer the highest quality merchandise while still providing good value.

### *TravelSmith*—Acquired 7/96

TravelSmith is a leading source for its customers' varied travel needs by offering clothing and accessories designed to make travel more comfortable and convenient. The concept for the company resulted from the world-wide travels of the company's founder, Charles L. Slaughter, who recognized the need for more durable and convenient travel products and who teamed with industry veteran Scott R. Sklar to found the company. Most merchandise is sold under the TravelSmith brand name and is specially designed by and available only from the company. All merchandise serves a travel-related function. The company designs its products to be strong enough to be completely reliable yet light enough to be conveniently packable. Apparel is wrinkle-resistant, washable and suitable for multiple climates. Much of the company's merchandise mix emphasizes basic functionality and a classic look that makes such merchandise successful year after year.

### *The Territory Ahead*—Acquired 3/97

The Territory Ahead offers unique, high-quality men's and women's clothing, accessories and other products distinguished by a craftsman-like approach to material and detail and by a practical, rugged American styling. The company's primary catalog is The Territory Ahead. In the spring of 1998, the company introduced and tested the Isabella Bird catalog, which offers women's apparel that is somewhat dressier than the

Confidential

offerings of The Territory Ahead. The company's clothing is designed by The Territory Ahead sold under The Territory Ahead brand name and available only from the company. Products are designed using attractive fabric trims that are incorporated into classic, comfortable styles. The merchandise is intended to have a distinctive casual style, which combines elegant with rugged, dressy with casual, and classic with trendy. Weathered finishes and dynamic colors are hallmarks of The Territory Ahead products.

*Garnet Hill*—Acquired 7/97

Garnet Hill offers a highly-edited selection of home and casual apparel products, all of which convey a lifestyle image emphasizing taste, classic looks and stylish flair. The company offers high-quality, natural-fiber bedding, bath products and other fine home products, as well as sleepwear, women's ready-to-wear clothing and children's clothing. Garnet Hill began operations as an importer of English flannel sheets that were not commercially available in the United States, and has expanded its business to focus on other natural-fiber products. The company is committed to supplying hard-to-find products that help define and differentiate its customers' lifestyles, from the look of their bedrooms to the clothes they and their children wear. Most of the company's product offerings are sold under the Garnet Hill brand name, are designed by the company and are not available elsewhere. The company believes that its customers view Garnet Hill as a design resource committed to fresh interpretations, high-quality fabrics, and a viewpoint that provides new twists on the familiar in home products and women's and children's apparel.

*Ballard Designs*—Acquired 8/97

Ballard Designs provides home decorating solutions for aspiring "do-it-yourself" interior designers. The company offers interior furnishings, architectural accents and decorative accessories, with a focus on products that are "updated traditional," frequently with a European flair. Merchandise is often developed based on an original antique or architectural designs, and many of the products offered by Ballard Designs are not available from other catalogs. Because many of the company's products are designed with a classic, enduring theme, the company has a core of basic products that are consistently strong sellers. Basic products are often enhanced by updating fabrics, colors and accessories. The Ballard Designs brand is positioned to provide high-quality and originally designed merchandise at more reasonable prices than exclusive original dealers.

*Whispering Pines*—Acquired 9/97

Whispering Pines, which is a smaller and earlier stage business than the other Cornerstone companies, offers a selection of high-quality, rustic home products, casual apparel and accessories targeted at upscale consumers, many of whom own second homes. The company's product offerings are designed to help customers achieve the comfortable, nostalgic feeling of family retreats and a rustic, simpler life. Whispering Pines' merchandise is nostalgic, fun-loving and designed to withstand the trials of cabin

life. A portion of the company's products are designed by or available exclusively from Whispering Pines. The company's merchandise selection is consistent with its lifestyle theme and provides Whispering Pines with a distinctive merchandise assortment and unique brand identity.

Confidential



# EXHIBIT / ATTACHMENT

2

(To be scanned in place of tab)

## § 422. Incentive stock options

- (a) In general

  Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock option if -
  - (1) no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 1 year after the transfer of such share to him, and
  - (2) at all times during the period beginning on the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of either the corporation granting such option, a parent or subsidiary corporation of such corporation, or a corporation or a parent or subsidiary corporation of such corporation issuing or assuming a stock option in a transaction to which section 424(a) applies.
- (b) Incentive stock option

  For purposes of this part, the term "incentive stock option" means an option granted to an individual for any reason connected with his employment by a corporation, if granted by the employer corporation or its parent or subsidiary corporation, to purchase stock of any of such corporations, but only if -
  - (1) the option is granted pursuant to a plan which includes the aggregate number of shares which may be issued under options and the employees (or class of employees) eligible to receive options, and which is approved by the stockholders of the granting corporation within 12 months before or after the date such plan is adopted;
  - (2) such option is granted within 10 years from the date such plan is adopted, or the date such plan is approved by the stockholders, whichever is earlier;
  - (3) such option by its terms is not exercisable after the expiration of 10 years from the date such option is granted;
  - (4) the option price is not less than the fair market value of the stock at the time such option is granted;
  - (5) such option by its terms is not transferable by such individual otherwise than by will or the laws of descent and distribution, and is exercisable, during his lifetime, only by him; and
  - (6) such individual, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation. Such term shall not include any option if (as of the time the option is granted) the terms of such option provide that it will not be treated as an incentive stock option.
- (c) Special rules
  - (1) Good faith efforts to value of stock

    If a share of stock is transferred pursuant to the exercise by an individual of an option which would fail to qualify as an incentive stock option under subsection (b) because there was a failure in an attempt, made in good faith, to meet the requirement of subsection (b)(4), the requirement of subsection (b)(4) shall be considered to have been met. To the extent provided in regulations by the Secretary, a similar rule shall apply for purposes of subsection (d).

  - (2) Certain disqualifying dispositions where amount realized is less than value at exercise

    If -
    - (A) an individual who has acquired a share of stock by the exercise of an incentive stock option makes a disposition of such share within either of the periods described in subsection (a)(1), and
    - (B) such disposition is a sale or exchange with respect to which a loss (if sustained) would be recognized to such individual, then the amount which is includible in the gross income of such individual, and the amount which is deductible from the income of his employer corporation, as compensation attributable to the exercise of such option shall not exceed the excess (if any) of the amount realized on such sale or exchange over the adjusted basis of such share.
  - (3) Certain transfers by insolvent individuals

    If an insolvent individual holds a share of stock acquired pursuant to his exercise of an incentive

stock option, and if such share is transferred to a trustee, receiver, or other similar fiduciary in any proceeding under title 11 or any other similar insolvency proceeding, neither such transfer, nor any other transfer of such share for the benefit of his creditors in such proceeding, shall constitute a disposition of such share for purposes of subsection (a)(1).

o (4) Permissible provisions

An option which meets the requirements of subsection (b) shall be treated as an incentive stock option even if -
- (A) the employee may pay for the stock with stock of the corporation granting the option,
- (B) the employee has a right to receive property at the time of exercise of the option, or
- (C) the option is subject to any condition not inconsistent with the provisions of subsection (b). Subparagraph (B) shall apply to a transfer of property (other than cash) only if section 83 applies to the property so transferred.

o (5) 10-percent shareholder rule

Subsection (b)(6) shall not apply if at the time such option is granted the option price is at least 110 percent of the fair market value of the stock subject to the option and such option by its terms is not exercisable after the expiration of 5 years from the date such option is granted.

o (6) Special rule when disabled

For purposes of subsection (a)(2), in the case of an employee who is disabled (within the meaning of section 22(e)(3)), the 3-month period of subsection (a)(2) shall be 1 year.

o (7) Fair market value

For purposes of this section, the fair market value of stock shall be determined without regard to any restriction other than a restriction which, by its terms, will never lapse.

- (d) $100,000 per year limitation
  o (1) In general

To the extent that the aggregate fair market value of stock with respect to which incentive stock options (determined without regard to this subsection) are exercisable for the 1st time by any individual during any calendar year (under all plans of the individual's employer corporation and its parent and subsidiary corporations) exceeds $100,000, such options shall be treated as options which are not incentive stock options.

o (2) Ordering rule

Paragraph (1) shall be applied by taking options into account in the order in which they were granted.

o (3) Determination of fair market value

For purposes of paragraph (1), the fair market value of any stock shall be determined as of the time the option with respect to such stock is granted.

## THE INTERNATIONAL CORNERSTONE GROUP, INC.
## 1995 STOCK OPTION PLAN
(Revised and Restated to include First Amendment 4/97)

**Section 1.**   Establishment; Purpose; Effective Date; Definition.

1.1   Establishment of Plan.   The International Cornerstone Group, Inc., a Delaware corporation formerly known as The Cornerstone Investments Group, Inc. ("Cornerstone"), hereby establishes a stock option plan for certain officers and key Employees and Consultants of Cornerstone or any of its Subsidiaries, as described herein, which shall be known as The International Cornerstone Group, Inc. 1995 Stock Option Plan (the "Plan").

1.2   Purposes.   The purposes of the Plan are to enable Cornerstone to attract and retain officers, key employees and Consultants of Cornerstone or any of its subsidiaries, to stimulate the efforts of such individuals toward the achievement of the objectives of Cornerstone and to encourage the identification of the interests of such individuals with those of the stockholders of Cornerstone.

1.3   Effective Date of the Plan.   Subject to approval by the stockholders of Cornerstone, the effective date of the Plan is the day on which it was adopted by the Board of Directors of Cornerstone.   The Plan shall remain in effect until it shall expire or be terminated as provided in Section 9 hereof.

Any option granted pursuant to the Plan after the adoption by the Board of Directors of Cornerstone of any amendment to the Plan which is required by the provisions of Section 10 hereof to be approved by the stockholders of Cornerstone and which could not have been granted but for such amendment shall, if granted before such stockholder approval is obtained, be granted subject to the obtaining of such approval, and if such approval is not obtained within one (1) year after the adoption of such amendment by the Board of Directors, such option shall become null and void.

1.4   Definitions.   As used herein, the following definitions shall apply:

(a)   "Code" means the Internal Revenue Code of 1986, as amended.

(b)   "Committee" means the Compensation Committee of the Board of Directors of Cornerstone.

(c)   "Common Stock" means the Common Stock of Cornerstone, par

value $0.001 per share.

(d)    "Consultant" means any person, including an advisor, who is engaged by Cornerstone or any Subsidiary to render services and is compensated for such services, and any director of the Cornerstone whether compensated for such services or not, provided that if and in the event the Cornerstone registers any class of any equity security pursuant to the Exchange Act, the term Consultant shall thereafter not include directors who are not compensated for their services or are paid only a director's fee by Cornerstone.

(e)    "Continuous Status as an Employee or Consultant" means that the employment or consulting relationship is not interrupted or terminated by Cornerstone or any Subsidiary. Continuous Status as an Employee or Consultant shall not be considered interrupted in the case of: (i) any leave of absence approved by Cornerstone, including sick leave, military leave, or any other personal leave; provided, however, that for purposes of Incentive Stock Options, any such leave may not exceed ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract (including certain Cornerstone policies) or statute, provided, further, that on the ninety-first day of any such leave (where reemployment is not guaranteed by contract or statute) the Optionee's Incentive Stock Option shall automatically convert to a Nonstatutory Stock Option; or (ii) transfers between locations of Cornerstone or between Cornerstone, its Subsidiaries or its successor.

(f)    "Employee" means any person, including officers and directors, employed by Cornerstone or any Subsidiary of Cornerstone. The payment of a director's fee by Cornerstone shall not be sufficient to constitute "employment" by Cornerstone.

(g)    "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i)   If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported, as quoted on such exchange or system for the last market trading day prior to the time of determination) as reported in The Wall Street Journal or such other source as the Committee deems reliable;

(ii)  If the Common Stock is quoted on the National Association of

2

Securities Dealers, Inc. Automated Quotation ("NASDAQ") System (but not on the Nasdaq Stock Market thereof) or regularly quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the high bid and low asked prices for the Common Stock or;

(iii)   In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Committee or by the Directors of Cornerstone.

(h)   "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

(i)   "Nonstatutory Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(j)   "Option" means a stock option granted pursuant to the Plan.

(k)   "Optioned Stock" means the Common Stock subject to an Option.

(l)   "Optionee" means an Employee or Consultant who receives an Option.

(m)   "Share" means a share of the Common Stock, as may be adjusted in accordance with Section 4 below.

(n)   "Subsidiary" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

Section 2.   Plan Administration.

2.1   Administration. The Plan shall be administered by the Committee, subject to the authorization and ratification of the Board of Directors of Cornerstone.

Options covering up to 943,809 shares of the Common Stock, may be granted pursuant to the Plan.  The Committee, in its discretion, may recommend to the Board of Directors of Cornerstone that the Optionee pay consideration to Cornerstone for an option.  As used in this Plan, the term "grant" shall include grant of an option or sale of an option.  Each Option (as defined below) shall be identified by the Committee at the time it is granted as either an "Incentive Stock Option" which satisfies the requirements of Section 422 of the Code, or any successor provision (an "ISO"), or an Option that is not an ISO (a "non-ISO").  (Individually, each ISO or non-ISO is hereinafter referred to as an "Option", and collectively they are

3

hereinafter referred to as "Options".)  An Option shall be a non-ISO if: if the fair market value of the Stock which may be acquired upon exercise of such Option exceeds the limitation set forth in Section 422(d) of the Code, (ii) if for some other reason such Option does not satisfy the requirements of the Code applicable to ISOs; or (iii) if the terms of such Option provide that it will not be treated as an ISO.

2.2    Authorized Actions.  Subject to the express provisions and limitations of the Plan, the Committee, subject to any limitations and authorization by the Board of Directors of Cornerstone, shall have full power and authority to interpret the Plan and any Options granted thereunder, to establish, amend and rescind rules and regulations relating to the Plan or any Options, to determine the form and content of Options (which need not be identical or uniform) to be issued, to provide for conditions and assurances deemed necessary or advisable to protect the interests of Cornerstone and to make all other determinations necessary or advisable for the administration of the Plan.  The Committee may correct any defect or any omission or reconcile any inconsistency in the Plan or any Option in the manner and to the extent that the Committee shall deem advisable, subject to ratification by the Board of Directors of Cornerstone.  The Committee, subject to authorization by the Board of Directors of Cornerstone, may also

(i)  determine the Fair Market Value of the Common Stock, in accordance with the Plan;

(ii)  determine the number of shares of Common Stock to be covered by each such award granted hereunder;

(iii)  approve forms of Stock Option Agreements and any changes thereto for use under the Plan;

(iv)  determine the terms and conditions, not inconsistent with the terms of the Plan, of any award granted hereunder;

(v)  determine whether and under what circumstances an Option may be settled in cash under subsection 6.2 instead of Common Stock;

(vi)  reduce the exercise price of any Option to the then current Fair Market Value if the Fair Market Value of the Common Stock covered by such Option shall have declined since the date the Option was granted.

Subject to the restrictions, limitations and authorization by the Board of Directors of

4

Cornerstone set forth herein, the Committee shall determine the officers, key employees and Consultants to whom, and the time or times at which, Options shall be granted, the types of Options to be granted, the number of shares of Stock to be subject to each of the Options, the exercise price of each of the Options (the "Option Price"), the consideration, if any, to be paid for the Option, and the period during which and the terms and conditions upon which each of the Options may be exercised.

Furthermore, the Committee may, with the consent of the Option holder, cancel any Option and issue a replacement Option, or amend any Option.

2.3     Decisions Are Final and Conclusive. All actions or determinations of the Committee (subject to approval of the Board of Directors of Cornerstone) shall be by majority vote of its members and all such actions and determinations as to any question arising under the Plan or any Options, including questions of construction and interpretation, shall be final, binding and conclusive upon all persons, including Cornerstone, its stockholders and persons having any interests in the Options.

2.4     Committee Liability/Indemnification. No member or former member of the Committee or of the Board shall be liable for any action or determination made in good faith with respect to the Plan or any Option awarded under it.  To the maximum extent permitted by applicable law, each member or former member of the Committee or of the Board shall be indemnified and held harmless by Cornerstone against any cost or expense (including counsel fees, which fees may be advanced by Cornerstone), or liability (including any sum paid in settlement of a claim with the approval of Cornerstone) arising out of any act or omission to act in connection with the Plan unless arising out of such member's or former member's own fraud or bad faith.  Such indemnification shall be in addition to any rights of indemnification the members or former members may have as directors or under the Certificate of Incorporation or By-Laws of Cornerstone.

Section 3.     Plan Eligibility.

3.1     Eligibility. Officers, key employees of Cornerstone or any Subsidiary shall be eligible to receive Options.  Consultants may only be granted non-ISOs.

3.2     Rights of Participants. Nothing in this Plan or in any Option shall interfere with or limit in any way the right of Cornerstone or any of its Subsidiaries to terminate any

5

participant's employment, or consulting relationship, at any time, or confer upon any participant any right to continue in the employ of Cornerstone or any Subsidiary, or to continue as a Consultant.

Section 4.   Stock Subject to the Plan.

4.1   Number.   The total number of shares of Common Stock which may be acquired upon the exercise of Options granted under the Plan shall not exceed 943,809, subject to increase or decrease as provided for in Section 4.3 hereof.  Such shares may consist, in whole or in part, of authorized but unissued, or reacquired, shares of Common Stock or Common Stock of Cornerstone that is held as treasury stock, which is not reserved for any other purpose.

4.2   Unused Stock.   In the event any shares of Common Stock are subject to an Option which, for any reason, is terminated or expires unexercised as to such shares, such shares shall again be available for acquisition pursuant to Options granted pursuant to this Plan.

4.3   Adjustment in Capitalization.   If there is any increase or decrease in the number, or change in the classification or designation, of outstanding shares of Common Stock by reason of a stock dividend, recapitalization, merger, consolidation, stock split, combination or exchange of shares of Common Stock, the aggregate number and/or class of shares of Common Stock available under this Plan, the number and class of shares of Stock subject to each outstanding Option and the Option Price thereof shall be appropriately adjusted, in a manner consistent with Section 424 of the Code, by the Committee, whose determination shall be conclusive; provided, however, that fractional shares shall be rounded down to the nearest whole share.  In the event of any other change affecting the Common Stock, such adjustment shall be made as may be deemed equitable by the Committee, in its sole discretion, to give proper effect to such event, subject to the limitations of Section 424 of the Code.

Section 5.   Options.

5.1   Option Agreement.  Each Option granted under the Plan shall be evidenced by a written stock option agreement (the "Option Agreement") setting forth the terms upon which the Option is granted, which Option Agreement shall be substantially in the form as shall be approved by the Committee.  Each Option Agreement shall state the number of shares of Common Stock, as designated by the Committee, to which that Option pertains.  More than one Option may be granted to an eligible officer or key employee.

6

5.2    Option Price.  The per share Option Price for any ISO granted pursuant to this Plan shall not be less than the fair market value of a share of Common Stock on the date the Option is granted, as such value is determined by the Committee; provided, however, that in the case of an ISO granted to any person who owns, directly or indirectly, shares of Common Stock possessing more than 10% of the total combined voting power of all classes of stock of Cornerstone or any of its subsidiaries, the per share Option Price shall be not less than 110% of the fair market value of a share of Common Stock on the date the ISO is granted, as such value is determined by the Committee, and such ISO shall expire not later than ten years from the date on which such ISO is granted.

The per share Option Price for any non-ISO granted pursuant to this Plan shall be determined by the Committee.

5.3    Duration of Options.  Each Option shall be of the duration specified in the Option Agreement pursuant to which it is granted.  The Option Agreement may provide that all rights to exercise such Option shall expire not later than up to ten years from the date on which such Option is granted, except as otherwise provided pursuant to Section 5.2.

5.4    Other Terms and Conditions.  Options may contain such other provisions, which shall not be inconsistent with any of the foregoing terms, as the Committee shall deem appropriate, subject to the restrictions and limitations set forth herein.  Without limiting the generality of the foregoing, the Committee, in its discretion, may elect to include in any Option Agreement provisions pursuant to which Cornerstone may agree to loan funds to the Option holder upon exercise of an Option and/or provisions that the Option is not and will not be treated as, an ISO.  Notwithstanding any other provision of this Plan, Cornerstone shall use its best efforts to ensure that any ISO granted hereunder shall contain all provisions required to be included in the terms of an ISO under the then applicable provisions of the Code, but in no event and under no theory shall Cornerstone have any liability should an ISO granted hereunder fail to contain all provisions required under the Code.

5.5    Exercise.  Each Option granted under the Plan shall be exercisable in accordance with the terms specified in the Option Agreement pursuant to which it is granted.

Section 6.    Purchase of Stock.

6.1    Written Notice.  The holder of an Option wishing to exercise an Option,

7

or a portion of an Option, shall give written notice to Cornerstone. The date Cornerstone receives such notice shall be considered the date such Option was exercised as to the shares of Common Stock specified in such notice.

6.2   Payment. Simultaneously with the delivery to the holder of an Option of one or more certificates evidencing shares of Common Stock being acquired upon exercise of such Option, such holder shall: (a) pay to Cornerstone the sum of (i) the aggregate Option Price of all shares being purchased pursuant to such exercise of the Option, or, if the Committee shall permit the payment of such Option Price in installments, on such terms and conditions as it may determine, and (ii) an amount equal to the federal, state and local income taxes, if any, required to be withheld and paid by Cornerstone as a result of such exercise; and, if applicable, (b) accept and agree to the terms of a Restricted Stock Purchase Agreement substantially in the form attached to the Option Agreement (each such agreement being hereafter referred to as a "Purchase Agreement"), unless such holder is already a party to such a Purchase Agreement, in which event the restrictions on transfer contained therein will, without any action on the part of Cornerstone or such holder, be applicable to the shares of Stock to be issued upon the exercise of such Option.  The consideration to be paid for the shares of Common Stock to be issued upon exercise of an Option, including the method of payment, shall be determined by the Committee (and, in the case of an Incentive Stock Option, shall be determined at the time of grant) and may consist entirely of (1) cash, (2) check, (3) other Shares which (x) in the case of Shares acquired upon exercise of an Option either have been owned by the Optionee for more than six months on the date of surrender or were not acquired, directly or indirectly, from the Company and (y) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, or (4) if the Common Stock shall be publicly traded, delivery of a properly executed exercise notice together with such other documentation as the Committee and the broker, if applicable, shall require to effect an exercise of the Option and delivery to the Company of the sale or loan proceeds required to pay the exercise price.  In making its determination as to the type of consideration to accept, the Board shall consider if acceptance of such consideration may be reasonably expected to benefit Cornerstone. The proceeds from such payment shall constitute general funds of Cornerstone and shall be available without restriction for its corporate purposes.

8

6.3   Issuance of Stock Certificates.  As soon as possible after receipt of written notice of exercise of an Option, and simultaneously with payment and satisfaction of any other conditions to the exercise of such Option set forth in the Plan or Option Agreement by the holder of the Option, Cornerstone shall deliver, free and clear of any stock issue or transfer taxes payable in connection therewith, to the holder of the Option (or, if, pursuant to the Restricted Stock Purchase Agreement, all certificates of Common Stock owned by such person must be held by the escrow agent, to  the escrow agent thereunder) a certificate or certificates for the appropriate number of shares of Common Stock.

6.4   Privileges of a Stockholder.  No holder of any Option or his legal representatives, legatees or distributees, as the case may be, shall be deemed a stockholder (for purposes of voting, receipt of dividends or any other rights) with respect to any shares of Common Stock covered by Options held by such holder until he has exercised the Option as to such shares, paid for such shares in full and a stock certificate has been issued to him or his custodian or the escrow agent, for such shares of Common Stock.

Section 7.   Non-Transferability of Options.

Each Option will provide that it is not transferable by the holder thereof otherwise than by will or the applicable laws of descent and distribution, and is exercisable, during such holder's lifetime, only by him or by his guardian or legal representative.

Section 8.   Termination of Employment.

(a)   Each Option shall terminate upon the termination, for whatever reason, of the Option holder's Continuous Status as an Employee or Consultant with Cornerstone or any Subsidiary (but not in the event of a change of status from Employee to Consultant (in which case an Employee's Incentive Stock Option shall automatically convert to a Nonstatutory Stock Option on the ninety-first (91st) day following such change of status) or from Consultant to Employee), except that:  (i) if the employment of an Option holder terminates due to the Disability (as defined below) of such person, such Option holder may exercise his Option or Options (to the extent he was entitled to do so at the termination of his employment) at any time and from time to time within twelve (12) months after such termination, but in no event after the expiration of his Option or Options; provided, however,  that options granted under the Plan shall not be affected by any change of employment provided the Option holder continues to be

9

an employee of Cornerstone or any of its subsidiaries; (ii) in the event of the death of a holder of an Option, the Option or Options theretofore granted to him may be exercised (to the extent the deceased was entitled to do so at the date of his death) at any time and from time to time within a period of twelve (12) months after his death by his personal representatives or the person or persons to whom his rights under said Option or Options shall pass by will or the applicable laws of descent and distribution, but in no event may such person or persons exercise any Option after its expiration; (iii) if the employment of an Option holder is terminated other than for Cause (as defined below), such Option holder may exercise his Option or Options (to the extent he was entitled to do so at the termination of his employment or position as a director) at any time and from time to time within thirty (30) days after such termination, but in no event after the expiration of his Option or Options; and (iv) if Cornerstone determines to cease using the services of a Consultant, such Consultant shall be advised in writing of such termination in order to terminate the Continuous Status of a Consultant with Cornerstone or any Subsidiary of such Consultant for purposes of this Plan.

(b) As used in this Section and elsewhere in the Plan, the following terms shall have the following meanings:

"Cause" means (i) a Criminal Conviction; (ii) the willful failure by an employee, in the judgment of the Committee, to substantially perform his duties, other than any such failure resulting from his incapacity due to physical or mental illness; or (iii) willful misconduct by him that, in the judgment of the Committee, is materially injurious to Cornerstone or any of its subsidiaries. Notwithstanding the foregoing, an employee shall not be deemed to have been terminated for Cause under clauses (ii) or (iii) above unless and until there shall have been delivered to him a copy of a resolution, duly adopted by the affirmative vote of not less than two-thirds of the entire membership of the Committee at a meeting of the Committee called and held for the purpose (after thirty (30) days prior written notice to him and an opportunity for him, together with his counsel (whose fees and expenses shall be paid by him), to be heard before the Committee), finding that in the good faith opinion of the Committee he was guilty of conduct set forth above in clause (ii) or (iii) above and specifying the particulars thereof in detail. The employee agrees to cooperate with the Committee of the Board in any investigation by it to determine whether Cause for his termination exists.

10

"Criminal Conviction" means any conviction of a criminal violation related to an employee's duties or responsibilities to Cornerstone or any Subsidiary, regardless of the classification of such violation; or any conviction of a criminal violation not related to his duties or responsibilities to Cornerstone or any of Subsidiary, which violation is classified as a felony.

"Disability" means that an Option holder has been unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than one hundred twenty (120) days.

(c)     Rule 16b-3.  Options granted to persons subject to Section 16(b) of the Exchange Act must comply with Rule 16b-3 and shall contain such additional conditions or restrictions as may be required thereunder to qualify for the maximum exemption from Section 16 of the Exchange Act with respect to Plan transactions.

(d)     Buyout Provisions.  The Administrator may at any time offer to buy out for a payment in cash or Shares, an Option previously granted, based on such terms and conditions as the Administrator shall establish and communicate to the Optionee at the time that such offer is made.

Section 9.     Duration.

The Plan shall remain in effect for ten years, or until sooner terminated by the Board of Directors of Cornerstone; but Options theretofore granted may extend beyond the date of the termination or expiration of the Plan, in accordance with the provisions of the Plan. Subject to the foregoing, all Options granted under this Plan shall be granted within ten years from the date this Plan was adopted by the Board of Directors of Cornerstone.

Section 10.     Amendment.

No amendment to the Plan may be made unless such amendment shall have been approved by the affirmative vote or written consent of 51% of the Board of Directors of Cornerstone, and no amendment to the Plan shall be made unless such amendment shall have also been approved by the affirmative vote or written consent of the holders of a majority of the outstanding Common Stock.

11

No termination, expiration or amendment of the Plan may, without the written consent of the holder of any Option then outstanding, affect adversely the rights of the holder under such Option.

Section 11.     Government Regulations.

The Plan, the grant and exercise of Options thereunder and the obligation of Cornerstone to sell and deliver shares of Common Stock pursuant to such Options shall be subject to all applicable laws, rules and regulations, and to any required approvals by any governmental agencies or national securities exchanges.

So long as this Plan is in effect, each member of the Committee shall be a director of Cornerstone who is a disinterested person as defined in Rule 16b-3(c)(i) or any successor Rule under the Securities Exchange Act of 1934 (the "Exchange Act"). With respect to persons subject to Section 16 of the Exchange Act, transactions under this Plan are intended to comply with all applicable conditions of Rule 16b-3 or its successors under the Exchange Act. To the extent any provision of the Plan or action by the Committee fails to so comply, it shall be deemed null and void, to the extent permitted by law and deemed advisable by the Committee.

I:\tmk1\39073cnr.log
(rev. 5/1/97)

12



# EXHIBIT / ATTACHMENT



3

(To be scanned in place of tab)

# THE INTERNATIONAL CORNERSTONE GROUP, INC.

## ACQUISITION OF 80% OF THE COMMON STOCK OF THE TERRITORY AHEAD, INC.

March 31, 1997

William T. End

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement (the "Agreement") made this 31st day of March 1997, by and among The International Cornerstone Group, Inc., a Delaware corporation ("Cornerstone") and The Bruce A.L. Willard Living Trust U/A dated 11-11-93 ("Willard Trust"), of which Bruce A.L. Willard ("Willard") is the sole trustee (Cornerstone and Willard Trust are hereinafter sometimes referred to as the "Stockholders") and The Territory Ahead, a Delaware corporation (the "Company").

## R E C I T A L S

WHEREAS, contemporaneously with the execution of this Agreement, Cornerstone will acquire 2,400 shares of the Common Stock, $0.01 par value per share ("Common Stock") of the Company under the terms and conditions of that certain Stock Purchase Agreement (the "Stock Purchase Agreement") by and among Cornerstone, the Company and Lands' End Diversified Businesses, Inc. ("Lands' End") (the "Acquisition");

WHEREAS, Willard Trust currently owns 600 shares of the Common Stock of the Company;

WHEREAS, Willard has been the Chief Executive Officer of the Company for the past eight years and shall continue to act as the Chief Executive Officer of the Company after the Acquisition in accordance with the terms of that certain Employment Agreement of even date herewith between Willard and the Company (the "Employment Agreement");

WHEREAS, after the Acquisition, Cornerstone and Willard Trust will be the sole Stockholders of the Company; and

WHEREAS, Cornerstone and Willard Trust have decided to set forth the terms of their relationship as Stockholders of the Company.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and lawful consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.

## GENERAL

1.1   Definitions. Any terms used herein but not defined herein shall have the meaning ascribed to such terms in the Stock Purchase Agreement.

WILLARD\STCKHLDR.AG8
03-21-13:40
STEUBER & PASICH, LLP

lending tests are not met, and if the lender under the facility referred to above declines to lend the full amount of the facility required, Cornerstone may, but is not obligated to, contribute to the Company the difference between the required amount and the amount the lender will fund. Until March 31, 2000, any amounts invested by Cornerstone in the Company shall be in the form of debt, rather than additional purchases of equity. Cornerstone and the Company acknowledge that the facility is anticipated to be a revolving credit facility from a commercial bank with an established national or regional reputation, on such terms and conditions as are customary in facilities of this type from lenders of this type, with an interest rate equal to Cornerstone's interest rate on its primary credit facility. Cornerstone's obligation to provide any such guaranty shall terminate upon (i) a transfer by stockholders of the Company of more than 50% of the outstanding capital stock of the Company (computed on a fully-diluted basis), (ii) a sale of all or substantially all of the assets of the Company to a third party, by sale of assets, merger or otherwise, or (iii) such time as Cornerstone owns all of the outstanding capital stock of the Company.

     8.4    Stock Option Plan. Attached hereto as <u>Exhibit "B"</u> is a copy of the Stock Option Plan of Cornerstone. The Board of Directors of Cornerstone have taken all action necessary to reserve for issuance to directors and senior management employees of the Company options to purchase the common stock of Cornerstone. At the Closing of the Acquisition, Cornerstone shall have reserved for issuance options to purchase 316,667 shares of the common stock of Cornerstone for issuance to directors and senior management employees of the Company, all of which options, upon issuance, will vest ratably over four (4) years and be exercisable within seven (7) years after the grant date pursuant to the terms of the Stock Option Plan of Cornerstone. Of the options to purchase 316,667 shares reserved for issuance, options to purchase at least 126,667 shares shall be granted to Willard as described in the following sentences. At the Closing of the Acquisition, fifty percent (50%) of the options reserved for issuance, or options to purchase 158,334 shares of common stock of Cornerstone shall be granted at an exercise price of $6.00 per share as follows: (i) options to purchase 63,334 shares of the common stock of Cornerstone shall be issued to Willard pursuant to a separate Option Agreement between Willard and Cornerstone to be entered into between the parties within five business days of the Closing Date of the Acquisition and (ii) options to purchase 95,000 shares of the common stock of Cornerstone shall be issued to senior management employees of the Company, as directed by Willard, each of which grant shall be evidenced by a separate Option Agreement between Cornerstone and such designated senior management employee. Of the 316,667 shares reserved for issuance above, the remaining fifty percent (50%), or options to purchase 158,333 shares of the common stock of Cornerstone, shall be granted as follows: (i) options to purchase 63,333 shares will be issued to Willard no later than April 15, 1997 at a fair market value exercise price of $6.00 per share and (ii) options to purchase 95,000 shares at an exercise price equal to fair market value shall be granted to senior management employees and/or directors of the Company as directed by a committee of the Board of Directors of the Company authorized by the Board of Directors to identify such senior management employees and/or directors and to make such grants.



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

# THE INTERNATIONAL CORNERSTONE GROUP, INC.

## ACQUISITION OF GARNET HILL, INC.

July 28, 1997

The International
Cornerstone Group, Inc.

L

International **Cornerstone** Group

June 20, 1997

Garnet Hill, Inc.
PO Box 262
Franconia, NH 03580

Gentlemen:

This Letter of Intent sets forth the terms upon which The International Cornerstone Group, Inc. a Delaware corporation ("Cornerstone"), proposes to acquire all of the outstanding stock of Garnet Hill, Inc. a New Hampshire corporation ("GH").

1.    Structure of the Transaction.  Cornerstone will purchase all of the outstanding shares of capital stock of GH in a transaction structured as a stock purchase (provided that Cornerstone may elect to structure the acquisition as a merger if that would provide Cornerstone with tax benefits without resulting in any adverse tax consequences to the GH stockholders) (the "Transaction").

2.    Purchase Price.  The purchase price to paid for the capital stock of GH will be $38 million, consisting of (a) $32 million in cash and (b) $6 million in Cornerstone common stock (comprised of 750,000 shares valued at $8.00 per share). It is understood that, as a condition to the closing of the Transaction, (a) Cornerstone will perform its own "due diligence" to satisfy itself as to the condition of GH's balance sheet as of the closing and the projected net worth of GH as of the closing (without regard to any adjustments that may be required by the structure of the transaction referred to in Section 5 below) and (b) GH will perform its own "due diligence" to satisfy itself as to the $8.00 per share valuation of the Cornerstone common stock.

3.    Stock Options.  Cornerstone will establish an employee stock option pool under which stock options with an aggregate value of $1.3 million will be granted to GH employees (including Jim Hamblin and Brad Williams, who may be allocated up to 50% of such option pool, as determined by the Board of Directors) over the five-year period following the closing of the Transaction.  It is the intention of Cornerstone that stock options representing up to 25% of such value be granted during the first year following the closing of the Transaction.  Such stock options will have an exercise price equal to the then fair market value of the Cornerstone common

(c)     has sufficient expertise in business and financial matters to be able to evaluate the risks involved in the acquisition of the Cornerstone Shares and to make an informed investment decision with respect to such acquisition;

(d)     understands that the Cornerstone Shares have not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act; and that the Cornerstone Shares cannot be sold, transferred or otherwise disposed of unless Cornerstone has received an opinion of counsel from counsel reasonably acceptable to Cornerstone (it being agreed that Hale and Dorr LLP and Siegel, O'Connor, Schiff & Zangari P.C. are each reasonably acceptable counsel) to the effect such shares have been registered under the Securities Act or an exemption from registration is then available; and

(e)     acknowledges that a legend substantially in the following form will be placed on each certificate representing the Cornerstone Shares:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold, transferred or otherwise disposed of in the absence of an effective registration statement under such Act or an opinion of counsel satisfactory to the corporation to the effect that such registration is not required."

2A.5   <u>Allocation of Cornerstone Shares Among the Stockholders</u>.  The Stockholders agree to the allocation of Cornerstone Shares to James B. Hamblin and Alice H. Williams only, as set forth on <u>Schedule I</u>.  Each Stockholder hereby acknowledges that all Stockholders have been offered the opportunity to receive a combination of Cornerstone Shares and cash as consideration for such Stockholder's GHI Shares on a pro rata basis with all other Stockholders, and that James B. Hamblin and Alice H. Williams have elected to receive a combination of shares of Cornerstone Common Stock and cash, and the remaining Stockholders have elected to receive only cash.  Each Stockholder hereby agrees that each share of Cornerstone Common Stock has a fair market value on the Closing Date of $8.00, and irrevocably waives any right to initiate any claim, suit, action or proceeding against any Stockholder, GHI or Cornerstone asserting that the Cornerstone Shares were on the Closing Date worth more or less than $8.00 per share.

5



# EXHIBIT / ATTACHMENT

## 5

(To be scanned in place of tab)

# THE INTERNATIONAL CORNERSTONE GROUP, INC.

## 1995 STOCK OPTION PLAN

### STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the 1995 Stock Option Plan (the "Plan") adopted by The International Cornerstone Group, Inc. (formerly known as The Cornerstone Investments Group, Inc.), a Delaware corporation (hereinafter the "Company"), shall have the same defined meanings in this Option Agreement.

## I.   NOTICE OF GRANT

**[Optionee's Name and Address]**
Helen Ballard Weeks
2000 Garraux Drive
Atlanta, GA 30322

You have been granted an option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

| | |
|---|---|
| Grant Number | #37 |
| Date of Grant | August 13, 1997 |
| Total Number of Shares Granted | 25,000 |
| Exercise Price per Share | $9.00 |
| Total Exercise Price | $225,000 |

Type of Option:   _x_ Incentive Stock Option   __Nonstatutory Stock Option

Scheduled Term/Expiration Date: August 13, 2004 (subject to earlier termination as set forth in Sections 6, 7 and 8 hereof and the Plan)

Vesting Schedule:

The Shares subject to this Option shall vest according to the following schedule:

| Date of Vesting | Number of Shares Vesting |
|---|---|
| August 13, 1998 | 6,250 |
| August 13, 1999 | 6,250 |
| August 13, 2000 | 6,250 |
| August 13, 2001 | 6,250 |
| TOTAL: | 25,000 |

Notwithstanding the foregoing, during the term of this Stock Option Agreement, at the sole discretion of the Compensation Committee of the Company and upon written notice thereof to Optionee, the Company may determine to allow accelerated vesting of all shares subject to this Option to occur at any time, including without limitation in connection with an underwritten offering to the public of common stock of the Company pursuant to an effective registration statement under the Securities Act of 1933, as amended.

## II.   AGREEMENT

1.   Grant of Option.  The Company hereby grants to the Optionee named in the Notice of Grant (the "Optionee"), an option (the "Option") to purchase a total number of shares of Common Stock (the "Shares") set forth in the Notice of Grant (set forth in Section I. above), at the exercise price per share set forth in the Notice of Grant (the "Exercise Price") subject to the terms, definitions and provisions of the Plan adopted by the Company, which is incorporated herein by reference and the terms and conditions of this Option Agreement. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option.

This Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. However, to the extent that this Option exceeds the $100,000 rule of Code Section 422(d) it shall be treated as a Nonstatutory Stock Option.

2.   Exercise of Option. This Option shall be exercisable during its Term in accordance with the terms set out in the Notice of Grant and with the provisions of the Plan as follows:

(i)   Right to Exercise.

(a)   Subject to subsections 2(i)(b) through 2(i)(e) below, this Option shall be exercisable according to the vesting schedule set out in the Notice of Grant.  For purposes of this Stock Option Agreement, Shares subject to this Option shall vest based on continued employment of Optionee with the Company.

(b)   As a condition to exercising this Option as to any Shares at any time, Optionee shall have agreed in writing to be bound by the Stockholders Agreement, dated as of September 13, 1995, as it may be amended or changed from time to time, among the Company, Madison Dearborn Capital Partners, L.P., and Chase Venture Capital Associates, L.P. (a California Limited Partnership), and various other parties (the "Stockholders Agreement").  A form of agreement to execute the Stockholders Agreement (hereinafter referred to as the "Assumption Agreement") is attached hereto as Exhibit A.

(c)   This Option may not be exercised for a fraction of a share.

(d)   In the event of Optionee's death, disability or other termination of employment, the exercisability of the Option is governed by Sections 6, 7 and 8 below, subject to the limitation contained in subsection 2(i)(e).

(e)   In no event may this Option be exercised after the date of expiration of the term of this Option as set forth in the Notice of Grant.

(ii)   Method of Exercise. This Option shall be exercisable by written notice (in the form attached as Exhibit B) which shall state the election to exercise the Option, the number of Shares in respect of which the Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such

2

shares of Common Stock as may be required by the Company pursuant to the provisions of the Plan. Such written notice, together with an executed copy of the Assumption Agreement, shall be signed by the Optionee and shall be delivered in person or by certified mail to the Secretary of the Company. The written notice and the Assumption Agreement shall be accompanied by payment of the Exercise Price. This Option shall be deemed to be exercised upon receipt by the Company of such written notice and signed Assumption Agreement, all accompanied by the payment of the Exercise Price.

No Shares will be issued pursuant to the exercise of an Option unless such issuance and such exercise shall comply with all relevant provisions of law and the requirements of any stock exchange upon which the Shares may then be listed. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

3.    Optionee's Representations. Optionee hereby represents and warrants:  (a) In the event the Shares purchasable pursuant to the exercise of this Option have not been registered under the Securities Act of 1933, as amended, at the time this Option is exercised, Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company an Investment Representation Statement in the form attached hereto as Exhibit C.

(b)  There has been made available to Optionee, a reasonable time prior to Optionee's execution hereof, an opportunity to ask questions and receive answers concerning the terms and conditions of this Stock Option Agreement and to obtain any additional information which the Company or a Subsidiary possesses or can acquire without unreasonable effort or expense and Optionee has received all additional information which Optionee has requested.

(c)  Optionee is aware of and familiar with the restrictions imposed on the transfer by Optionee of any shares of Common Stock, including, without limitation, the restrictions contained in this Agreement and in the Stockholders Agreement.

(d)  Optionee acknowledges that the Company is entering into this Agreement in reliance upon Optionee's representations, warranties and agreements contained in this Agreement, and that such representations, warranties and agreements constitute part of the consideration received by the Company for the sale of the Shares to Optionee.

4.    Method of Payment. Payment of the Exercise Price shall be, subject to the prior written consent of the Company, in its sole discretion, by any of the following:

(i) cash;

(ii) check;

(iii) surrender of other shares of Common Stock of the Company which (A) in the case of Shares acquired pursuant to the exercise of a Company option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (B) have a fair

3

market value on the date of surrender equal to the Exercise Price of the Shares as to which the Option is being exercised; or

        (iv) if the Common Stock shall be publicly traded, delivery of a properly executed exercise notice together with such other documentation as the administrator of the Plan and the broker, if applicable, shall require to effect an exercise of the Option and delivery to the Company of the sale or loan proceeds required to pay the exercise price.

     5.    Restrictions on Exercise. (a) As a condition to the exercise of this Option, the Company may require Optionee to make any additional representations and warranties to the Company as may be required by any applicable law or regulation.

        (b) The Company's obligation to issue and sell the shares of Common Stock to Optionee shall be subject to the fulfillment to the Company's satisfaction of the following conditions at or prior to the date of Payment of the Exercise Price:

        (i) Optionee shall have performed and complied with all agreements and conditions contained in this Agreement and the Plan required to be performed or complied with by Optionee prior to or at the date of Payment of the Exercise Price.

        (ii) Optionee's representations and warranties contained in this Agreement shall be true and correct when made and at and as of the date of Payment of the Exercise Price.

        (c) Optionee's purchase of Common Stock in accordance with this Agreement shall constitute a certification by Optionee to the effect that Optionee's representations and warranties contained in this Agreement are true and correct, as if made at and as of the date of Payment of the Exercise Price and that Optionee has complied with all agreements and satisfied all conditions on Optionee's part to be performed or satisfied at or prior to the date of Payment of the Exercise Price.

     6.    Termination of Relationship. Notwithstanding the Scheduled Term/Expiration Date set forth in Section 1 or any other term or condition of this Agreement, if Optionee shall cease to be employed by the Company or any of its Subsidiaries for any reason other than death or Disability (as defined in the Plan), subject to any applicable terms of the Plan, Optionee may exercise this Option to the extent Optionee was entitled to do so at the termination of Optionee's employment at any time within the ninety days period immediately following such termination of employment (but in no event later than the date of expiration of the term of this Option as set forth in Section 10 below). After such ninety day period, this Option Agreement shall terminate.

     7.    Disability of Optionee. Notwithstanding the provisions of Section 6 above, in the event of termination of Optionee's employment as a result of Disability, as defined by the Plan, Optionee may, but only within twelve (12) months from the date of termination of employment (but in no event later than the date of expiration of the term of this Option as set forth in Section 10 below), exercise the Option to the extent otherwise so entitled at the date of such termination. To the extent that Optionee was not entitled to exercise the Option at the

4

date of termination of employment, or if Optionee does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

8.    Death of Optionee. In the event of termination of Optionee's employment as an Employee as a result of the death of Optionee, the Option may be exercised at any time within twelve (12) months following the date of death (but in no event later than the date of expiration of the term of this Option as set forth in Section 10 below), by Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent the Optionee could exercise the Option at the date of death.

9.    Non-Transferability of Option. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

10.    Term of Option. This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

11.    Taxation Upon Exercise of Option. Optionee understands that, upon exercising a Nonstatutory Stock Option, he or she may recognize income for tax purposes in an amount equal to the excess of the then fair market value of the Shares over the exercise price. If the Optionee is an employee, the Company may withhold from Optionee's compensation, or collect from Optionee and pay to the applicable taxing authorities an amount equal to a percentage of this compensation income. Additionally, the Optionee may at some point be required to satisfy tax withholding obligations with respect to the disqualifying disposition of an Incentive Stock Option. The Optionee shall satisfy his or her tax withholding obligation arising upon the exercise of this Option out of Optionee's compensation or by payment to the Company. THE SUMMARY IN SECTION 11 IS NECESSARILY INCOMPLETE, AND THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. OPTIONEE SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THIS OPTION OR DISPOSING OF THE SHARES.

12.    Company's Purchase Rights. (a) At any time within six months after the termination of Optionee's employment with the Company for any reason, the Company shall have the right (the "Purchase Right"), to purchase all or a part of the Vested Options and to repurchase any Shares purchased pursuant to this Option by giving Optionee or any holder of such Shares or Option, written notice of the Company's intention to exercise such Purchase Right (the "Company Notice"). The Company Notice shall include (i) the number of Shares and Vested Options being purchased; (ii) the Purchase Price; and (iii) the place, time and date for the purchase and sale of the Shares and Vested Options.

(b)    Purchase Price. The Purchase Price of the Shares shall equal the fair market value of the Shares as determined in good faith by the Board of Directors of the Company, which determination shall be conclusive and final. In making such determination the Board of Directors may consider (but shall not be bound by) the Board's prior determination of the fair market value of shares of common stock for the exercise price of recently granted

5

incentive stock options and the value attributed to shares of common stock in recent transactions or acquisitions occurring prior to the date of the Company Notice.

The Purchase Price of the Vested Options shall equal the Purchase Price of the Shares as determined above, less the unpaid exercise price for such Vested Options.

(c)    <u>Termination of Company's Purchase Right Upon Public Offering</u>. Notwithstanding the foregoing, the Company's Purchase Right under this Section 12 shall immediately terminate in the event of a public offering of common stock of the Company pursuant to an effective registration statement under the Securities Act of 1933, as amended.

(d)    <u>Legends</u>.  Shares issued upon exercise of this Option may contain a legend reflecting the Purchase Right of the Company as described in this Section 12.

(e)    <u>Payment and Delivery Procedures</u>.  At the place, time and date specified in the Company Notice for the sale of the Shares and Vested Options, the Optionee or other holder of the Shares or Vested Options shall deliver certificates for such Shares and the Option Agreement, as applicable, duly endorsed, or accompanied by written instruments of transfer in form satisfactory to the Company duly executed, by the Optionee or other holder of the Shares and Vested Options, and the Company shall pay the Purchase Price therefor (less any amount of federal, state or local tax which the Company may be required to withhold) by delivering a certified or bank cashier's check or checks, payable to the Optionee or other holder of the Shares and Vested Options in an amount equal to the Purchase Price.

13.    <u>No Employment Right</u>. OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THIS OPTION OCCURS ONLY BY CONTINUING EMPLOYMENT AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED OR BEING GRANTED THIS OPTION). OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS AGREEMENT, NOR IN THE COMPANY'S STOCK OPTION PLAN SHALL CONFER UPON OPTIONEE ANY RIGHT WITH RESPECT TO CONTINUATION OF EMPLOYMENT BY THE COMPANY, NOR SHALL IT INTERFERE IN ANY WAY WITH THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S EMPLOYMENT AT ANY TIME, WITH OR WITHOUT CAUSE.

6

14.   Governing Law; Consent to Jurisdiction. The validity, construction and performance of this Option shall be governed by and construed in accordance with the laws of the State of Delaware. Optionee hereby consents to the exclusive jurisdiction and venue of any of the following courts for the purposes of any action brought by Optionee or the Company to enforce or interpret this Agreement: the Superior Court in the County of Suffolk, Commonwealth of Massachusetts and the Federal District Court for the District of Massachusetts. Optionee further agrees that service of process upon Optionee in any such action may be made by first class mail, certified or registered, to Optionee's address as it last appears on the records of the Company. If any legal, equitable or other action, claim or proceeding of any kind or nature (including without limitation enforcing judgments and appeals) is brought to enforce or interpret any provision of this Agreement, then the prevailing party shall be entitled to its attorneys' fees and costs, in addition to any other relief to which it may be entitled.

The International Cornerstone Group, Inc.
(formerly known as The Cornerstone Investments Group, Inc.)

By:   _____
      Donald Steiner
      Executive Officer and Managing Director

By:   _____
      William T. End
      Executive Officer and Managing Director

K:\tmk1\39073897.log

7



# EXHIBIT / ATTACHMENT

6

(To be scanned in place of tab)

As filed with the Securities and Exchange Commission on October 28, 1998.

Registration No. 333-62235

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## AMENDMENT NO. 1
## TO
## FORM S-1
### REGISTRATION STATEMENT UNDER
### THE SECURITIES ACT OF 1933

# CORNERSTONE BRANDS, INC.
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 5961 | 01-0520036 |
|---|---|---|
| (State or other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

415 Congress Street, Suite 600
Portland, Maine 04101
(207) 780-6585
(Address, Including Zip Code, and Telephone Number,
Including Area Code, of Registrant's Principal Executive Offices)

William T. End
Chief Executive Officer
Cornerstone Brands, Inc.
415 Congress Street, Suite 600
Portland, Maine 04101
(207) 780-6585
(Name, Address, Including Zip Code, and Telephone
Number, Including Area Code, of Agent For Service)

*Copies To:*

| | |
|---|---|
| Mark G. Borden, Esq. | Keith F. Higgins, Esq. |
| Patrick J. Rondeau, Esq. | Ropes & Gray |
| Hale and Dorr LLP | One International Place |
| 60 State Street | Boston, Massachusetts 02110 |
| Boston, Massachusetts 02109 | Telephone: (617) 951-7000 |
| Telephone: (617) 526-6000 | Telecopy: (617) 951-7050 |
| Telecopy: (617) 526-5000 | |

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC:  As soon as practicable after the effective date hereof.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

On August 13, 1997, the Company issued 2,216,667 shares of its Common Stock to four former stockholders of Ballard Designs in connection with the acquisition of Ballard Designs by stock merger. The Company received representations from these individuals as to their sophistication as investors and as to their investment intent in connection with the merger transaction and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

In October of 1997, the Company issued an aggregate of 1,762 shares of its Common Stock to five former stockholders of Frontgate in lieu of fractional shares of its Series B Convertible Preferred Stock in connection with the conversion into Series B Convertible Preferred Stock of certain shares of its Series C Convertible Preferred Stock that were issued to them in connection with the Company's acquisition of Frontgate. The Company received representations from these individuals as to their sophistication as investors in connection with the acquisition transaction and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On January 12, 1998, the Company issued an aggregate of 1,050,000 shares of its Common Stock and paid an aggregate of $6,300,000 to four former stockholders of Frontgate in exchange for certain securities previously issued to such stockholders by the Company in connection with the acquisition of Frontgate. The Company received representations from these individuals as to their sophistication as investors and as to their investment intent in connection with the acquisition transaction and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On May 19, 1998, the Company issued 25,000 shares of its Common Stock to Nicolas A. Kensington for an aggregate purchase price of $250 upon the exercise of a warrant granted in June 1995. Mr. Kensington was Secretary of the Company and through its relationship with Mr. Kensington the Company had acquired a reasonable basis for concluding that Mr. Kensington was a sophisticated investor. The securities were issued in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On July 6, 1998, the Company issued 55,555 shares of its Common Stock to John Walter for an aggregate purchase price of $500,000. The Company received representations from Mr. Walter as to his sophistication as an investor and as to his investment intent in connection with the sale of the securities and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On August 25, 1998, the Company issued 4,166,111 shares of its Common Stock to two former members of Smith+Noble as consideration for its acquisition of all the outstanding equity interests of Smith+Noble. The Company received representations from these individuals as to their sophistication as investors and as to their investment intent in connection with the acquisition transaction and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On September 15, 1998, the Company (i) issued to Boston Capital Ventures II, L.P. 46,040 shares of its Common Stock for an aggregate purchase price of $460.40 upon exercise of a warrant issued in June 1995 and 11,510 shares of its Common Stock for an aggregate purchase price of $11,510 upon exercise of an option granted in September 1995 and (ii) issued to Boston Capital Ventures III, L.P. 33,960 shares of its Common Stock for an aggregate purchase price of $339.60 upon exercise of a warrant issued in June 1995 and 8,490 shares of its Common Stock for an aggregate purchase price of $8,490 upon exercise of an option granted in September 1995. The Company received representations from Boston Capital Ventures II, L.P. and Boston Capital Ventures III, L.P. as to their sophistication as investors in connection with the formation of the Company and issued the securities in reliance upon the exemption from registration set forth in Section 4(2) of the Securities Act.

On September 16, 1998, the Company issued 4,000 shares of its Common Stock to Nicholas F. Kourtis for an aggregate purchase price of $40 upon exercise of a warrant originally issued to Nicolas A. Kensington in June 1995 and subsequently transferred to Mr. Kourtis, a law partner of Mr. Kensington. Mr. Kourtis had served as one the Company's legal advisors and through its relationship with Mr. Kourtis the Company had acquired a



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# THE INTERNATIONAL CORNERSTONE GROUP, INC.

# REORGANIZATION AND ACQUISITION OF SMITH & NOBLE, LLC

## AUGUST 25, 1998

## VOLUME I OF II

CONFIDENTIAL

AGREEMENT AND PLAN OF REORGANIZATION

BY AND AMONG

THE INTERNATIONAL CORNERSTONE GROUP, INC.,

CORNERSTONE BRANDS, INC.,

CORNERSTONE SN ACQUISITION CORP.,

SMITH & NOBLE LLC

AND

THE MEMBERS OF SMITH & NOBLE LLC

_____

August 25, 1998

Exhibit A

## AGREEMENT AND PLAN OF REORGANIZATION

This AGREEMENT AND PLAN OF REORGANIZATION (the "Agreement") is entered into as of August 25, 1998 by and among The International Cornerstone Group, Inc., a Delaware corporation ("Cornerstone"), Cornerstone Brands, Inc., a Delaware corporation and a wholly owned subsidiary of Cornerstone ("NewCo"), Cornerstone SN Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of NewCo (the "Transitory Subsidiary"), Smith & Noble LLC, a California limited liability company prior to the effectuation of the LLC Merger (as defined in Section 2.3 below) and thereafter a Delaware limited liability company ("S&N"), and Fred E. Kamgar, Moira E. Kamgar and Robert M. Perkowitz, being all of the members of S&N (the "Members"). Cornerstone, NewCo, the Transitory Subsidiary, S&N and the Members and the are referred to collectively herein as the "Parties".

This Agreement contemplates (i) a merger of the Transitory Subsidiary into Cornerstone pursuant to Section 251(g) of the Delaware General Corporation Law, in which Cornerstone is the surviving corporation, all of the securityholders of Cornerstone receive like securities of NewCo, and NewCo becomes the sole stockholder of Cornerstone, (ii) a merger of S&N into a newly-organized Delaware limited liability company and (iii) a contribution, assignment and transfer by the Members of 100% of their interest in such Delaware limited liability company to NewCo, in exchange for shares of common stock of NewCo. It is intended that the merger of the Transitory Subsidiary into Cornerstone constitute a tax-free reorganization within the meaning of Section 368(a)(2)(E) of the Internal Revenue Code of 1986, as amended (the "Code"), that the reorganization and the contribution, assignment and transfer by the Members of their S&N membership interests constitute tax-free transfers of property under Section 351 of the Code and that the transactions contemplated by this Agreement be accounted for as a "pooling of interests".

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements herein contained, the Parties agree as follows.

### ARTICLE I

### MERGER OF TRANSITORY SUBSIDIARY INTO CORNERSTONE

1.1    The Merger. Upon and subject to the terms and conditions of this Agreement, the Transitory Subsidiary shall merge with and into Cornerstone pursuant to Section 251(g) of the Delaware General Corporation Law (with such merger referred to herein as the "Merger") at the Effective Time (as defined below). From and after the Effective Time, the separate corporate existence of the Transitory Subsidiary shall cease and Cornerstone shall continue as the surviving corporation in the Merger (the "Surviving Corporation"). The "Effective Time" shall be the time at which the Surviving Corporation files an agreement of merger prepared and executed in accordance with Section 251(g) of the Delaware General Corporation Law (the

(k)     Pooling Letter.  S&N shall have received a letter from Ernst & Young LLP, addressed to S&N and NewCo, regarding its concurrence with NewCo's management's conclusions as to the appropriateness of the pooling of interests accounting under Accounting Principles Board Opinion No. 16 for the Closing Transactions, as contemplated to be effected as of the date of the letter, it being agreed that the Parties shall each provide reasonable cooperation to Ernst & Young LLP to enable them to issue such a letter.

(l)     No Material Adverse Change to Draft Form S-1.  There shall be no material adverse change in the information contained in the Registration Statement on Form S-1 as proposed to be filed by NewCo pursuant to and in accordance with Section 7.5 below, as compared to the information contained in the Draft Form S-1.

(m)     Closing Deliveries.  The Members shall have received such other certificates and instruments (including without limitation certificates of good standing of Cornerstone and NewCo in their jurisdictions of incorporation, certified organizational documents, certificates as to the incumbency of officers and the adoption of authorizing resolutions) as it shall reasonably request in connection with the Closing.

## ARTICLE VII

## POST-CLOSING COVENANTS

7.1     Stock Options.

(a)     As soon as practicable, but in no event later than five days after the Closing, NewCo will grant incentive stock options to the S&N management personnel covering the number of shares of NewCo common stock specified in Exhibit K hereto.  The exercise price for such options shall equal $17.00 per share.  Such stock options shall provide for vesting over four years, and shall have other terms consistent with NewCo's customary stock option terms.

(b)     As soon as practicable, but in no event later than five days after the Closing, NewCo will grant incentive stock options to Fred E. Kamgar and Robert M. Perkowitz, with respect to an aggregate of 25,000 shares of NewCo common stock, which options shall have an exercise price per share of $17.00.  The vesting period for such options shall be four years, and all such stock options shall have other terms consistent with NewCo's customary stock option terms for persons occupying comparable positions.  NewCo shall grant to Messrs. Kamgar and Perkowitz stock options under NewCo's stock option plans, in amounts which are comparable to those granted by NewCo to persons occupying comparable positions at other NewCo

-49-





# EXHIBIT / ATTACHMENT

## $8$

(To be scanned in place of tab)



# Consolidated Financial Statements

## Cornerstone Brands, Inc.

Years ended January 31, 1998 and
January 30, 1999

**ƎII ERNST & YOUNG LLP**

Cornerstone Brands, Inc.

Notes to Consolidated Financial Statements (continued)

**2. Acquisitions (continued)**

fees, expenses and a warrant to purchase Company stock. On September 16, 1998, the Company purchased the remaining outstanding shares of Territory Ahead for an aggregate purchase price of $10.7 million. The purchase price consisted of the following: $2.9 million in cash, $1.9 million in the repayment of the seller's obligation to Territory Ahead and a $5.9 million promissory note due and paid in January 1999, with an interest rate of 5%.

On July 28, 1997, the Company acquired 100% of the outstanding shares of Garnet Hill, Inc. (Garnet Hill). Garnet Hill is a catalog company that specializes in home and casual apparel products. The assets and business were acquired for an aggregate purchase price of approximately $38 million, including related fees and expenses. The total consideration includes cash payments aggregating $30 million, issuance of 750,000 shares of Company common stock valued at $6 million and issuance of notes to the shareholders of approximately $1,700,000.

On September 4, 1997, the Company acquired a 51% ownership interest in Whispering Pines LLC (Whispering Pines). Whispering Pines is a catalog company that specializes in home, leisure and casual apparel products. The Company paid $1 million in cash for its share of Whispering Pines. On October 8, 1998, the Company purchased an additional 29% ownership interest in Whispering Pines for an aggregate purchase price of $1 million, consisting of $700,000 in cash and 17,647 shares of Company stock valued at $300,000.

For financial reporting purposes, these acquisitions were accounted for under the purchase method. The operating results of the acquired businesses have been included in consolidated operating results since the dates of acquisition. The 1997 acquisitions, which resulted in a new basis of accounting reflecting the fair values of the assets at the acquisition date, have been summarized as follows:

|  | Garnet Hill | The Territory Ahead | Whispering Pines |
|---|---|---|---|
| Historical basis of net assets acquired. | $12,024,474 | $   893,296 | $1,010,000 |
| Fair value and other adjustments: |  |  |  |
| Customer master file | 1,500,000 | 1,020,000 | — |
| Inventory valuation adjustment | 2,460,484 | 2,392,433 | — |
| Fixed asset valuation adjustment | 433,733 | — | — |
| Deferred tax adjustment | (1,696,168) | (1,364,973) | — |
| Fair value of net assets | 14,722,523 | 2,940,756 | 1,010,000 |
| Ownership percentage | 100% | 80% | 51% |
| Fair value of net assets purchased | 14,722,523 | 2,352,605 | 515,100 |
| Goodwill | 23,007,281 | 10,897,395 | 484,900 |
| Total purchase price | $37,729,804 | $13,250,000 | $1,000,000 |

11



# EXHIBIT / ATTACHMENT

9

(To be scanned in place of tab)

January 8, 1998

TO:     Cornerstone Shareholders

FROM:   Cornerstone Management

RE:     Business Update – November 1997

We at Cornerstone wanted to provide you with a brief update on the company for the ten months ended November 1997.

Enclosed please find The International Cornerstone Investments Group, Inc. consolidated income statement through the ten (10) months ended November 30, 1997.

The November 1997 fiscal year to date had net revenues of $171.6 million, 7.7% ahead of budget and 41% over last year, and net income of $7.8 million, $1.1 million ahead of plan and 65% ahead of last year. These amounts include the consolidated results of Cinmar, TravelSmith, The Territory Ahead (TTA), Ballard, and Garnet Hill and Cornerstone's Home Office prior to minority interests. Overall, Cornerstone is having an exceptional year in terms of revenues, margins and expense performance.

The 1997 fiscal year, which ends in January 1998, has been a very successful year in terms of acquisitions and overall financial performance. We acquired an 80% interest in The Territory Ahead last April. In July Cornerstone acquired a 100% ownership interest in Garnet Hill. We also closed on Ballard Designs in early August with a 100% ownership. In early September we completed an acquisition of the majority of Whispering Pines, Inc. with further rights to acquire 100% of the equity on a formula basis over the next several years. Whispering Pines is small (approx. $2 million in revenues), but growing catalog offering distinctive home, apparel and gift products that are typically found at a lakeside cabin, mountain lodge or country trading post.

The end of November 1997 financial reports includes Cinmar, TravelSmith, TTA, and Ballard results from the beginning of the fiscal year. Since Garnet Hill's pre acquisition fiscal year ended on July 31, which is also their audit date, we have only included their results from the date of acquisition.

The enclosed financial statements through November 1997 show our catalog's performance on a combined basis vs. their performance for the prior year (the equivalent of same store sales). Due to significant acquisition activity in 1997, actual 1997 vs. 1996 will show approximately 200% growth in revenues and even greater growth in earnings.

The Cornerstone businesses generally had good holiday seasons in terms of sales growth and while it is too early to know about profits, we anticipate solid results. For the year ending January 1998, we expect that we will exceed $220 million in net revenues and with a significant increase in net income over 1997.

The Cornerstone management team continues to be active in talking to potential acquisitions targets. More of our time and attention will now turn to realizing the benefits of collaboration among the 6 Cornerstone affiliates and developing plans for continued growth and profitability. We continue to be very optimistic about Cornerstone and its future.

If you have any questions, please do not hesitate to call any of the Cornerstone Officers: Don Steiner, Bill End, John O'Steen, Paul Tarvin or Mark Fasold.

From Desk of **Cornerstone** Group

DATE    August 27, 1998

TO      Cornerstone Shareholders

FROM    Bill End, Mark Fasold, Don Steiner

RE.     Announcements

We wanted to provide you with a brief update on some very important events at the company.  After several months of preparation, yesterday we filed our draft Registration Statement with the Securities and Exchange Commission.  Subject to approval by the SEC and market conditions, we hope to complete our IPO by the end of the year.  We have selected as our underwriters: NationsBanc Montgomery Securities, Goldman Sachs and Merrill Lynch.

On another note we have also finalized a deal to acquire Smith+Noble, a specialty cataloger offering high quality, custom window treatments  The Smith+Noble catalogs include: Windoware, Window Elements and Windoware Sourcebook.  Please join us in welcoming CEO and President Fred Kamgar, Chief Operating Officer Bob Perkowitz and all the employees of Smith+Noble to the Cornerstone family of catalog companies

Lastly, we wanted to inform you that we have changed our company name from The International Cornerstone Group, Inc. to Cornerstone Brands, Inc.  We made this change for a number of reasons including the need for an unencumbered name that we could register in the state of Delaware and also a name with an available URL.

We will keep you informed of our progress toward an IPO.  As always, if you have any questions or comments, please feel free to give one of us a call

## HALE AND DORR LLP

COUNSELLORS AT LAW

60 STATE STREET, BOSTON, MASSACHUSETTS 02109

617-526-6000 • FAX 617 526-5000

STEVEN D. BARRETT

617-526-6238

steven.barrett@haledorr.com

September 11, 1998

To the Selling Stockholders of Cornerstone Brands, Inc.
participating in its initial public offering:

As you know, Cornerstone Brands, Inc. (the "Company") is preparing to make
an initial public offering of its common stock ("Common Stock"), in which you are
participating as a selling stockholder (a "Selling Stockholder"). This letter and the
enclosed materials explain the documents which you much complete and return in
order to participate in this public offering. **THE ENCLOSED DOCUMENTS MUST
BE RETURNED BY FRIDAY, SEPTEMBER 25, 1998.**

The Initial Public Offering

The terms and conditions of the Company's initial public offering will be
substantially as set forth in (i) the Registration Statement on Form S-1 (the
"Registration Statement"), which the Company filed with the Securities and Exchange
Commission (the "SEC") on April 26, 1998, and (ii) the underwriting agreement
among the Company, the underwriters named in Schedule A thereto (the
"Underwriters") and the Selling Stockholders (the "Underwriting Agreement"). The
Registration Statement registers under the Securities Act of 1933, as amended, the
shares of Common Stock which may be sold in the public offering and contains
certain information regarding the Company and the offering. The Underwriting
Agreement provides for the purchase by the Underwriters of Common Stock from
the Company and the Selling Stockholders and the resale by the Underwriters of such
Common Stock to the public. Copies of the Registration Statement, as initially filed
with the SEC, and the form of Underwriting Agreement are enclosed with this letter.

The Registration Statement and the Underwriting Agreement contemplate that
shares of Common Stock will be offered by the Underwriters to the public, with a
portion of such shares to be purchased by the Underwriters from the Company and a
portion of such shares to be purchased by the Underwriters from the Selling
Stockholders. The Registration Statement and the Underwriting Agreement also
provide that the Underwriters shall have the option to purchase additional shares
from the Company and certain Selling Stockholders to cover over-allotments in the
offering of the shares to the public. The number of shares proposed to be purchased

WASHINGTON, DC                    BOSTON, MA                    LONDON, UK*

HALE AND DORR LLP INCLUDES PROFESSIONAL CORPORATIONS
*HOMECE HALE AND DORR INTERNATIONAL (AN INDEPENDENT JOINT VENTURE LAW FIRM)

Selling Stockholders of
Cornerstone Brands, Inc.
Page 2

from you is set forth on Schedule I to the enclosed Power of Attorney.

    The price at which the shares of Common Stock of the Company covered by the Registration Statement (the "Shares") will be offered to the public, the percentage of the public offering price allocated to the underwriting discounts and commissions, and the price at which the Shares will be purchased from the Company and the Selling Stockholders (which will be equal to the public offering price less the underwriting discounts and commissions) have not yet been determined. These prices will be negotiated among the Company and the representatives of the Underwriters after the Registration Statement is declared effective, which is currently expected to occur in early November 1998. The closing of the public offering (at which the Underwriters will pay the Company and the Selling Stockholders for the Shares being purchased from them) should occur approximately one week after the pricing of the offering. It should be kept in mind that the public offering is conditioned upon favorable market conditions and certain other contingencies.

Documents Enclosed

    In addition to the Registration Statement and form of Underwriting Agreement, the following documents are enclosed with this letter:

    1.    Irrevocable Power of Attorney (the "Power of Attorney") (3 copies)

    2.    Custody Agreement (3 copies)

    3.    Selling Stockholders Questionnaire (1 copy)

    4.    Form W-9 (Payer's Request for Taxpayer Identification Number and Certification) (1 copy)

Power of Attorney

    The Power of Attorney authorizes William T. End and Donald J. Steiner to act on your behalf in connection with the sale of the Shares to be sold by you to the Underwriters. The number of shares to be sold by you is set forth on Schedule I to the Power of Attorney. Among the acts which the Power of Attorney specifically authorizes Messrs. End and Steiner to undertake are (i) the execution of the Underwriting Agreement on your behalf, (ii) the delivery pursuant to the Underwriting Agreement of the Common Stock being sold by you, (iii) the execution and delivery of any and all such documents and the taking of all such actions which the Attorneys deem necessary or desirable to effect the sale of Common Stock by you. Because you will be a party to, and bound by, the terms of the Underwriting Agreement, please review the enclosed draft carefully — particularly Section 1B (which contains representations and warranties by you) and Section 8 (in which you

Selling Stockholders of
Cornerstone Brands, Inc.
Page 3

agree to indemnify the Underwriters against certain liabilities, subject to the limitations in that Section ) — before executing the Power of Attorney.

To properly execute and deliver the Power of Attorney, please:

1.    Date and sign the Power of Attorney on page 10. The Power of Attorney should be signed in exactly the same manner as your share certificates are registered.  If the Power of Attorney is being signed on behalf of a corporation, partnership or in any other representative capacity, please indicate the name and title or capacity of the individual signing.

2.    Have your signature or signatures on page 10 guaranteed by a commercial bank or trust company or by a member firm of a registered national securities exchange or of the National Association of Securities Dealers, Inc.

Custody Agreement

The Custody Agreement authorizes the Company to act as custodian for the shares being sold by you, in order to expedite their delivery to the Underwriters at the closing of the public offering.  To properly execute and deliver the Custody Agreement, please:

1.    Date and sign the Custody Agreement and complete your address on page 6. The Custody Agreement should be signed in exactly the same manner as your share certificates are registered.  If the Custody Agreement is being signed on behalf of a corporation, partnership or in any other representative capacity, please indicate the name and title or capacity of the individual signing.

2.    If you are married, have your spouse execute the Spousal Consent on page 7.

3.    Complete the information in Schedule I, page 8 under the heading "Certificates Deposited."

4.    Enclose with the Custody Agreement the stock certificate(s) you have indicated on page 8. For the stock certificate(s), please either (i) complete and sign (in the same manner as you sign the Custody Agreement) the form of assignment on the reverse side thereof, or (ii) sign, in the same manner, a stock power, which may be in the form of Schedule II on page 9.  DO NOT date the stock power or fill in the number of shares.

5.    Have your signature or signatures (i) on page 7 of the Custody Agreement and (ii) on the stock assignment on the reverse of the certificate or the accompanying stock power, guaranteed by a commercial bank or trust company or

Selling Stockholders of
Cornerstone Brands, Inc.
Page 4

by a member firm of a registered national securities exchange or of the National
Association of Securities Dealers, Inc.

6.      Indicate in Schedule III on page 10 how you wish to receive payment
for your shares which are sold in the public offering.

Selling Stockholders Questionnaire

The enclosed Questionnaire requests information that must be included in the
Registration Statement concerning you, your ownership of Common Stock of the
Company and your relationship with the Company. Please complete this
Questionnaire.

Form W-9

The Form W-9 is intended to document the Underwriters' compliance with
federal tax withholding requirements. Please complete this in accordance with the
accompanying instructions.

Legal Opinion

Each Selling Stockholder must provide to the Underwriters an opinion of
counsel covering the matters set forth on Exhibit B to the Underwriting Agreement.
This opinion will have to be executed and delivered to the Underwriters at the
closing of the initial public offering and, if you sell Shares to the Underwriters
pursuant to the exercise of the over-allotment option, at the over-allotment closing.
Pleae return a draft of this opinion from your counsel along with the other enclosed
materials.

Return of Documents

The following documents should be completed by you, in accordance with the
instructions contained in this letter, and returned to the undersigned, by **Friday,
September 25, 1998.**

1.      Power of Attorney (3 copies)

2.      Custody Agreement (3 copies), along with stock certificates, endorsed on
the back or accompanied by a duly executed stock power

3.      Selling Stockholders Questionnaire (1 copy)

4.      Form W-9 (1 copy)

Selling Stockholders of
Cornerstone Brands, Inc.
Page 5

    5.    Draft opinion of counsel (1 copy)

    Please send these documents via courier or overnight mail to ensure safe and timely delivery.

    Please do not hesitate to call me with any questions you may have regarding the enclosed materials.

Very truly yours,

Steven D. Barrett

PJR:fm
Enclosures

cc:    William T. End
        Donald J. Steiner
        Keith F. Higgins, Esq.
        Patrick J. Rondeau, Esq.



# EXHIBIT / ATTACHMENT

## 10

(To be scanned in place of tab)


**Lead the Evolution.**

## .e Ones to Watch

Diane Cyr

**Catalog Age, Jun 1, 1998**

For more than 100 years, cataloging has been an upstart business. But by 2001, look for the big boys to be taking over. And as you'd expect, the people who'll be leading this bigger, grown-up industry won't be kids with hot ideas just out of business school. By and large, they'll be experienced, seasoned executives with a common quest: to build big companies, carefully but aggressively, one solid catalog at a time.

Among those listed here, few are gamblers. Almost all are acquisition-minded and old hands, having led, built, or rescued other catalogs. And all have strong, optimistic growth goals.

In fact, most of these names are pretty familiar. They're proven not only at surviving a tougher catalog industry, but at thriving as well. "The number of catalogs that make it from one year to the next, and continue to grow, are clearly in the distinct minority," says David Leibowitz, managing director of Burnham Securities. Well, if this bunch doesn't make it, maybe nobody can. The year 2001 is only three years away, but as Leibowitz points out, "three years is an awfully long time" in the catalog world. Stay tuned.

THE ONE TO BEAT Dennis Pence, cofounder/CEO, Coldwater Creek

    npany founded: 1984. Publicly traded since 1997.

Catalogs: gifts and apparel book Northcountry, apparel titles Spirit of the West and Milepost Four, linens book Bed & Bath

Key manager: Ann Pence, creative director

1997 sales: $246.7 million

1997 earnings: $11.7 million

1996 sales: $143 million

1996 earnings: $5.9 million

Growth rate: 66% annually since 1992

House file: 1.65 million 12-month buyers

Track record: American dream. Dennis Pence was a national marketing manager for Sony, Ann Pence a freelance ad copywriter when they decided to chuck it all and move to Sandpoint, ID.

    ay a leader: In a tough, oversold casual apparel market, Pence managed to give serious chase to L.L. Bean and Lands' End. To raise capital, Pence could have sold the company. Instead, he bet on himself, going public and making a killing.

What they say: "I think the catalog is a real star."-consultant Don Libey

"Ultimately, by segmenting its customer file and seeing product opportunity, Pence has created a tremendously successful catalog."-Craig Battle, managing director, Tucker Capital

Prospects: Although Coldwater stumbled a bit this spring, most believe that in timing, marketing, and product selection, Pence has struck gold.

(YOUNG) OLD HAND Mike Smith, president/CEO, Lands' End

CEO since: 1994

Company founded: 1963. Publicly traded since 1986.

Catalogs: apparel catalogs Lands' End, Kids, Beyond Buttondowns (tailored men's clothing), First Person Singular (tailored women's clothing), and Willis & Geiger (adventure wear); linens book Coming Home

Key managers: Gary Comer, founder/chairman; Bradley Johnson, chief financial officer; Chip Orum, chief operating officer; Mary Nordloh, creative director; Francis Schaecher, senior vice president, operations; William Ferry, vice chairman, sales

1997 sales: $1.26 billion

1997 earnings: $64.2 million

1996 sales: $1.12 billion

1996 earnings: $51 million

Growth rate: Sales up 9% during Smith's watch; earnings up 21%

House file: 9.6 million 36-month buyers

Track record: Smith, just 37, had already spent 14 years at Lands' End and led the successful Coming Home launch before being appointed to top post.

Why a leader: Nobody does it better than Lands' End. Under Smith's leadership, the catalog has continued its innovative marketing strategies and strong intuition for product, which is all layered over enormous brand equity. The cataloger is now opening up serious overseas potential in Japan, the U.K., and Germany.

What they say: "Everyone will still be chasing Lands' End in 2001. It is very, very strong and will be getting stronger. The children's book started at zip and right now is a category killer. The company plans extremely well: It does five-year plans and gets through them in four years."-AnonymousP rospects: Lands' End is continually surprising in its marketing prowess. If Smith keeps the cataloger on course, it will likely only get stronger.

THE BUDDING BUILDER Bob Ostertag, CEO, Foster & Gallagher

CEO since: 1996 (handpicked by the company cofounder Tom Foster, who died in 1996)

Company founded: 1952, by Foster and Helen Gallagher

Catalogs: 20, including flower and plant books Michigan Bulb, Spring Hill Nurseries, Breck's, and Stark Brothers (fruit trees); food gifts catalogs Popcorn Factory and Mauna Loa (macadamia nuts); children's products books Childcraft, Learn & Play, HearthSong, and Magic Cabin Dolls; and home and gift catalogs Home Marketplace, Personal Comforts, and Walter Drake

Key managers: Bob Pellegrino, vice chairman; Mel Regal, chairman; Jon Elletson, chief financial officer

1997 sales: $480 million

Current earnings: "highly profitable," according to Ostertag

1996 sales: $376 million

 ͟ ͟ ͟wth rate: 125% over past four years

Expected sales for 2001: $1 billion-plus, through growth, acquisitions, and new business

House file: more than 5 million

Track record: Ostertag's long resume includes stints as chief operating officer of Childcraft, chief administrative director of multititle mailer Hanover Direct, and corporate controller of mail order firm Gardenway.

Why a leader: Turned around moribund Michigan Bulb when hired as catalog president in 1992. Then organized Foster & Gallagher into five business groups: Michigan Bulb, Spring Hill, Children's, Gift, and Corporate Business Services. Magic business touch in improving fulfillment and marketing translated into higher profits and stronger platform companywide, setting stage for acquisitions and new catalog initiatives.

What they say: "Ostertag has worked miracles. Michigan Bulb was a borderline company, and he turned that around so quickly it amazed us. He has done a good job of organizing the whole company so that it's had a tremendous increase in profits and sales. I don't know anyone who has done so much to a leading company to increase its profitability and sales volume."-consultant Dick Hodgson, who also sits on F&G's board

"Foster & Gallagher continues to thrive. It will remain very profitable and will make carefully thought- through acquisitions and may by 2001 have gone public."-consultant John Lenser

 ͟spects: Under Ostertag, solid, diversified company could prove good home to undermanaged acquisitions. Ostertag is less publicity-shy than the late Foster: Can you spell IPO?

THE CONSOLIDATOR KINGS Don Steiner (below left), founder, and Bill End (below right), chairman/CEO, The International Cornerstone Group

Company founded: 1993

Catalogs: Travelsmith (travel accessories); Frontgate, Ballard Designs, and Whispering Pines (home accessories and furnishings); The Territory Ahead (apparel); and Garnet Hill (natural fibers products)

Key managers: Mark Fasold, chief financial officer; John O'Steen, president, fulfillment, database and operations; Pau Targen, president/CEO, Frontgate

1997 sales: $200 million-plus

1997 earnings: "Nicely profitable, at or above industry standards," Steiner claims.

1996 sales: Less than $100 million (Travelsmith and Frontgate only)

Growth rate: Besides growth through acquisitions, each catalog is growing 25%-50% annually

 ͟pected sales in 2001: By some industry estimates, $1 billion-plus including potential acquisitions

House file: 3.5 million active buyers

Track record: Distinction galore. End, who came on in 1995, had been CEO of Lands' End and marketing chief at L.I

Bean; Steiner spent 12 years at Boston Capital Ventures, managing $100 million in assets.

Why leaders: As heads of the premier consolidation group with a brief, impressive history of buying quality brands with complementary customer databases and growth potential, Steiner and End make sure that Cornerstone adds the right amount of value (economies of scale in operations and database) while keeping hands off management. In short, e guys have goodeyes and deep pockets, and if it ain't broke, they don't fix it. What they say: Thanks to its key ...ders, "Cornerstone is positioned very, very well with very strong properties. It would be right up there with the best."-Lenser

"It has a collection of some of the best brand names, and I think brand names are going to be increasingly important."-Battle

"It has six good companies, significant in size and with complementary databases and excellent management. Cornerstone will be the king of consolidators."-Bill Nicolai, senior vice president, marketing, The Good Catalog Co.

Prospects: With a recent $60 million equity infusion and proven ability to spend money wisely, these are the guys to watch and emulate.

THE GIFTS & GAMES GURU Coy Clement, CEO, The Paragon

CEO since: January 1997

Company founded: 1971

Catalogs: gifts catalog The Paragon and puzzles catalog Bits & Pieces (acquired at the end of 1997)

Key manager: Stephen Rowley, president

)7 sales: approaching $60 million

1997 earnings: n/a

1996 sales: about $40 million

Growth rate: 50% on Clement's brief watch

Expected sales for 2001: $150 million-$200 million

House file: 1 million 12-month buyers

Track record: Clement's long career includes stints as marketing director of kits cataloger Heathkit, vice president of furniture catalog Yield House and outdoor apparel mailer Eddie Bauer, and president of tool and kits catalog Leichtung Workshops. Launched Improvements home products catalog; helped turn Bauer from Bean clone to casual clothing marketer.

Why a leader: Clement, in one year, has shown he knows how to expand a catalog franchise-fast. Now, using The Paragon as a platform, he is encouraging acquisitions and new business opportunities.

What they say: Clement, who convinced investment group Wand Partners to buy The Paragon with him, "understand : dynamics of the catalog business, and the add-on acquisitions [that are planned] will capitalize on The Paragon's ry, very efficient fulfillment and distribution and customer service. The investors understand the key to business is excellent management, and they've been bringing in excellent managers. The Paragon is a company you'll see branch out."-Battle

Prospects: Clement has shown that he knows how to grow a variety of new businesses. No reason he can't do the san



# EXHIBIT / ATTACHMENT

## 11

(To be scanned in place of tab)



John Berg
*Senior Managing Director*

August 20, 1998

Fred and Moria Kamgar
Robert Perkowitz
c/o Smith & Noble
1750 California #201
Corona, CA 91719

Dear Fred Kamgar, Moria Kamgar & Robert Perkowitz:

We are writing this letter to confirm our views with regard to the appropriate initial filing range for the initial public offering of International Cornerstone Group.

In the course of our analysis we conducted, along with our research analyst, significant due diligence on the Company and its respective brands. We believe Cornerstone is a premier company as it relates to its strategy, its management team and its brands and therefore will receive a premium value in the market. We have done our analysis with the understanding of a mid-to-late October offering. It is our assessment that this Company will receive a 24-26x multiple in a normal new issuance market, assuming no deterioration of the Company's business performance or prospects. As such, our valuation range, based on analyst estimates and the estimate of the weighted average shares in 1999, yields a $16-$19 filing range.

Our Commitment Committee has reviewed this analysis, and we have received their approval for this initial filing range.

Sincerely,

John A. Berg



# EXHIBIT / ATTACHMENT

## 12

(To be scanned in place of tab)



International **Cornerstone** Group

600 Atlantic Avenue Suite 2900
Boston, Massachusetts 02110
Phone 617.720.3002   Fax 617.720.3008

June 8, 1998

Oscar Lee Wiseley, Jr , Esq.
The Bowden Law Firm
191 Peachtree Street, N.E , Suite 849
Atlanta, GA 30303-1747

Dear Mr. Wiseley:

Enclosed are the documents you requested: Cornerstone's audited financial statements for 1996, 1997 and 1998 and our Stockholder and Registration agreements with amendments

I hope the following data points will help you:

- Cornerstone had a $57 million Private Placement in late 1995 and early 1996. For the Private Placement, Cornerstone Preferred shares were sold for $4.55 per share.

- Just prior to the Ballard transaction, Cornerstone shares were being issued at $6.00 per share

- At the time we acquired the Garnet Hill catalog in July 1997 Cornerstone shares were being issued at $8.00 per share.

- At our most recent board meeting in May 1998 our directors voted to raise the price per Cornerstone share to $9.00

As I mentioned in our conversation, we used a range of $6.00 to $8.00 per Cornerstone share to determine the number of shares for the Ballard transaction  Please feel free to call me if you have further questions

Regards,

*Don Steiner*

Donald J. Steiner



# EXHIBIT / ATTACHMENT

## 13

(To be scanned in place of tab)

Estate of Gladney Heazel v. United States of America

**POTENTIAL COMPARABLES - BUSINESS DESCRIPTIONS**

| Company | | Business Activities |
|---------|---|---------------------|
| Brylane, Inc. | (1) | Brylane, Inc. focuses on value-priced apparel for both regular and special-sized individuals. The Company focuses on value-oriented clothing, with a wide array of sizes and styles but minimal fashion risk. Catalog titles include Chadwick's, Lane Bryant, Roaman's, Lerner, and KingSize. In 1998, the Company was discontinuing the Sue Brett catalog and terminating its relationship with the Sears Classics catalog. Brylane views the use of promotions and private label credit cards as important marketing tools. The Company considers discounters such as Marshalls and J.C. Penney as main competitors. |
| Coldwater Creek, Inc. | (2) | Coldwater Creek markets its apparel and home furnishings to middle and upper income households through four catalogs and catalog-theme retail stores. The Northcountry catalog includes casual apparel, jewelry, artwork and gift items. Spirit of the West features upscale apparel, jewelry, and accessories. Milepost Four features upscale men's clothing. The Company also has a Bed & Bath catalog that features high-end linens, sleepwear, and decorative bath accessories. Coldwater Creek specifically targets affluent, well-educated consumers with interests in areas such as gourmet cooking and the arts. |
| DM Management Co | (3) | DM Management markets women's apparel, accessories, shoes and gifts to active women through two distinct catalogs. J. Jill offers simple, comfortable clothing while Nicole Summers offers updated versions of traditional styles. The Company focuses on providing its customers with a complete ensemble by pairing clothing with shoes and accessories. Although the majority of items featured in the J. Jill catalog are private label, only 29% of Nicole Summers items were private label in fiscal 1997. These two catalogs are designed to appeal to active women age 35 and older. |
| Lands' End, Inc. | (4) | Lands' End offers traditionally styled men's, women's, and children's clothing, accessories, shoes, domestics, and soft luggage through its retail catalogs. Titles include Kids, Coming Home, Beyond Buttondowns, and First Person Singular. The Company also owns the Willis & Geiger trademark to appeal to outdoor enthusiasts. Lands' End strives to provide products of exceptional quality at prices representing honest value. The company targets well-educated, middle to upper income consumers age 35-54. |
| Lillian Vernon Corp | (5) | Lillian Vernon catalogs feature gift, household, Christmas, and children's products. The Company strives to provide reasonably-priced items to its customers through a variety of titles. Catalog selections include Lilly's Kids, Christmas Memories, Favorites, Personalized Gift, Kitchen, and Neat Ideas For An Organized Life. These catalogs seek to differentiate their products from those of competitors by design, price, or personalization. |
| Williams-Sonoma, Inc. | (6) | Williams-Sonoma sells high quality cooking equipment, home furnishings and accessories, and garden accessories. The Company offers these products through its namesake stores and catalog, the Pottery Barn, Hold Everything, Gardeners Eden and Chambers titles. According to Catalog Age magazine, the Company targets affluent, educated households interested in gourmet cooking and entertaining. |

Sources:
(1) Brylane, Inc. 10-K for Fiscal Year Ended January 31, 1998
(2) Coldwater Creek, Inc. 10-K for Fiscal Year Ended February 28, 1998
(3) DM Management Co. 10-K for Fiscal Year Ended December 31, 1997
(4) Lands' End 10-K for Fiscal Year Ended January 30, 1998
(5) Lillian Vernon Corp. 10-K for Fiscal Year Ended February 28, 1998
(6) Williams-Sonoma, Inc. 10-K for Fiscal Year Ended February 1, 1998

Confidential



# EXHIBIT / ATTACHMENT

## 14

(To be scanned in place of tab)

Estate of Gladney Heazel v. United States of America

Determination of Implied Price per Share - February 16, 1998

## GUIDELINE COMPANY APPROACH

|  | Price/Sales | Price/EBITDA |
|---|---|---|
| Cornerstone Value | $280,349,913 | $173,111,455 |
| Number of Shares Outstanding | 25,844,133 | 25,844,133 |
| Implied Price per Share | $10.85 | $6.70 |

Confidential

Estate of Gladney Heazel v. United States of America

Determination of Cornerstone Value

## GUIDELINE COMPANY APPROACH

| | Price/Sales | Price/EBITDA |
|---|---|---|
| Peer Group Comparable Company Multiple | 1.34 | 13.79 |
| Cornerstone Financial Data | $209,216,353 | $12,553,405 |
| **Cornerstone Value** | **$280,349,913** | **$173,111,455** |

Confidential

Estate of Gladney Heazel v. United States of America

Determination of Peer Group Equity Price Multiples

## GUIDELINE COMPANY APPROACH

|  | Coldwater Creek Inc. (1) | Lands' End, Inc. (2) | Williams Sonoma Inc. (3) | Average |
|---|---|---|---|---|
| Stock Price (2/13/98) (4) | $37.6875 | $41.8438 | $46.0625 | |
| Shares Outstanding (5) | 10.12 | 31.03 | 25.83 | |
| Market Value (5) | $381.40 | $1,298.41 | $1,189.79 | |
| | | | | |
| TTM Sales (5) | $222.98 | $1,263.63 | $933.26 | |
| TTM EBITDA (5) | $20.78 | $113.69 | $102.68 | |
| | | | | |
| Price/Sales | 1.71 | 1.03 | 1.27 | 1.34 |
| Price/EBITDA | 18.35 | 11.42 | 11.59 | 13.79 |

**Notes:**

Data per company 10-Q, 10-K, and Bloomberg.

(1) TTM Sales, TTM EBITDA, and Shares Oustanding data as of November 29, 1997

(2) TTM Sales, TTM EBITDA and TTM Sales and TTM EBITDA data as of fiscal year end January 30, 1998.

(3) Shares Oustanding data as of December 12, 1997.  TTM Sales and TTM EBITDA as of fiscal year end February 1, 1998.

(4) February 16, 1998, was a national holiday.  Therefore, no trading occurred.

(5) Figures in millions.

Confidential

Estate of Gladney Heazel v. United States of America

Cornerstone Income Statement

**GUIDELINE COMPANY APPROACH**

| | 1/31/98 (1) | 1/25/97 (1) | Pro Forma 1/31/98 (2) |
|---|---|---|---|
| Net Sales | $185,421,881 | $72,907,137 | $209,216,353 |
| Cost of Sales | 94,433,774 | 36,765,975 | 106,840,149 |
| | | | |
| Gross Profit | 90,988,107 | 36,141,162 | 102,376,204 |
| | | | |
| Operating Expenses | | | |
| Selling, Catalog, and Fulfillment Expenses | 71,643,040 | 27,535,962 | 80,759,627 |
| General and Administrative | 11,912,237 | 4,881,435 | 14,157,025 |
| Amortization and Depreciation | 3,394,523 | 1,359,132 | 4,169,064 |
| Restructuring Charge | 943,000 | 0 | 943,000 |
| | | | |
| Total Operating Expenses | 87,892,800 | 33,776,529 | 100,028,716 |
| | | | |
| Operating Income | 3,095,307 | 2,364,633 | 2,347,488 |
| | | | |
| Other Income (Expense) | | | |
| Other Income | 2,874,358 | 1,044,730 | 3,009,712 |
| Interest Income | 568,021 | 890,390 | 568,021 |
| Interest Expense | (946,783) | (438,216) | (946,783) |
| Total Other Income (Expense) | 2,495,596 | 1,496,904 | 2,630,950 |
| | | | |
| Income Before Equity in Net Income of Affiliate, Minority Interest and Income Taxes | 5,590,903 | 3,861,537 | 4,978,438 |
| | | | |
| Equity in Net Income of Affiliate | 1,808,942 | 0 | 1,808,942 |
| Minority Interest | 275,199 | (315,121) | 275,199 |
| | | | |
| Income Before Income Taxes | 7,675,044 | 3,546,416 | 7,062,579 |
| | | | |
| Income Taxes | 3,103,038 | 1,149,999 | 2,972,408 |
| | | | |
| Net Income | $4,572,006 | $2,396,417 | $4,090,171 |

**Notes:**

(1) The International Cornerstone Group, Inc. Consolidated Financial Statements for the Years Ended January 31, 1998 and January 25, 1997.

(2) Assumes the Garnet Hill, The Territory Ahead, and Whispering Pines acquisitions were completed at the beginning of fiscal year 1997.
  Adjustment made to represent a full twelve months of Company financials.

Confidential



# EXHIBIT / ATTACHMENT

## 15

(To be scanned in place of tab)

Estate of Gladney Heazel v. United States of America

Determination of Trade Activity During Week of February 13, 1998

## GUIDELINE COMPANY APPROACH

| | Coldwater Creek, Inc. | Lands' End, Inc. | Williams Sonoma, Inc. | Average |
|---|---|---|---|---|
| Shares traded on 2/13/98 | 14,600 | 62,000 | 88,000 | |
| Shares traded on 2/12/98 | 50,100 | 47,800 | 159,200 | |
| Shares traded on 2/11/98 | 7,700 | 44,800 | 175,100 | |
| Shares traded on 2/10/98 | 32,200 | 58,600 | 113,700 | |
| Shares traded on 2/9/98 | 33,500 | 37,800 | 323,600 | |
| Total shares traded | 138,100 | 251,000 | 859,600 | |
| | | | | |
| Shares Outstanding (1) | 10,120,000 | 31,030,000 | 25,830,000 | |
| | | | | |
| Percent of Shares Outstanding | 1.36% | 0.81% | 3.33% | 1.83% |

Note:
(1) Shares outstanding as of the last quarter prior to date of valuation.

Confidential



# EXHIBIT / ATTACHMENT

_/6_

(To be scanned in place of tab)

# THE INTERNATIONAL CORNERSTONE GROUP, INC.

## ACQUISITION OF GARNET HILL, INC.

July 28, 1997

The International
Cornerstone Group, Inc.

L

international **Cornerstone** Group

June 20, 1997

Garnet Hill, Inc.
PO Box 262
Franconia, NH 03580

Gentlemen:

This Letter of Intent sets forth the terms upon which The International Cornerstone Group, Inc. a Delaware corporation ("Cornerstone"), proposes to acquire all of the outstanding stock of Garnet Hill, Inc. a New Hampshire corporation ("GH").

1.      Structure of the Transaction.  Cornerstone will purchase all of the outstanding shares of capital stock of GH in a transaction structured as a stock purchase (provided that Cornerstone may elect to structure the acquisition as a merger if that would provide Cornerstone with tax benefits without resulting in any adverse tax consequences to the GH stockholders) (the "Transaction").

2.      Purchase Price.  The purchase price to paid for the capital stock of GH will be $38 million, consisting of (a) $32 million in cash and (b) $6 million in Cornerstone common stock (comprised of 750,000 shares valued at $8.00 per share). It is understood that, as a condition to the closing of the Transaction, (a) Cornerstone will perform its own "due diligence" to satisfy itself as to the condition of GH's balance sheet as of the closing and the projected net worth of GH as of the closing (without regard to any adjustments that may be required by the structure of the transaction referred to in Section 5 below) and (b) GH will perform its own "due diligence" to satisfy itself as to the $8.00 per share valuation of the Cornerstone common stock.

3.      Stock Options.  Cornerstone will establish an employee stock option pool under which stock options with an aggregate value of $1.3 million will be granted to GH employees (including Jim Hamblin and Brad Williams, who may be allocated up to 50% of such option pool, as determined by the Board of Directors) over the five-year period following the closing of the Transaction.  It is the intention of Cornerstone that stock options representing up to 25% of such value be granted during the first year following the closing of the Transaction.  Such stock options will have an exercise price equal to the then fair market value of the Cornerstone common

sent by:   THECORNERSTONEGROUP   ↳ /202308          01/21/97  3:38PM   ⊃ 560        Page 4:5

International **Cornerstone** Group

August 9, 1996

Mr Ray Weeks
Ballard Designs
4497 Park Drive
Nacross, Georgia  30093

Dear Ray

In order to consider a potential business transaction together, we will need to exchange certain confidential, proprietary information (both orally and in writing) regarding our companies. This Confidential Information may include financial statements, capital structure, operating performance and growth plans in the form of memoranda, notes, analyses, reports, compilations or studies

The International Cornerstone Group ("Cornerstone") agrees to use the Confidential Information received from Ballard Designs ("the Company") only for the purposes of evaluating a potential transaction or investment in the Company. Likewise, the Company agrees to use the Confidential Information provided by Cornerstone only for the purposes of evaluating a potential transaction or investment in the Company by Cornerstone

Information will not be deemed Confidential Information to the extent recipient can establish that such information: (i) was already available to, or in the possession of, recipient prior to its disclosure by, or at the direction of, the Company or Cornerstone, (ii) is or becomes available in the public domain on or after the date hereof (other than as a result of a disclosure by the recipient or any of its advisors), or (iii) is acquired from a person other than a person who is known (or who reasonably should have been known) by recipient to be in breach of an obligation of confidentiality to the Company or Cornerstone at or prior to recipient's receipt of such information

Cornerstone may be involved in discussions of potential transactions with other companies whose products and customers may overlap with those of the Company. Likewise, the Company may be involved in discussions of potential transactions with strategic or financial partners who may be competitors of Cornerstone. Cornerstone and the Company both agree not to disclose to these competitors any Confidential Information or the fact that discussions are taking place concerning a potential transaction between Cornerstone and the Company.

Page 2 Confidentiality

Both Cornerstone and the Company may be evaluating other relationships as well as internal new business development opportunities, line extensions and or new catalog titles. Neither the Company nor Cornerstone will provide to the other Confidential Information deemed highly sensitive and competitive unless or until such time as we execute a letter of intent

Both Cornerstone and the Company agree not to disclose to anyone who is not a partner, director, officer, or legal advisor of Cornerstone or the Company the fact that discussions are taking place concerning a potential transaction between Cornerstone and the Company  The Cornerstone Group and the Company agree to limit the distribution of the Confidential Information to those partners, directors, officers and legal advisors whom they reasonably determine need to know such information.  Cornerstone and the Company agree that all parties who receive Confidential Information under this agreement will be informed of the nature of the Confidential Information and shall be required to treat the information accordingly.

All Confidential Information (including copies) exchanged between Cornerstone and the Company will be destroyed or returned upon written request by either company.

Very truly yours,

THE INTERNATIONAL CORNERSTONE GROUP

Donald J. Steiner, Managing Director

Agreed to and Accepted by

_____

By:_____
Its:_____
Date:_____

Confidentiality Revision 6/13/96





# EXHIBIT / ATTACHMENT

_17_

(To be scanned in place of tab)

Estate of Gladney Heazel v. United States of America

**STOCK MARKET APPRECIATION PERCENT FROM 03/31/97 TO 02/13/98**

| | 03/31/97 | 02/13/98 | Percent Appreciated |
|---|---|---|---|
| Coldwater Creek, Inc. (1) | $13.875 | $37.250 | 168% |
| Williams Sonoma, Inc. (1) | $28.750 | $45.875 | 60% |
| Lands' End, Inc. (1) | $26.500 | $41.688 | 57% |
| NASDAQ Composite Index | 1,221.70 | 1,710.42 | 40% |
| Dow Jones Industrial Index | 6,583.48 | 8,370.10 | 27% |

**Note:**
(1) Price per share.

Confidential



# EXHIBIT / ATTACHMENT

_18_

(To be scanned in place of tab)



## FRANCIS X. BURNS, MANAGING DIRECTOR

### CONSULTING EXPERIENCE

Francis X. Burns is a Managing Director with InteCap, Inc. His practice is focused on the valuation of business interests and intangible assets for purposes of estate planning, tax litigation, shareholder disputes and licensing negotiations.

Mr. Burns works with business owners and individual entrepreneurs to assess the fair market value of their company stock and/or the economic value of specific patents and trademarks. He has also conducted numerous appraisals of investment holding companies and limited partnerships. His consulting experience has encompassed a wide variety of industries in the manufacturing, consumer products and financial services sectors. He has analyzed the economic determinants of value in numerous markets, including computer components, drug delivery systems, medical devices, professional health practices, fast-food restaurant franchises, optics technology, pharmaceuticals, telecommunications and heavy equipment manufacturing.

Mr. Burns has been retained to value both minority and controlling stock interests, and has addressed the issues of minority interest discounts, control premiums and lack of marketability discounts. He has authored valuation reports for use in the arbitration of shareholder disputes, joint venture negotiations, estate planning, as well as in response to estate tax litigation. Mr. Burns has testified as a valuation expert in U.S. Tax Court on behalf of both taxpayers and the Internal Revenue Service.

### EDUCATIONAL BACKGROUND AND SELECTED AFFILIATIONS

- M.B.A., Finance and Economics, Kellogg Graduate School of Management, Northwestern University - 1986

- B.A., Political Science, Stanford University - 1982

- Business Valuation Association

- Institute of Business Appraisers

- American Society of Appraisers - Candidate Member

### OTHER INFORMATION

- More than 15 years experience as a consultant on valuation and litigation assignments

- Provided expert testimony in over 20 matters before Federal, State and U.S. Tax Court

- Co-author of chapter in the *Transfer Pricing Handbook* (1995) titled "Intangible Asset Valuation and Royalty Rates"

# INTECAP

## FRANCIS X. BURNS, MANAGING DIRECTOR

### PREVIOUS TESTIMONY

- *NBC Fifth Realty Corp. v. Petco Animal Supplies, Inc.*, U.S. District Court for the Northern District of Illinois. Deposition testimony, April 2003.

- *Estate of Gore v. Commissioner of Internal Revenue*, United States Tax Court. Trial testimony, March 2003; Oklahoma City, Oklahoma.

- *Estate of Deputy v. Commissioner of Internal Revenue*, United States Tax Court. Trial testimony, June 2002; Chicago, Illinois.

- *Peracchio v. Commissioner of Internal Revenue*, United States Tax Court. Trial testimony, June 2002; Detroit, Michigan.

- *The John P. Ward II Revocable Trust and Orien Rose, L.L.C. v. Michael E. Coughlin and MEC Enterprises, LLC*, District Court of Johnson County, Kansas. Deposition testimony, November 2001.

- *Blain Supply, Inc., et. al., v. Cleary Gull Investment Management Services, Inc., et. al.*, Circuit Court of Rock County, Wisconsin. Deposition testimony, June 2001.

- *F.Y.I. Incorporated v. Identitech, Inc.*, U.S. District Court for the Northern District of Texas. Deposition testimony, April 2001.

- *In the Matter Between NG Acquisition, LLC and Gavin Gaskins*, American Arbitration Association. Deposition testimony, November 2000. Hearing testimony, January 2001; Nashville, Tennessee.

- *In the Matter of Independent Trust Corporation, a/k/a Intrust*, Circuit Court of Cook County, Illinois (Chancery Division). Hearing testimony, July 2000; Chicago, Illinois.

- *Estate of Jones v. Commissioner of Internal Revenue*, United States Tax Court. Trial testimony, June 2000; Dallas, Texas.

- *Commonwealth Edison Company v. Novarco, Ltd. and Xeray Systems, Inc.*, U.S. District Court for the Northern District of Illinois. Deposition testimony, April 2000.

- *Trovan, Ltd and Electronic Identification Devices, Ltd v. Pfizer, Inc.*, U.S. District Court for the Central District of California. Deposition testimony, May 1999. Trial testimony, October 1999, December 1999; Los Angeles, California.

# INTECAP

- *Knight v. Commissioner of Internal Revenue*, United States Tax Court.  Trial testimony, April 1999; San Antonio, Texas.

- *Estate of Reichardt v. Commissioner of Internal Revenue*, United States Tax Court.  Trial testimony, April 1999; San Antonio, Texas.

- *Senior Technologies, Inc. v. R.F. Technologies, Inc.*, U.S. District Court for the District of Nebraska.  Deposition testimony, March 1999, June 1999; Chicago, Illinois.  Trial testimony, June 1999; Lincoln, Nebraska.

- *S.N.A. Nut Company v. National Union Fire Insurance Company of Pittsburgh, Pennsylvania*, U.S. Bankruptcy Court for the Northern District of Illinois.  Deposition testimony, May 1998; Chicago, Illinois.

- *Richard L. Denning v. James J. Miller and Murphy & Miller, Inc.*, Circuit Court of Cook County, Illinois.  Deposition testimony, March 1998; Chicago, Illinois.

- *Thomas D. Stocks, III v. Park, L.P., et. al.*, Circuit Court of Lake County, Illinois.  Deposition testimony, June 1997; Chicago, Illinois.

- *Furman v. Commissioner of Internal Revenue*, United States Tax Court.  Trial testimony, April 1997; Tampa, Florida.

- *Estate of Jameson v. Commissioner of Internal Revenue*, United States Tax Court.  Trial testimony, November 1996; Houston, Texas.

- *J.T. Eaton & Co., Inc. v. Enforcer Products Inc.*, U.S. District Court for the Western District of Wisconsin.  Deposition testimony, February 1996.  Trial testimony, April 1996; Madison, Wisconsin.

- *J.T. Eaton & Co., Inc. v. Bell Laboratories Inc., et. al.*, U.S. District Court for the Western District of Wisconsin.  Deposition testimony, February 1996; Milwaukee, Wisconsin.

- *In the Matter of Sunbelt Clothing Company v. Commissioner of Internal Revenue*, United States Tax Court.  Deposition testimony, February 1996.  Trial testimony, March 1996; Houston, Texas.

- *In the Matter of Medieval Attractions N.V., et. al. v. Commissioner of Internal Revenue*, United States Tax Court.  Trial testimony, May 1995; San Francisco, California.

- *Maurice Keane v. Hi-Gate Erectors, Inc.*, U.S. District Court for the Northern District of Illinois.  Deposition testimony, March 1993.  Trial testimony, May 1994; Chicago, Illinois.